Mark A. Kleiman (SBN 115919)
Law Office of Mark Allen Kleiman
2907 Stanford Ave. Venice, CA 90292
Telephone: (310) 306-8094
Facsimile: (310) 306-8491
Email: mkleiman@quitam.org

Ben Gharagozli (SBN 272302)
Law Offices of Ben Gharagozli
2907 Stanford Avenue
Marina del Rey, California 90292
Telephone: (661) 607-4665
Facsimile: (855) 628-5517
Email: ben.gharagozli@gmail.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RABAB ABDULHADI,<br><br>                    Plaintiff,<br><br>          v.<br><br>BOARD OF TRUSTEES of the CALIFORNIA STATE UNIVERSITY;  LESLIE WONG; SUE V. ROSSER; JENNIFER SUMMIT; and DOES 1-10; inclusive<br><br>                    Defendants. | Case No.:  4:18-cv-04662-YGR<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

1.   Plaintiff is a Professor at San Francisco State University (hereinafter SFSU).  She alleges (1) she has been discriminated against based on her race/national origin, and her religious affiliation and who she associated with.  She also alleges that the employer-refused to make reasonable accommodations for her disabilities and has intermittently refused to even engage in the interactive process the law requires.  She further alleges that she was retaliated against in violation of 42 U.S.C. §1983, She also alleges that SFSU breached its written contract with her and misrepresented the nature of the position to induce her to leave the University of Michigan to take a job at SFSU.

**PARTIES**

2.   Plaintiff, Rabab Abdulhadi is an Associate Professor at San Francisco State University (hereafter "SFSU"), which is part of the California State University system. Plaintiff is female, Palestinian, and, as will be detailed below, suffers from a disability or disabilities, at least one of which significantly limits major life and work activities.

3.   California State University (hereafter CSU) is a governmental entity, which operates public universities throughout California, including SFSU.

4.   Defendant Board of Trustees of CSU adopts and oversees the implementation of policies throughout the entire CSU system, including SFSU.  Those policies include, *inter alia*, policies for civil rights compliance and human resources management for all the campuses.

5.   Defendant Leslie Wong, PhD., became the President of SFSU in October of 2012 and is the chief executive officer of the university.  On or about October 2, 2018, Defendant Leslie Wong announced that he would retire effective July 30, 2019.  Plaintiff reserves the right to amend the present complaint when and if the President of SFSU changes during the course of the present litigation.

6.   Defendant Sue V. Rosser, Ph.D., was Provost and Vice President for Academic Affairs at SFSU from August 2009, until October 2016.  As such she was the senior academic administrator and was the second highest ranking officer at the university.

7.   Defendant Jennifer Summit, Ph.D. served as Interim Provost at SFSU from October, 2016 until March, 2018, when she was appointed Provost.  As such she was (and is) the senior academic administrator and the second highest ranking officer at the university.

8.   The true and identity of each defendant denominated as a "Doe" is unknown to plaintiff at this time, so said defendants are sued in this capacity.  As each such defendant becomes known to Plaintiff, she shall seek leave amend this Complaint to set forth that defendant's true identity.

**JURISDICTION**

9.    Jurisdiction is proper because this action includes claims that Defendant harmed Plaintiff through discriminatory employment practices in violation of 42 U.S.C. §§ 2000e et. seq., as amended (hereafter "Title VII"), discriminated against Plaintiff in violation of 42 U.S.C. §1981, denied Plaintiff's equal rights under 42 U.S.C. §1983, and also discriminated against her in violation of 42 U.S.C. §§ 12112 et. seq. (hereinafter the "ADA")

10.   To the extent that the conduct giving rise to this action also implicates state law claims, this Court is requested to exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. §1367.

11.    None of the claims advanced in this complaint are subject to any collective bargaining agreement.

**VENUE**

12.    Venue is proper in this district under 28 U.S.C. §1391(b) because all or nearly all of the events or omissions giving rise to this action occurred in this District.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

13.    On August 2, 2017, Plaintiff received a Notice of Case Closure and Right to Sue from the California Department of Fair Employment and Housing based upon her timely filed complaint of "Discrimination Denied a good faith interview process, Denied a work environment free of discrimination and/or retaliation, Denied equal pay, Denied promotion" on the basis of her "Disability, National Origin, - including language use restrictions, Race, Religion, Sex – Gender."

14.  On November 26, 2018, Plaintiff timely submitted a Government Claim form to the Government Claims Program of the Office of Risk and Insurance Management in the California Department of General Services.

---

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. __3:18-cv-04662

## **GENERAL ALLEGATIONS**

15.   Rabab Abdulhadi is an Arab woman of Palestinian ancestry. When she was twelve years old the Israeli Army invaded and occupied her city, Nablus, and established military rule in violation of well-established international law, custom, and norms. She later came to the United States, earned her BA at Hunter College in 1994 and went on to graduate school at Yale University, earning two Master's degrees and a doctorate in Sociology, the latter being earned in 2000.

16.   From 2004-2006 Dr. Abdulhadi was the Director of the Center for Arab American Studies at the University of Michigan (Dearborn).

17.   In 2005, SFSU's Dean of the College of Ethnic Studies, Ken Monteiro,  indicated to Plaintiff that SFSU wanted to recruit her for a position as an international scholar as the position was described and presented to her by then Dean of the College of Ethnic Studies, Kenneth Monteiro.  Dean Monteiro indicated that the faculty position would involve Plaintiff leading a program of nearly a dozen senior and junior faculty members.  Plaintiff also wanted to hire three faculty members for the new program she would establish there.  In negotiations with the University she ultimately accepted its offer to fund two full-time tenure track faculty positions.  Dr. Abdulhadi also made it clear that she did not want to be burdened with administrative responsibilities for the new program, insisting on a ten-month academic contract rather than a twelve-month (year-round) administrative one.  SFSU agreed.  It was thus clear to SFSU from the outset that Dr. Abdulhadi expected to function as a senior scholar, exercising intellectual and pedagogical leadership of an international research and teaching effort.

18.   In 2006 Dr. Abdulhadi was recruited to join SFSU as a tenured Associate Professor. SFSU sent her a contractual offer in letter form signed by the then-President Robert Corrigan that included a memorandum of understanding signed by then Dean of the College of Ethnic Studies, Kenneth Monteiro, a copy of which is attached to this Amended Complaint as Exhibit "A".  The contract offer promised terms that were material to Dr. Abdulhadi's acceptance of the offer, and for which she had specifically negotiated, including, *inter alia*, a

---

1  guarantee that the University would fully fund two additional full-time faculty positions and

2  would also fund Dr. Abdulhadi's research and teaching-related international and national

3  travel.  As to faculty positions, SFSU explicitly and expressly offered in pertinent part:

4  **Additional Positions for Arab/Islamic Studies in Ethnic Studies**

5  The university will support two additional lines in the areas of Arab/Islamic

6  studies. They will first be opened as Research Associates (R.A) under your

7  supervision and then can be converted to tenure track faculty lines at a later time

8  to be determined by the academic needs as you assess them. When they are

9  converted a normal tenure track search process will be used to fill the positions

10  (see http://wvrlv.sfsu.edu/~acaffrs/faculty_nanual/3_1   1.htm?t=1).  The likely

11  R.A. salary range for these positions would be between $55,000 and $65,000

12  annually based on the credentials of the applicant and on approval of the

13  Provost. The likely Assistant Professor salary would be between $58,000 and

14  $70,000. The beginning dates for the research associates or faculty will be

15  determined by the Provost's approval after your submission of appropriate job

16  descriptions, supervisory models, accountability standards and search

17  processes for the positions. These appointments could begin as

18  early as spring 2007.

19  19.  The offer extended by SFSU and accepted by Dr. Abdulhadi called for her

20  "leadership to the development of curriculum and scholarship regarding Araba and Islamic

21  diaspora studies."  This ultimately was named by Dr. Abdulhadi the "Arab and Muslim

22  Ethnicities and Disapora Studies" program (hereafter "AMED").

23  20.  Pursuant to this contract, beginning in 2007 the University opened two lines for

24  Research Associates who were immediately hired by Dr. Abdulhadi as part of the University's

25  budget.  In 2009, Dr. Abdulhadi obtained approval at all academic and administrative levels to

26  begin the search for two tenure-track assistant professors.  The searches were advertised in

27  academic circles and publications, Dr. Abdulhadi formed and chaired a search committee,

28

1    interviews were set up for screening interviews to create the long/short list at the annual

2    meetings of the American Studies Association (ASA) and the Middle East Studies Association

3    (MESA), and a short list of candidates were about to be invited for campus interviews.

4    Although these positions were included in SFSU's approved budget for 2009, then-President

5    Corrigan canceled the searches. SFSU never reinstated them.

6         21.   Plaintiff is informed and believes and based thereon alleges that virtually all other

7    faculty searches in programs other than AMED Studies which were canceled at that time were

8    later restored. Plaintiff is further informed and believes that the positions that were promised for

9    Dr. Abdulhadi's program are almost the only ones that were never restored.

10        22.   In either 2011 or 2012, SFSU suspended the budget lines which would have

11   permitted Dr. Abdulhadi to hire research associates and lecturers.  This left her as the sole

12   faculty member in this AMED "program".

13        23.   Despite this, SFSU continued to lead Dr. Abdulhadi to believe and expect that the

14   contract would be honored and that she would be permitted to direct the hiring of two additional

15   faculty members as the MOU promised to her.  In 2015, President Wong publicly admitted that

16   the University "owed" AMED the restoration of these two positions.

17        24.   It was not until late August of 2018 that Dr. Abdulhadi learned that Provost Summit

18   was stating that Corrigan, while he was President, had repudiated the existence of the

19   contractually obligated faculty lines, and that Summit had instructed Dean Monteiro to act and

20   speak as though the lines had never existed.

21        25.   Plaintiff is informed and believes and based thereon alleges that at the time

22   Corrigan approved of and signed the contractual offer to Dr. Abdulhadi, he knowingly

23   misrepresented the kind and character of the work that was being offered to her, in violation of

24   Cal. Labor Code §970.

25        26.   False allegations of anti-Semitism is a common tactic that anti-Palestinian

26   organizations routinely, habitually and regularly use to improperly abuse, discredit, punish,

27   silence, censor, bully, intimidate, and/or harass scholars and students who advocate who

28

---

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. __3:18-cv-04662

6

advocate for justice in/ for Palestine such as Dr. Abdulhadi.  In Summer 2018, an Al-Jazeera documentary on such organizations revealed that such organizations engage in "character assassination" against such activists and academics.  The same documentary revealed that such organizations were directly connected with and received funding and other material support from the Israeli government.

27.   When President Wong first arrived on campus in 2012 he initially stated his support for the AMED program. Upon his investiture, Wong accepted an invitation to travel to Israel from the Jewish Community Relations Council (JCRC), which has a pro-Israel and anti-Palestinian bias. Information on this trip's itinerary, flights and accommodations, meetings, goals and objectives has not been made available to the university community. Upon President Wong's return from Israel he began to express notable hostility toward Professor Abdulhadi, AMED studies, and Palestinian students, accepting AMCHA's erroneous conflation of criticism of Israel with anti-Semitism. In the  fall of 2013 , the Koret Foundation[1]-funded AMCHA Initiative began loudly (and falsely) accusing Dr. Abdulhadi of anti-Semitism.[2]

28.   Shortly after the AMCHA slanders, high-ranking campus administrators themselves directed anti-Palestinian slurs at Dr. Abdulhadi.  Although President Wong was present, neither he nor any of the other administrators objected or even challenged these remarks.  Having remarks such as these condoned by the university President and other high-ranking officials effectively ratified their making.

29.   Far from censuring the anti-Palestinian remarks, President Wong enthusiastically acted on them, ordering repeated investigations into Plaintiff's international research and

---

[1]  The Koret Foundation is a Bay Area foundation which describes itself as seeking to improve the quality of life for Bay Area residents "and to supporting the vitality of the worldwide Jewish community".  The Koret Foundation, which promised a two million donation to SFSU also established a "donor directed fund" at the Jewish Community Federation of San Francisco through which it sought to funnel large sums to AMCHA undetected

[2]  The AMCHA Initiative is a pro-Israel group which released a blacklist of more than 200 Middle East Studies professors in the United States it declared to be "anti-Israel" (including Plaintiff).  It has also filed multiple complaints with the U.S. Department of Education Office for Civil Rights alleging that speech critical of Israel creates a hostile environment for Jewish students in violation of Title VI of the 1964 Civil Rights Act.  None of these complaints have ever been upheld.  AMCHA has also tried to pressure UC and CSU campuses into cancelling courses and lectures with which it disagreed.

lecturing trips, which were supported pursuant to Plaintiff's contract with SFSU. SFSU also revoked authorization for Plaintiff's 2014 research trip to Palestine even though it had already been approved.  This was followed by a campaign of harassing inquisition into Plaintiff's scholastically-related travel which continues to this day.  The ongoing harassment is the result of and evidence of continuing violations of Plaintiff's civil rights.

30.   Defendants have continued their campaign to obstruct and impede Dr. Abdulhadi's research and teaching-related travel by imposing conditions and requirements not typically imposed on other faculty members, by delaying reimbursement for approved trips, and by setting impossible deadlines, insisting that Dr. Abdulhadi respond to demands on Christmas Day, on a Saturday night, during school breaks, etc.

31.   Plaintiff is informed and believes and based thereon alleges that the objective of this campaign of discriminatory and unending harassment is to establish a work environment that is so hostile and inimical to Dr. Abdulhadi's research and academic pursuits that she either resigns her position or at least spends most of her time locked in administrative battles, thus reducing her energy, time, and effectiveness for her scholarship, to advocate for teaching, publishing and protecting her students, and engaging in service as a public intellectual.  Plaintiff is also informed and believes and based thereon alleges that the defendants engage in this campaign of discriminatory harassment which continually violates her rights in order to appease donors and influential political figures who themselves harbor biases against students and faculty who are Arabs and/or Muslims or who are members of organizations primarily composed of Arabs and/or Muslims.  This is evidenced by the following:

(A)  As recently as June 9, 2016, President Wong and Vice President Hong admitted to GUPS, whose membership is overwhelmingly Arab and Muslim they were being targeted by University officials.  Wong and Hong admitted that GUPS members were selectively prosecuted for acts undertaken by many students who were neither Arab or Muslim

1  or members of GUPS.[3]  Many of these students are enrolled in courses in AMED studies, the

2  program run by Dr. Abdulhadi.

3          (B)      Although President Wong has explicitly and repeatedly denounced as

4  "anti-Semitism" acts or speech he has viewed, or claimed to view in this fashion, he does not

5  similarly criticize anti-Arab or anti-Palestinian racism or Islamophobia by name, instead

6  offering broad generalizations about "racism" and "discrimination".

7      32.    For at least the past several years prior to the filing of this suit, despite her senior

8  status and her title as director and senior scholar in AMED Studies, Dr. Abdulhadi, a Palestinian

9  Muslim woman, was repeatedly excluded from University task forces and working groups that

10  were set up to address anti-Semitism and Islamophobia.

11      33.    Since at least October 14, 2016, in addition to direct forms of national origin

12  discrimination, SFSU has tolerated the acts of third parties that have contributed to the creation

13  and maintenance of a hostile and threatening environment for Dr. Abdulhadi.  The acts

14  tolerated have included outside organizations putting up posters that made vile and unfounded

15  accusations against her, her colleagues, and her students.  Although the posters violated SFSU

16  regulations, the university took no steps to remove them or to prevent the reoccurrence of this.

17  Similar posters have been placed on campus several times.

18      34.    The treatment to which Dr. Abdulhadi and her students have been subjected by

19  SFSU contrasts greatly with the kid-glove treatment afforded non-Muslim, non-Arab, and non-

20  Palestinian students. For example, in the fall of 2018 an avowed Nazi whose social media posts

21  have called for the murder of Muslims, Jews and immigrants, registered as a student in Dr.

22  Abdulhadi's Palestine class  Despite these  threats of bigoted violence, on information and

23

24  [3] GUPS is the General Union of Palestinian Students, GUPS is a student-run organization that has been a part of the
    SFSU community for over four decades.  It is dedicated to political and cultural awareness of Palestinian and Arab
25  culture within the San Francisco Bay Area community.  GUPS also increases awareness of the Palestinian struggle
    for liberation and justice.

26

27

28

belief,  Defendants have not removed the Nazi from campus or in any way address the danger he poses to students, faculty, and administration, or at least provided Dr. Abdulhadi and her students reasonable security and protection for this class.  This stands in sharp contrast to the 2014 treatment meted out to a Palestinian student, who was ordered out of school and suspended for a year for social media posts.

35.   Another stark contrast is the University's double standard in choosing which complaints to formally investigate.  When the Executive Director of San Francisco Hillel, an off-campus organization, complained over coffee to Vice President Hong about Hillel's purported exclusion from a student-organized event in 2017 the University immediately launched a massive and time-consuming investigation.  By contrast, in the face of Hillel's public silence about a violence-advocating Nazi student on campus, the complaints of Dr. Abdulahadi and student groups, such as Jews Against Zionism, GUPS, the Muslim Students' Association, the Muslim Women's Students Association, Movimiento Estudiantil Chicano de Aztlan, Students for Quality Education (MECHA), Ethnic Studies Students' Organization, and other groups representing students of color, went unheeded.

36.   In addition to the foregoing, Dr. Abdulhadi has been subjected to a continuous stream of discriminatory harassing conduct including, *inter alia*, abrupt and arbitrary cancellation of classes she had planned and selected qualified community scholars to teach; University republication, on the official SFSU website, of false and smearing allegations delaying replacement of her work laptop computer for several months after hers was stolen during an academic trip; preventing Dr. Abdulhadi from accepting prestigious visiting fellowships at five international and national universities; refusing to publicize academic fellowships she was awarded; moving her office without her permission (which was halted only after the faculty union intervened); insisting that she obtain insurance for a teach-in that was held in the college conference room where insurance had never been required or suggested for non-Arab, non-Muslim groups; doing nothing to protect her students who have been stalked on-line and received death threats and threats of sexual violence, and at least one whose

1   employer was contacted in an effort to get the student fired; and arbitrarily reducing the

2   amount of travel support by 13% in further violation of the contractual agreement SFSU made

3   with Dr. Abdulhadi.[4]

4       37.   The harassing conduct by high-ranking University officials including, without

5   limitation, the university President, the Provost, and the Interim Dean of the College Ethnic

6   Studies, because of Dr. Abdulhadi's race, national origin and/or religion and is cumulatively so

7   severe and/or pervasive as to constitute a hostile work environment for Dr. Abdulhadi by

8   altering the conditions of her employment.

9

10   **Associational Discrimination in Violation of**

11   **42 U.S.C. §1981 and Cal. Gov. Code . §12940**

12       38.   Throughout her time at San Francisco State University Dr. Abdulhadi has closely

13   associated with students who were Palestinians and others of Arab ancestry, as well as with

14   Muslim students.  She has also advocated for them when they felt themselves subjected to

15   discriminatory treatment.

16       39.   For example, Dr. Abdulhadi worked with and advocated for Palestinian, Arab, and

17   Muslim students:

18       a.   When they were attacked by the Administration for wanting to include a

19           nonviolent cartoon character on a mural to be displayed at the student center on

20           campus;

21       b.    When they were subjected to hate speech on campus perpetrated by outsiders;

22       c.   When they were threatened with disciplinary action in retaliation for political

23           protests; and most recently

24       d.   When the University did not even investigate it after students discovered a

25           naked man inside of the Muslim Women Students' Association's prayer room.

26

27

28

---

[4] Adjusted for inflation since the contract's inception, this is a 29% reduction in support for Dr. Abdulhadi's academic-related travel expenses.

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. __3:18-cv-04662

40.   In all the ways described elsewhere in this Complaint, Dr. Abdulhadi has been subjected to a substantial, material alteration of her working conditions so pervasive as to constitute a hostile working environment as discrimination or punishment for her association with students of Palestinian and/or Arab ancestry, and/or who were Muslim.

## **Unlawful Retaliation in Violation of 42 U.S.C. §1983**

41.   When Plaintiff was invited as an SFSU faculty member in addition to her teaching and scholarship, to serve as faculty adviser to GUPS.

42.   In 2009, GUPS and AMED co-sponsored an event to celebrate the creation of a mural on campus which honored the late Edward Said, who had been a Professor at Columbia University, had served as President of the Modern Language Association, and had been a visiting Professor at Harvard, Yale, and Johns Hopkins.

43.   In 2009 GUPS and AMED invited Omar Barghouti to speak at this event. Although Barghouti had received international acclaim he as disliked by some influential community members and SFSU donors because he advocated a nonviolent campaign to pressure the Israeli government to change some of its policies.[5]

44.   At or about the time of the commemoration event then-SFSU President Corrigan met with representatives JCRC which demanded the event be cancelled.  Very shortly thereafter Corrigan issued a statement condemning this nonviolent campaign and SFSU then cancelled the faculty search and withdrew the contractually promised faculty lines. Corrigan possessed final decision-making authority in such matters.  Plaintiff is informed and believes and based thereon alleges that these actions were ordered by Corrigan in retaliation for Dr.

---

[5]  The nonviolent campaign bears the acronym BDS and is a Palestinian-led international movement dedicated to the proposition that Palestinians deserve the same rights as everyone else.  The BDS movement seeks to achieve this by encouraging the boycott of the Israeli government and Israeli and international companies involved in human rights violations; divestment from such companies by churches, universities, and labor pension funds, and governmental sanctions, similar to those the United States and European nations applied to South Africa.  (*See* https://usacbi.org/guidelines-for-applying-the-international-academic-boycott-of-israel/ last visited January 13, 2009.  Request for Judicial Notice of this document was granted by Judge Orrick in *Mandel, et. al. v. Board of Trustees* 3:17-cv-03511 Dkt. No. 167, pp. 2-3, fn. 3.)

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. __3:18-cv-04662

1  Abdulhadi's firmness in bringing Barghouti and other speakers to the campus, and in standing

2  up for the rights of Palestinians.

3       45.   At the time Corrigan withdrew the two faculty positions SFSU had, at the

4  minimum, a policy or practice of honoring the terms of contracts it had negotiated and signed

5  with faculty members.

6       46.   When Corrigan unilaterally withdrew the contractually required faculty positions

7  for AMED it was clearly established that professors at state universities could not be subjected

8  to retaliation for the exercise of their rights of free speech under the First Amendment to the

9  United States Constitution.

10       47.   On November 7, 2013, the student group Dr. Abdulhadi advised the General

11  Union of Palestinian Students (GUPS) held a rally and event on-campus to commemorate the

12  anniversary of the Edward Said Memorial Mural.  On November 19, 2013, President Wong,

13  under pressure from outside organizations, issued a statement claiming that chalked slogans

14  and posters and the image on a sweatshirt celebrated violence and promoted anti-Semitism,

15  even though none of the slogans, posters, or images mentioned Jews or used images associated

16  with Jewishness.

17       48.   In January 2014, Dr. Abdulhadi led a research trip to Palestine that included other

18  academics, including another SFSU Professor.  Beginning in March 2014, outside pressure

19  groups complained about the trip.  In May of 2014 President Wong ordered three separate (and

20  redundant) audits into Dr. Abdulhadi's travels including a five-year audit going back to 2009

21  even though SFSU had reviewed and approved each of these trips in advance, and even though

22  Dr. Abdulhadi, who had been proclaimed by SFSU as an international scholar under the terms

23  of her contract, was entitled to take University-funded international research trips.

24       49.   Thus began a pattern of interference and harassment which continues to the

25  present.  The pattern of acts was undertaken at the direction of President Wong, who held final

26  decision-making authority at SFSU, and was so consistently executed as to constitute a

27  governmental "custom"  as defined by *Los Angeles County v. Humphries,* 562 U.S. 29, 36

28

(2010).  In violation of its own travel policies SFSU has canceled a trip it had already approved, has singled out Dr. Abdulhadi for repeated scrutiny of how she spends her authorized budget for research-related travel, has demanded justifications of her trips not asked of other faculty, and has repeated "lost" travel-related documents, delaying reimbursement and forcing Dr. Abdulhadi through the time consuming exercise of repeatedly finding and resubmitting the same paperwork.  This has had the effect of obstructing Dr. Abdulhadi from her academic and scholarly obligations, which are already unconscionably burdensome in light of SFSU's repeated refusal to provide administrative support for this officially sanctioned program despite promises to do so.  It has also forced her to personally absorb expenses of the type that SFSU had previously approved, that were simply taking too much of her time to dispute, and to pay out of pocket for a part-time administrative assistant, a position which SFSU should have made available to AMED.

50.   SFSU has denied or greatly delayed repayment for, *inter alia*, the following legitimate and contractually authorized expenses:

    a.   In 2013 SFSU refused to pay for Dr. Abdulhadi's travel to present a paper at the bi-annual conference of the Center for American Studies and Research at the American University of Beirut.  SFSU and CSU delayed authorizing the trip for so long that Dr. Abdulhadi was ultimately unable to confirm to the conference organizers that she would be able to participate and was removed from the schedule.  This resulted in reputational harm to Dr. Abdulhadi, among other damages.

    b.   In 2015 SFSU delayed authorizing payment for Dr. Abdulhadi's travel to the annual meeting of the American Studies Association, until the day the conference began, so she could not attend.  The American Studies Association is the oldest scholarly organization dedicated to the study of U.S. culture and history.  This resulted in reputational harm to Dr. Abdulhadi, among other damages.

c.  SFSU claimed that in February of 2017 Dr. Abdulhadi had "canceled" two trips she had taken to the American Studies Association's and the National Women's Studies Association's annual meetings – even though the meetings had occurred months before.  Although SFSU ultimately relented, it took over a year -of bureaucratic wrangling to wrest the contractually authorized payments from SFSU.

d.  In October of 2017 Professor Abdulhadi was refused reimbursement for part of her expenses a trip to present a paper at the acclaimed Afro Middle East Center in Johannesburg where she met privately with (then) Deputy President Cyril Ramaphosa, weeks before he became President of South Africa.

e.  SFSU also denied contractually authorized travel authorization for Dr. Abdulhadi to present a 2017 lecture on the 100th Anniversary of the Balfour Declaration at the University of London's School of Oriental and African Studies (SOAS).  SOAS is widely acknowledged as the world's leading institution for the study of Asia, Africa and the Middle East.

f.  SFSU also denied payment to Dr. Abdulhadi for part of her expenses to travel to address the French National Assembly on the 100th Anniversary of the Balfour Declaration.  Importantly, Defendants are aware that these tactics impose a substantial financial hardship upon Dr. Abdulhadi.

51.  Dr. Abdulhadi is informed and believes and based thereon alleges that Wong ordered Dean Kenneth Monteiro and possibly other officials to interfere with her travel and to initiate pointless and time-consuming audits.

52.  These instructions were issued and carried out in violation of SFSU travel policies. This was done and is still being done at a time when it was clearly established that professors at state universities could not be punished for the exercise of their rights of free speech and/or academic freedom.

53.  Dr. Abdulhadi is further informed and believes and based thereon alleges that the same directions and the same approach has led to SFSU's denial of routine reimbursement for supplies necessary for her research and teaching, including, *inter alia*, storage charges for substantial amounts of electronic data, the cost of shipping extensive research files held at SFSU to New York where she was continuing her research and writing for publication, etc.

## Further Retaliation by Excluding Dr. Abdulhadi From Key Task Forces and Working Groups, and by Seeking to Deprive Her of Authority as Director of AMED Studies

54.  In May of 2017 SFSU convened a Presidential Task Force on "Campus Climate", headed by Dr. Wong.  Although numerous faculty, students, community representatives and administrators were invited to participate, Dr. Abdulhadi was conspicuously **not** invited, nor was her input sought.

55.  In the summer of 2017, Dr. Hong established an "Ad Hoc Working Group to develop an "Equity and Social Justice Educational Outreach Plan".  Although a great many faculty members were invited, again, Dr. Abdulhadi was not invited, nor was her input sought.

56.  Similarly, in 2018, the Department Chair has repeatedly sought to sidestep Dr. Abdulhadi and deal directly with her teaching associate and doctoral student about what courses he can teach and how to arrange them.  The Department Chair has continued with this approach despite repeatedly being asked to go through Dr. Abdulhadi on these matters.

57.  Beginning with President Corrigan and continuing with President Wong, SFSU enacted policies and consistent customs to interfere with and obstruct Plaintiff's professional productivity, to deny her support regardless of the fact that it had been contractually agreed to or was otherwise required by law, and to harass her in ways large and small so as to reduce her effectiveness, all in retaliation for her exercise of her rights of freedom of speech and academic freedom.

**Disability Discrimination**

58.    Dr. Abdulhadi has disabilities which are exacerbated when Dr. Abdulhadi carries heavy objects, does extensive typing or handwriting, walks long distances, or stands for a long time.  She has been prescribed splints, anti-inflammatory injections, pain medications, and hot and cold compresses, and uses these modalities.  Surgery on her shoulder was unhelpful because she still had to carry a very heavy computer and was refused the assistance she requested and needed. These disabilities substantially limit one or more major life activities.

59.    Dr. Abdulhadi has also been diagnosed with a bilateral sensorineural hearing loss with only 48% speech understanding when background noise is present.  Her otolaryngologist has recommended that she teach online and that she is assisted with captioning for audio-visual material she uses in her work.

60.    This disability substantially limits one or more major life and work activities in that she cannot talk on the telephone without headphones, she must ask people to speak slowly when she is on the telephone or in conferences because she cannot understand them if they speak too quickly, she has to ask students and audience members to speak slowly and clearly.

61.    Dr. Abdulhadi has been diagnosed with carpal tunnel syndrome.  This disability substantially limits one or more major life and work activities in that it makes it painful for her to type, impairs her ability to sleep without wearing splints, prevents her from washing dishes, from holding a regular sized plate unless it is plastic or paper, and interferes with her ability to carry skillets or pots.  She cannot carry luggage.  It is painful for her to prepare written notes when she gives talks or lectures, and it is painful for her to take notes when she attends the talks or lectures of others.

62.    Dr. Abdulhadi has herniated discs in her spine and neck.  This disability substantially limits one or more major life activities in that she cannot stand or sit for prolonged periods.  It also interferes with her carrying her own books, class materials, or personal belongings.

63.   Dr. Abdulhadi must rely on a regiment of trigger point injections, pain medication, and analgesic patches and, when all else fails, resigns herself to working in great pain – and much more slowly and less productively than she otherwise would.

64.   Despite these disabilities, Dr. Abdulhadi is able to perform the essential functions of her job and has performed well as a professor, getting favorable reviews from the vast majority of her students and accolades and recognition from her academic peers for her scholarship and public engagement. She lectures internationally and has promoted the university and the college at international public and academic research sites. She is a valued reviewer to scholarly publications and serves on several well-respected research boards. She successfully founded the AMED Studies program and obtained university approval for students to officially declare the field as an academic Minor with 22 courses that are relevant to contemporary public concerns and are also classified as General Education courses that fulfil several university requirements in the areas of Global Perspectives, Social Justice, American Ethnic and Racial Minorities, as well as Upper- and Lower-Division in the Humanities and Social Sciences. She initiated and established the Memorandum of understanding (MOU) between SFSU and An-Najah National University in Palestine, the first and only collaborative agreement SFSU has with any Arab or Muslim research site. She founded the Edward Said Scholarship for merit and community service to SFSU graduate and undergraduate students. She takes great pride in her work and is deeply committed to her students, investing significant amounts of time and energy to mentor them and encourage their intellectual endeavors and community service inside and outside the classroom. Her students were accepted in well-regarded doctoral programs at top universities, receiving distinguished awards and shining in their fields. As a public intellectual, a service SFSU emphasizes and cherishes, Dr. Abdulhadi has brought international recognition to university and the college at public forums and intellectual research sites. She has an active research agenda with cutting edge and pioneering research projects on matters of public concerns and current relevance in the U.S. and throughout the world. Dr. Abdulhadi has also launched an active public education campaign at

AMED Studies that opens up the classroom to the community and exposes students to community-based knowledge and expertise and further allows students, scholars, and community leaders to collectively co-learn and discuss pertinent issues in a critical thinking approach of respect for diverse views and debates. The open classrooms/public events she organizes with no funding from the university are further streamed live to reach larger audiences and engage global publics, thus also promoting SFSU's rankings.

65.   As a reasonable accommodation for her hearing loss, Dr. Abdulhadi has repeatedly requested for captioning for video materials since 2013. Despite the fact that SFSU faculty are contractually expected to engage in academic research and to serve the academic and broader communities, SFSU has consistently refused to make captioning or other assistive adaptations available to Dr. Abdulhadi for her research and community service activities, insisting that they would only support her teaching (and begrudgingly at that.)  Although SFSU's Disability Programs and Resource Center approved a list of reasonable accommodations in 2013, some of the approved accommodations have not always been provided.  For example, in 2013 she was given an adaptive headset, but SFSU insisted that she return it in 2014 because she was on sabbatical, a time when she was relieved of teaching responsibilities but was supposed to work and research for publication.  Even when she returned to teaching in fall 2014, it was not replaced. Captioning for material Dr. Abdulhadi needs to use for her research has been) similarly refused.  Her request for on-line teaching where a combination of captioning and sound separation and amplification can make it more feasible for her to hear her students during class sessions has not been allowed.

66.   Similarly, SFSU has refused to permit her to teach all of her classes online even though this would help compensate for her hearing loss and for the inadequacy of SFSU's captioning arrangements.

67.   As a reasonable accommodation for her carpal tunnel syndrome  and her herniated discs Dr. Abdulhadi -requested a new lightweight computer on April 3, 2012. SFSU promptly approved the computer (via email on April 6)—and then refused to provide the computer for at

least eight months. Plaintiff is uncertain exactly when she finally got the long-awaited computer but knows that it was later than December 6, 2012, as she was still writing SFSU officials and asking about it on that date. This problem was repeated

68.   Similarly, when Dr. Abdulhadi reported in April of 2016 that her computer had been broken by Israeli soldiers at a checkpoint in Palestine in March 2016, where she was traveling for research. The computer was not replaced until August or September of 2018. Ironically, although the acting Dean of the College of Ethnic Studies knew the laptop had arrived in August 2018, and though she sent Dr. Abdulhadi numerous emails that week on many other subjects, not a single one of these emails mentioned that the laptop had arrived.

69.   As a further reasonable accommodation for her herniated discs, Dr. Abdulhadi also requested that she be assigned a classroom reasonably near to her office to reduce the distance she would have to walk with heavy books and other instructional materials.  Despite prior knowledge that Dr. Abdulhadi's condition was permanent and that this was an accommodation that would be permanently required, SFSU refuses to make this accommodation unless Dr. Abdulhadi renews her request for it at the beginning of each semester. SFSU has also insisted that as a condition of being given a nearby classroom, she would have to teach a class that began at 7 p.m., despite the university's knowledge that this would decrease student enrollment, a key performance metric used in SFSU evaluations.

70.   Despite her multiple requests, SFSU has delayed and/or failed to provide plaintiff reasonable accommodations for her disabilities. The accommodations she needs are comparatively minor and are not so costly as to make it impracticable for SFSU to accommodate Plaintiff including, but not limited to permitting Plaintiff to do online teaching, allowing her to work remotely, reducing the amount of paperwork and incessant and unnecessary emails she must respond to from SFSU administrators while refusing to provide her with assistance, furnishing her with a lightweight, portable, appropriate computer, with timely and proper captioning, other devices and medically approved accommodations, and hiring student assistants and administrative staff as promised.

**First Cause of Action for Breach of Contract Against**

**Board of Trustees of the California State University**

71.   Plaintiff repeats and repleads each allegation in Paragraphs 1-70, inclusive, as though fully alleged herein.

72.   Plaintiff entered into a valid and enforceable contract with California State University.

73.   The terms of this contract were prepared by the Dean of the College of Ethnic Studies and approved by the Provost/Vice President for Academic Affairs and the Dean of Faculty Affairs and Professional Development.

74.   The three SFSU officials had both actual and ostensible authority to agree the terms of this contract.

75.   During the contract negotiations Dr. Abdulhadi received written assurances from Dean Monteiro that President Corrigan had approved the two additional AMED faculty lines as well as the other terms specified in the contract (Exhibit A).

76.   At all times material hereto Plaintiff performed each and every one of her obligations under the contract, or alternatively any nonperformance was justified.

77.   Defendant sued in this Cause of Action breached this contract by failing and refusing to hire two additional faculty to assist Plaintiff with the AMED program.

78.   As a direct and legal result of this breach, Plaintiff has suffered economic loss in a sum to be proven at trial.

**Second Cause of Action for Violation of California Labor Code §970**

**Against Board of Trustees of California State University**

79.   Plaintiff repeats and repleads each allegation in Paragraphs 1-70, inclusive, as though fully alleged herein.

80.   Defendant's agents or officers sued in this Cause of Action influenced or persuaded Plaintiff to change from outside of the State of California to San Francisco State

1  University by means of knowingly false representations about the kind and character of the

2  work.

3      81.  The false representations about the kind and character of the work were material to

4  Plaintiff, who would not have relocated without them.

5      82.  As a direct and legal result of this breach, Plaintiff has suffered economic loss in a

6  sum to be proven at trial.

7      83.  As a direct and legal result of this breach, Plaintiff has suffered other damages to

8  her professional reputation in a sum to be proven at trial.

9      84.  As a direct and legal result of this breach, Plaintiff has suffered other damages due

10  to emotional distress and exhaustion in a sum to be proven at trial.

11

12      **Third Cause of Action for Race Discrimination in Violation of 42 §U.S.C. 1981**

13      **Against Defendants:  Board of Trustees of California State University,**

14      **Leslie Wong, Sue V. Rosser, Jennifer Summit, and Does 1-10, Inclusive**

15      85.  Plaintiff repeats and repleads each allegation in Paragraphs 1-70 as though fully set

16  forth herein.

17      86.  Dr. Abdulhadi is in a protected class because of her race, that of Palestinian-Arab.

18      87.  At all times material hereto Dr. Abdulhadi has been qualified for the employment

19  position, job responsibilities and duties she performed for SFSU.

20      88.  Through its managerial employees, Defendant California State University has

21  engaged in acts, practices, and a course of conduct, which discriminated against Dr. Abdulhadi

22  because of her race and national origin.

23      89.  The Defendant's actions which are the subject of this Complaint, were motivated

24  by race when Defendant denied Plaintiff resources, denied her protection, subjected her to

25  excessive and unwarranted scrutiny and requirements not endured by professors.  Those acts

26  deprived Dr. Abdulhadi of equal employment opportunities, equal terms and conditions of

27  employment, and adversely affected her status as an employee because of her race.

28

_____

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. __3:18-cv-04662

90.   Defendants subjected Dr. Abdulhadi to unequal terms and conditions of employment.  Her race or as an "Arab was a substantial motivating factor in defendant's decision to subject Plaintiff to unequal terms and conditions of employment.

91.   By impairing Dr. Abdulhadi's ability to perform her job functions because of her race Defendant violated 42 U.S.C. §1981.

92.   This illegal discrimination deterred Dr. Abdulhadi from seeking appointment as a full professor, with a concomitant salary increase.  It also prevented her from taking other opportunities to advance her career.

93.    As a direct and legal result of Defendant's violation of 42 U.S.C. §1981, Dr. Abdulhadi has suffered embarrassment, stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, and damage to personal and professional reputation.

94.  As a further direct and legal result of Defendant's violation of 42 U.S.C. §1981, Dr. Abdulhadi has been forced to incur out-of-pocket expenses to pay for administrative assistance, research, and other services, equipment, and travel which the SFSU should be providing.

95.  As a further direct and legal result of Defendant's violation of 42 U.S.C. §1981, Dr. Abdulhadi has prior income and will lose income in the future.

96.  California State University's unlawful and discriminatory actions are intentional, willful, and/or are taken in willful disregard of Dr. Abdulhadi's rights.

97.  Plaintiff seeks injunctive relief to protect future applicants from Defendant's discriminatory employment practices described herein.

98.  The acts alleged herein were done with malice or reckless indifference to Plaintiff's federally protected rights, entitling her to punitive damages in an amount sufficient to punish the defendants and to deter future similar misconduct. And all other and further relief this Honorable Court deems fit and proper.

---

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. __3:18-cv-04662

**Fourth Cause of Action for Race, National Origin, and Religious Discrimination**

**in Violation of 42 §U.S.C. 2000e et. seq. Against Defendants Board of Trustees**

**of California State University, Leslie Wong, Sue V. Rosser,**

**Jennifer Summit, and Does 1-10, Inclusive**

99.    Plaintiff repeats and  repleads each allegation in Paragraphs 1-70 as though fully set forth herein.

100.    Dr. Abdulhadi is in a protected class because of her race or alternatively her race, ("Palestinian-Arab"), her national origin (Palestinian), and her religion (Muslim).

101.    At all times material hereto Dr. Abdulhadi has been qualified for the employment position, job responsibilities and duties she performs for SFSU.

102.    Through its managerial employees, Defendant has engaged in acts, practices, and a course of conduct, which discriminated against Dr. Abdulhadi because of her race, her national origin, and/or her religion.

103.    Defendant's actions which are the subject of this Complaint, were motivated by race, national origin, and/or religious discrimination when they denied her resources, denied her protection, subjected her to excessive and unwarranted scrutiny and requirements not endured by white professors, U.S. born, and/or non-Muslim male professors. Those acts deprived Dr. Abdulhadi of equal employment opportunities, equal terms and conditions of employment, and adversely affected her work as an employee because of her race, her national origin, and/or her religion.

104.   Defendant subjected Dr. Abdulhadi to unequal terms and conditions of employment.  Plaintiff's race or race as an "Arab", her national origin as a Palestinian, and/or her status as a Muslim was a substantial motivating factor in Defendant's decision to deny Plaintiff equal job opportunities.

105.    This illegal discrimination deterred Dr. Abdulhadi from seeking appointment as a full professor, with a concomitant salary increase.  It also prevented her from taking other opportunities to advance her career.

106.    By impairing Dr. Abdulhadi's ability to perform her job functions because of her race or race, her national origin, and/or her religion, Defendant violated 42 U.S.C. §2000e et. seq.

107.    As a direct and legal result of Defendant's violation of 42 U.S.C. §2000e et. seq., Dr. Abdulhadi has lost income and shall lose income in the future in an amount to be proven at trial.

108.    As a direct and legal result of Defendant's violation of 42 U.S.C. §2000e et. seq., Dr. Abdulhadi has suffered embarrassment, , stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, , and damage to personal and professional reputation.

109.    As a further direct and legal result of Defendant's violation of 42 U.S.C. §2000e et. seq., Dr. Abdulhadi has been forced to incur out-of-pocket expenses to pay for services, equipment, and travel which the SFSU should be providing.

110.    SFSU's unlawful and discriminatory actions are intentional, willful, and/or are taken in willful disregard of Dr. Abdulhadi's rights.

111.    Plaintiff seeks injunctive relief to protect future applicants from Defendant's discriminatory employment practices described herein.

**Fifth Cause of Action for Disability Discrimination in Violation of**

**42 U.S.C. §12112 et. seq. Against Defendants**

**Board of Trustees of California State University**

112.    Plaintiff repeats and repleads each allegation in Paragraphs 1-70 as though fully set forth herein.

113.    Defendant sued in this cause of action is an "employer" as defined by the ADA, 42 U.S.C. § 12111(5)(A), as amended.

114.    Plaintiff is an "employee" as defined by the ADA, 42 U.S.C. § 12111(4).

115.    Plaintiff has herniated discs in her spine and neck, and carpal tunnel syndrome.

---

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. __3:18-cv-04662

She also has the further disability of bilateral sensorineural hearing loss and with only 48% speech understanding when background noise is present, making her disabled within the meaning of the statute.  Defendant is aware of the foregoing.

116.   By refusing to furnish and/or unreasonably delaying furnishing Dr. Abdulhadi with the reasonable accommodations described hereinabove, including, but not limited to assistance, a lightweight portable appropriate computer; with proper and timely captioning to assist with lectures and presentations; and a classroom reasonably convenient to her office, as well as other devices and medically approved accommodations despite her repeated requests, Defendant has denied Plaintiff a reasonable accommodation for her disabilities.

117.   Defendant's actions create and subject Dr. Abdulhadi to a hostile work environment based on her disability, in further violation of the ADA.

118.   SFSU's unlawful and discriminatory actions are intentional, willful, and/or are taken in willful disregard of Dr. Abdulhadi's rights.

119.   As a legal cause of SFSU's conduct and omissions, Plaintiff suffers and continues to suffer embarrassment, stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, , and damage to personal and professional reputation.

120.   As a further direct and legal result of Defendant's violation of the ADA Plaintiff has been forced to incur out-of-pocket expenses to pay for services, equipment, and travel which the SFSU should be providing.

121.   Plaintiff seeks injunctive relief to protect future applicants from Defendant's discriminatory employment practices described herein.

**<ins>Sixth Cause of Action for Race, National Origin, and/or Religious Discrimination</ins>**

**<ins>in Violation Cal. Government Code §12940, et. seq.</ins>**

**<ins>Against the Board of Trustees of California State University</ins>**

122.    Plaintiff repeats and repleads each allegation in Paragraphs 1-70, Paragraphs 86-96, and Paragraphs 101-109, *supra*, as though fully set forth herein.

123.    Dr. Abdulhadi is in a protected class because of her race or her race, ("Arab"), her national origin (Palestinian), and her religion (Muslim),

124.    At all times material hereto Dr. Abdulhadi has been qualified for the employment position, job responsibilities and duties she performed for SFSU.

125.    Through its managerial employees, Defendant has engaged in acts, practices, and a course of conduct, which discriminated against Dr. Abdulhadi because of her race, her national origin, and/or her religion.

126.    The Defendant's actions which are the subject of this Complaint, were motivated by race, national origin, and/or religion when they denied her resources, denied her protection, subjected her to excessive and unwarranted scrutiny and requirements not endured by white male professors, U.S. born, and/or non-Muslim professors.  Those acts deprived Dr. Abdulhadi of equal employment opportunities, equal terms and conditions of employment, and adversely affected her status as an employee because of her race, her national origin, and/or her  religion.

127.    Defendant subjected Dr. Abdulhadi to unequal terms and conditions of employment.  Plaintiff's race as an "Arab", her national origin as a Palestinian, and/or her religion as a Muslim was a substantial motivating factor in defendant's decision to deny Plaintiff equal job opportunities.

128.    By impairing Dr. Abdulhadi's ability to do her job because of her race her national origin, and/or her religion, Defendant violated Cal. Gov. Code §12940 et. seq.

129.    This illegal discrimination deterred Dr. Abdulhadi from seeking appointment as a full professor, with a concomitant salary increase.  It also prevented her from taking other opportunities to advance her career.

130.    As a direct and legal result of Defendant's violation of Cal. Gov. Code §12940 et. seq., Dr. Abdulhadi has suffered and will suffer lost wages in an amount to be proven at trial;

131.    As a direct and legal result of Defendant's violation of Cal. Gov. Code §12940 et. seq., Dr. Abdulhadi has suffered embarrassment, , stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, , and damage to personal and professional reputation.

132.    As a further direct and legal result of Defendant's violation of Cal. Gov. Code §12940 et. seq., Dr. Abdulhadi has been forced to incur out-of-pocket expenses to pay for services, equipment, and travel which the SFSU should be providing.

## Seventh Cause of Action for Failure to Prevent Race, National Origin, and/or Religious Discrimination in Violation Cal. Government Code §12940(k), et. seq. Against the Board of Trustees of California State University

133.    Plaintiff repeats and repleads each allegation in Paragraphs 1-70, Paragraphs 86-96, and Paragraphs 101-109, *supra*, as though fully set forth herein.

134.    Defendant sued in this cause of action failed to take all reasonable steps necessary to the discrimination.

135.    As a direct and legal result of Defendant's violation of Cal. Gov. Code §12940 et. seq., Dr. Abdulhadi has suffered and will suffer lost wages in an amount to be proven at trial;

136.    As a direct and legal result of Defendant's violation of Cal. Gov. Code §12940 et. seq., Dr. Abdulhadi has suffered embarrassment, , stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, , and damage to personal and professional reputation.

137.   As a further direct and legal result of Defendant's violation of Cal. Gov. Code §12940(k) et. seq., Dr. Abdulhadi has been forced to incur out-of-pocket expenses to pay for services, equipment, and travel which the SFSU should be providing.

**Eighth Cause of Action for Disability Discrimination – Failure to Accommodate**
**in Violation Cal. Government Code §12940(m), et. seq.**
**Against the Board of Trustees of California State University**

138.   Plaintiff repeats and repleads each allegation in Paragraphs 1-70  as though fully set forth herein.

139.   Pursuant to Government Code § 12940(m) and 2 C.C.R. §7293.9. it is unlawful for an employer to fail to provide reasonable accommodation to an employee with a disability.

140.   Pursuant to Government Code §§ 12926 and 12926.1 Plaintiff has a physical disability, a record of physical disability, and/or was perceived as or treated as having a physical disability by Defendant.

141.   By refusing to furnish and/or unreasonably delaying furnishing Dr. Abdulhadi with the reasonable accommodations described hereinabove, including, but not limited to assistance, a lightweight portable appropriate computer; with proper and timely captioning to assist with lectures and presentations; and a classroom reasonably convenient to her office, as well as other devices and medically approved accommodations despite her repeated requests, Defendant has denied Plaintiff a reasonable accommodation for her disabilities.

142.   As a direct and legal result of Defendant's wrongful conduct, Plaintiff has suffered damages including, but not limited to, a loss of income and benefits.

143.   As a further direct and legal result of Defendant's wrongful conduct, suffered emotional distress and other general damages.

144.   Plaintiff seeks injunctive relief to protect future applicants from Defendant's discriminatory employment practices described herein.

---

**Ninth Cause of Action for Disability Discrimination – Failure to Engage in the**

**Interactive Process in Violation Cal. Government Code §12940(n), et. seq.**

**Against the Board of Trustees of California State University**

145.    Plaintiff repeats and repleads each allegation in Paragraphs 1-70 as though fully set forth herein.

146.    Pursuant to Government Code § 12940(m) it is unlawful for an employer to fail to provide reasonable accommodation to an employee with a disability.

147.    Pursuant to Government Code §§ 12926 and 12926.1 Plaintiff has a physical disability, a record of physical disability, and/or was perceived as or treated as having a physical disability by Defendant.

148.    As set forth above, Plaintiff requested various reasonable accommodations that would allow her to continue her work.

149.    Defendant failed and refused to respond to those requests and failed and refused to engage in a timely, good faith interactive process.

150.    Defendant's repeated imposition of delays obstacles to the of said interactive process created a hostile work environment in further violation of §12940.

151.    As a direct and legal result of Defendant's wrongful conduct, Plaintiff has suffered damages including, but not limited to, a loss of income and benefits.

152.    As a further direct and legal result of Defendant's wrongful conduct, suffered emotional distress and other general damages.


**Tenth Cause of Action for Deprivation of Civil Rights Under Color of State Law**

**Against the Board of Trustees of California State University, Leslie Wong,**

**Sue V. Rosser, Jennifer Summit, and Does 1-10, Inclusive**

153.    Plaintiff repeats and repleads each allegation in Paragraphs 1-70 inclusive, as though fully set forth herein.

154.    This cause of action is asserted against defendants Wong, Rosser and Summit and Does 1-10 in their individual capacities insofar as compensatory and punitive damages are sought.

155.    This cause of action is asserted against defendants Wong, Rosser, and Summit and Does 1-10 in their official capacities only insofar as prospective and injunctive relief are sought.

156.    At all times material hereto Plaintiff was an employee of California State University.

157.    Plaintiff exercised her right to free speech under the First Amendment of the U.S. Constitution by speaking out on a matter of public concern, including but not limited to racism, Islamophobia, sexism, and the rights of the Palestinian people, inter alia.

158.    Plaintiff has been subjected to harassment, interference with her professional and scholastic activities, denial of opportunities for professional advancement, withdrawal of promised support for additional tenure-track professors and administrative support, and denial of reasonable accommodations.

159.    These adverse actions against Plaintiff were a direct response to and were intended to harass and discriminate against Plaintiff for her exercise of her free speech rights on matters of public concern. The Board of Trustee's adverse retaliatory actions Plaintiff violated her constitutional rights under the First Amendment to the U.S. Constitution, as enforced through 42 U.S.C. Section 1983.  These adverse actions were directed, supervised and/or executed by Defendants Wong, Rosser, and Summit.

160.    The acts by Defendants of which Plaintiff complains in this cause of action were taken by Defendants under color of state law.

161.    Defendants were at all times material hereto policy makers and operating under policy or practice of California State University.

162.    As a direct and legal result of the aforementioned violations, Plaintiff has been harmed in an amount to be proven at trial.

163.   The acts of defendants Wong, Rosser, and Summit were done with malice, fraud, oppression, and in reckless disregard of Plaintiff's clearly established constitutional rights. Further, these acts were despicable in character and warrant the imposition of punitive damages in an amount sufficient to punish the defendants and to deter future similar misconduct.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for damages against Defendants as follows:

### **FIRST CAUSE OF ACTION FOR BREACH OF CONTRACT:**

1.   Specific performance of the breached portions of the contract, allowing for modification of the salary ranges to reflect 2019 ranges, in an amount to be proven at trial;

2.   General damages in an amount to be proven at trial; and

3.   Incidental damages in an amount to be proven at trial

### **SECOND CAUSE OF ACTION FOR VIOLATION OF LABOR CODE §970:**

3.   Two times all general damages all general damages, in an amount to be proven at trial pursuant to *Cal. Labor Code* §972;

4.   Two times all consequential damages, in an amount to be proven at trial pursuant to *Cal. Labor Code* §972;

5.    Two times all incidental damages, in an amount to be proven at trial pursuant to *Cal. Labor Code* §972;

6.    Two times all damages for emotional distress or other suffering in an amount to be proven at trial pursuant to *Cal. Labor Code* §972.

**THIRD CAUSE OF ACTION FOR RACE DISCRIMINATION**

**IN VIOLATION OF 42 U.S.C. §1981 (against all Defendants, jointly and severally)**

7.    General damages for embarrassment, humiliation, stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, loss of dignity, and damage to personal and professional reputation in an amount to be proven at trial;

8.    Damages for loss of income in an amount to be proven at trial;

9.    Damages for future loss of income in an amount to be proven at trial;

10.   Damages for incidental expenses for services, equipment, and travel in an amount to be proven at trial;

11.   Injunctive relief to prevent employees from being subjected to such discriminatory employment practices;

12.   Reasonable attorney's fees and costs of litigation;

13.   As to Defendants Wong, Rosser, and Summit: Punitive or exemplary damages in an amount sufficient to punish each defendant and to deter future similar misconduct.


**FOURTH CAUSE OF ACTION FOR VIOLATION OF RACE, NATIONAL**

**ORIGIN, and RELIGIOUS DISCRIMINATION in VIOLATION of**

**42 U.S.C. §2000e  (against all Defendants, jointly and severally)**

14.   General damages for embarrassment, humiliation, stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, loss of dignity, and damage to personal and professional reputation in an amount to be proven at trial;

15.   Damages for loss of income in an amount to be proven at trial;

16.   Damages for future loss of income in an amount to be proven at trial;

17.   Damages for incidental expenses for services, equipment, and travel in an amount to be proven at trial;

18.    Injunctive relief to prevent employees from being subjected to such discriminatory employment practices;

---

19.   Reasonable attorney's fees and costs of litigation;

**FIFTH CAUSE OF ACTION FOR DISABILITY DISCRIMINATION (AMERICANS WITH DISABILITIES ACT)**

20.   General damages for embarrassment, humiliation, stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, loss of dignity, and damage to personal and professional reputation in an amount to be proven at trial;

21.   Damages for incidental expenses for services, equipment, and travel in an amount to be proven at trial;

22.   Injunctive relief to prevent employees from being subjected to such discriminatory employment practices;

23.   Reasonable attorney's fees and costs of litigation;

**SIX, SEVENTH, EIGHTH, and NINTH  CAUSES OF ACTION FOR DISCRIMINATION, FAILURE TO PREVENT DISCRMINATION; FAILURE TO REASONABLY ACCOMMODATE DISABILITIES; and/or FAILURE TO ENGAGE IN INTERACTIVE PROCESS IN VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT**

24.   General damages for embarrassment, humiliation, stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, loss of dignity, and damage to personal and professional reputation in an amount to be proven at trial;

25.   Damages for loss of income in an amount to be proven at trial;

26.  Damages for future loss of income in an amount to be proven at trial;

27.  Damages for incidental expenses for services, equipment, and travel in an amount to be proven at trial;

28.  Reasonable attorney's fees and costs of litigation;

**TENTH CAUSE OF ACTION FOR DEPRIVATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW**

**Against California State University and Against Leslie Wong, Sue V. Rosser, and Jennifer Summit Only in Their Official Capacities**

29.   Such injunctive relief as the Court may specify to prevent employees from being retaliated against for the exercise of their rights under the First Amendment of the United States Constitution.

**Against Leslie Wong, Sue V. Rosser, and Jennifer Summit Only in Their Individual Capacities**

30.   General damages for embarrassment, humiliation, stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, loss of dignity, and damage to personal and professional reputation in an amount to be proven at trial;

31.   Damages for loss of income in an amount to be proven at trial;

32.   Damages for future loss of income in an amount to be proven at trial;

33.   Damages for incidental expenses for services, equipment, and travel in an amount to be proven at trial;

34.   As to Defendants Wong, Rosser, and Summit: Punitive or exemplary damages in an amount sufficient to punish each defendant and to deter future similar misconduct

35.   Reasonable attorney's fees and costs of litigation;

**AND FOR ALL CAUSES OF ACTION**

36.   Allowable costs of litigation; and

37.   Such other and further relief as the court may find justified.

---

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. __3:18-cv-04662

35

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED:  January 14, 2019            RESPECTFULLY SUBMITTED

**LAW OFFICE OF MARK ALLEN KLEIMAN**


By:   /s/ Mark Allen Kleiman, Esq.

Mark Allen Kleiman, Esq.


**LAW OFFICES OF BEN GHARAGOZLI**
Ben Gharagozli, Esq.

---

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. __3:18-cv-04662

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff demands a jury trial on all issues so triable.

3

DATED:  January 14, 2019               RESPECTFULLY SUBMITTED

4
                                       **LAW OFFICE OF MARK ALLEN KLEIMAN**
5

6

7                                      By:   /s/ Mark Allen Kleiman, Esq.

8                                      Mark Allen Kleiman, Esq.

9                                      **LAW OFFICES OF BEN GHARAGOZLI**
10                                     Ben Gharagozli, Esq.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. __3:18-cv-04662

EXHIBIT "A"

**San Francisco**
**State University**

1600 Holloway Avenue
San Francisco, CA 94132-4100

Tel: 415/338-1693
Fax: 415/338-1739

College of Ethnic Studies
Office of the Dean

Date:        September 28, 2006

To:          Rabab Abdulhadi, Ph.D.

From:        Kenneth P. Monteiro, Dean
             College of Ethnic Studies

Subject:     MOU Regarding Appointment Offer

---

I am pleased to put in writing a memorandum of understanding that outlines the terms of the offer that the College of Ethnic Studies is proposing as supplemental to the formal contractual offer from San Francisco State University. Should you accept the formal tenure-track offer that the University extended, we are prepared to provide you with the following:

**Supplemental Salary:**
For the first five years, the College will provide you summer salary at the rate of 15% above your base to support your summer academic and research activities. In the summer of 2007, these payments will be made during the months of July and August. In addition, at promotion to full professor typical raises run between 5 to 15%. I must note that raises occur pursuant to negotiated contractual arrangements between the CFA and the CSU and dependent on budgetary constraints at the time of the promotion. Thus, this constitutes an estimate based on past norms, not a guarantee.

**Start date Agreement:**
The start date for your position is January 2, 2007.

**Expectations for application to promotion to Full Professor:**
All individuals being considered for promotion from Associate to Full Professor are reviewed as per contract and policy (see Faculty Manual http://www.sfsu.edu/~acaffrs/faculty_manual/welcome.htm and promotions policy links http://www.sfsu.edu/%7Esenate/documents/policies/F04-028.pdf ). Thus, the final determination of whether promotion occurs is pursuant to those policies and procedures after your review by your program, college, the university promotions committee, provost and president. Nothing in this MOU is intended to circumvent or prejudice that process. Faculty going up for promotion to Professor exhibit their professional achievement and growth in a variety of ways, including the publication of a book; the publication of refereed original journal articles; or successful

extramural grant applications. As per policy, the criteria for promotion are determined by the candidate's ability to satisfy the promotions criteria; hence, the timing of the request for review can be as early as the candidate requests, thus you may choose to submit your file for promotion as early as Fall of 2007. The timing of the review does not prejudice – for or against – the conditions of the review.

**Teaching load January 2007-May 2007:**
The normal teaching load in the College of Ethnic Studies is based on a 4/4 course-load base that by Senate and College policy is modified to be an expected 3/3 course load with 1/1 assigned time for instructionally related activities. From January 2007 to May 2007, you will be assigned one course teaching and, for the remainder of your teaching time, you will be released from your teaching load to conduct research and professional writing.

**Teaching load September 2007-May 2008:**
From September 2007 to May 2008, you will be released from all teaching duties to conduct research and professional writing.

**Teaching load September 2008—May 2013:**
Your teaching load will be guaranteed by the College to be 1/1 from September 2008 to May 2013

**Teaching load September 2013 and beyond**:
You will continue thereafter at 1/1 provided external funding or similar resources are made available to release you from the normal contractual load. If not as mentioned before, the normative teaching load is 3/3 with 1/1 instructionally related activity.

**Advancement Commitments during year of research 2007-2008:**
During the year of research release mentioned above, you will return to campus for two, two-day advancement visits to include a possible event and meetings with potential donors and advancement staff. The College will cover the cost of these return trips.

**Research Funds January 2007-1010:**
The University will provide you with $100,000 per year for the first three years to support the various research and professional activities that would build the Arab and Islamic American academic presence in the College. This is anticipated to include a journal, educational programming, and research activities among other activities, as you determine in your role of Principal Investigator for these funds. These funds can be used for all appropriate research needs, including hiring support staff or travel that are not otherwise specified in this MOU. The university's guaranteed commitment ends at the completion of this three-year period. Unused funds do not accrue across fiscal years.

2

**Research Funds January 2010 and beyond**:
Starting in the third year or before depending on the success of fundraising efforts, and based on a written agreement with Dr. Jess Ghannam on behalf of members of the Arab and Palestinian communities, your continued research support will be funded through monies raised from the community.

**Conference Travel Funds:**
The College will support you for three North American and one oversees professional trips per year.

**Moving expenses:**
Academic Affairs will provide you with $3000 and a one-way ticket travel expenses as per policy http://www.sfsu.edu/~acadres/facHse.htm. The College will augment that allotment up to $15,000 based on established costs from the mover as verified through Ms. Meredith Duke (415-338-7163, mduke@sfsu.edu) in our moving office. The move will be allowed in two parts, the first of which is anticipated Spring of 2007 and the second by Fall 2008, the exact dates can be arranged with our moving office.

**Technology**:
In addition to equipment purchased with your research fund, you will be provided with a computer workstation valued up to $3200 for your faculty office.

**Office Space**
You will be assigned a single person office. You will also be assigned a two-station office to house the two Research Associates.

**Housing**
The university housing office guarantees the availability of one of the following for January 2007: a one, two or three bedroom apartment. You will contact Mark Goodrich, Director, Residential Property at goodrich@sfsu.edu or 415-564-6127 to arrange your housing. You would rent your chosen unit based on normal pricing provided by the housing department. Additional benefits regarding special mortgage arrangements are delineated in our agreements with PERS and can be found at http://www.sfsu.edu/~hrwww/benefits/benefits.html

**Additional positions for Arab/Islamic studies in Ethnic Studies**
The university will support two additional lines in the areas of Arab/Islamic studies. They will first be opened as Research Associates (RA) under your supervision and then can be converted to tenure track faculty lines at a later time to be determined by the academic needs as you assess them. When they are converted a normal tenure track search process will be used to fill the positions (see http://www.sfsu.edu/~acaffrs/faculty_manual/3_1_1.htm?t=1). The likely R.A salary range for these positions would be between $55,000 and $65,000 annually based on

3

the credentials of the applicant and on approval of the Provost. The likely Assistant Professor salary would be between $58,000 and $70,000. The beginning dates for the research associates or faculty will be determined by the Provost's approval after your submission of appropriate job descriptions, supervisory models, accountability standards and search processes for the positions. These appointments could begin as early as spring 2007.

## Advancement/development support
Projects for the development of Arab and Islamic American studies will be placed among the College's priorities with the College advancement officers

## Handling of announcement of arrival
"SFSU is pleased to announce that Dr. Rabab Abdulhadi has agreed to join our faculty in the College of Ethnic Studies. Dr. Abdulhadi is an internationally respected expert in studies of the Arab and Islamic Diaspora...[listing of publications, previous positions, honors etc]. As a senior faculty member, Dr. Abdulhadi comes to the College bringing leadership to the development of curriculum and scholarship regarding Arab and Islamic diaspora studies. We anticipate the development of a research center and a core curriculum in this area that will be a model for the field."

## University Credit Card Authorization and billing information
You will be issued a university credit card and assisted by the Dean's office in the expenditures of funds attached to your projects as per university policies and procedures. Some specific highlights of these policies relevant to your specific needs: credit cards cannot be used for most travel expenses except pre-registrations or similar conference related purchases, other expenses (e.g. per diem and hotel are best submitted as an advance payment request, direct billing where the university has contracts (e.g. air travel and car rental) or as a reimbursement. Policies regarding the use of university credit cards and travel can be found at
http://fiscaff.sfsu.edu/AcctsPayable/Pcard/ and
http://fiscaff.sfsu.edu/AcctsPayable/Travel/, respectively.


Rabab Abdulhadi
I accept the agreements in this memorandum of understanding.



Cc:    J. Gemello, Provost and Vice President for Academic Affairs
       M. Verhey, Dean of Faculty Affairs and Professional Development

4