Mark A. Kleiman (SBN 115919)
Law Office of Mark Allen Kleiman
2907 Stanford Ave. Venice, CA 90292
Telephone: (310) 306-8094
Facsimile: (310) 306-8491
Email: mkleiman@quitam.org

Ben Gharagozli (SBN 272302)
Law Offices of Ben Gharagozli
2907 Stanford Avenue
Marina del Rey, California 90292
Telephone: (661) 607-4665
Facsimile: (855) 628-5517
Email: ben.gharagozli@gmail.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| RABAB ABDULHADI,<br><br>      Plaintiff,<br><br>      v.<br><br>LESLIE WONG; SUE V. ROSSER; JENNIFER<br>SUMMIT; and DOES 1-100;<br>inclusive<br><br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.:  4:18-cv-04662-YGR

**SECOND AMENDED COMPLAINT
AND DEMAND FOR JURY TRIAL**

1.   Plaintiff is a Professor at San Francisco State University (hereinafter "SFSU").
She alleges -that she was retaliated against in violation of 42 U.S.C. §1983.

## PARTIES

2.   Plaintiff, Rabab Abdulhadi is an Associate Professor at San Francisco State
University (hereinafter "SFSU"), which is part of the California State University system.
Plaintiff is female and Palestinian.

3.   Defendant Leslie Wong, PhD., became the President of SFSU in October of
2012 and is the chief executive officer of the university.  On or about October 2, 2018,

Defendant Leslie Wong announced that he would retire effective July 30, 2019.  Plaintiff reserves the right to amend the present complaint when and if the President of SFSU changes during the course of the present litigation.

4.    Defendant Sue V. Rosser, Ph.D., was Provost and Vice President for Academic Affairs at SFSU from August 2009, until October 2016.  As such she was the senior academic administrator and was the second highest ranking officer at the university.

5.    Defendant Jennifer Summit, Ph.D. served as Interim Provost at SFSU from October, 2016 until March, 2018, when she was appointed Provost.  As such she was (and is) the senior academic administrator and the second highest ranking officer at the university.

6.    The true and identity of each defendant denominated as a "Doe" is unknown to plaintiff at this time, so said defendants are sued in this capacity.  As each such defendant becomes known to Plaintiff, she shall seek leave amend this Complaint to set forth that defendant's true identity.

## JURISDICTION

7.    Jurisdiction is proper because this action includes claims that Defendant harmed Plaintiff by violating Plaintiff's rights under 42 U.S.C. §1983.

8.   None of the claims advanced in this complaint are subject to any collective bargaining agreement.

## VENUE

9.   Venue is proper in this district under 28 U.S.C. §1391(b) because all or nearly all of the events or omissions giving rise to this action occurred in this District.

## THE GOVERNANCE STRUCTURE AT SFSU

10.       **Wong's Authority as President**:  CSU defines university presidents as the "Chief Executive Officers" of their institutions, as such, investing him with 'final decision making authority' and fixing his potential liability under §1983 as the policy maker and final decisionmaker on campus.

11.     **The Authority of the Provost and Vice President for Academic Affairs Under a Shared Governance Model**:  Although Wong's superiors believe he has been vested with final decision-making authority, when pressured, Wong has sought to shift that authority (and the blame for how it is exercised) to others.

12.     On July 27, 2016, a group of students met with Wong, his Chief of Staff, Alison Sanders, and Luo Luo Hong, Vice President for Student Affairs.  When the students asked Wong about the fulfilling SFSU's contractual obligations to Plaintiff (see ¶¶ 22-26, *infra*), Wong denied having any control over the process of faculty hiring, insisting that this process was between the Provost (at that time Defendant Rosser) and the Dean of the college for which a position was opening.   The other administrators who were present at this meeting did not object or challenge this position.

13.     Wong denied that he had the authority to intervene or even to directly influence the process.  Wong gave as an example, the firing of the President of the UC Davis campus which he said took place when she overstepped her boundaries.

14.     The lines of authority for enacting SFSU policies are not a model of clarity.  University pronouncements and declarations frequently describe the decision-making practice as "shared governance".  The phrase "shared governance" appears seven times in the SFSU job description for the new President to be hired, and three times in the job description for the Associate Vice President for Academic Affairs.  Wong's predecessor as President, Robert Corrigan, advised Wong that "shared governance between faculty and the administration has worked well on this campus."  Defendant Rosser states that one reason she agreed to come to SFSU as the Provost was the "strong sense of shared governance" on the campus.

15.     Academic Senate Policy #S03-158 states that requests for new positions must be submitted to and decided upon by the Vice President for Academic Affairs, without any mention made of the President.  On the other hand, the Academic Senate's "Faculty Constitution" recognizes that the President has the authority to approve or

1  disapprove of Academic Senate policies and may substitute his or her own policies for those

2  passed by the Academic Senate.

3      16.        "Shared governance" similarly confounds lines of authority for

4  disciplinary activities.  When Defendant Summit threatened Plaintiff for her refusal to take

5  down a Facebook post on a Facebook page that was not owned by the University,  (see ¶56 ,

6  *infra*), Provost Summit referenced a disciplinary process which only the President, not she,

7  could initiate.

8      17.        The "shared governance" model even reaches decisions about faculty

9  travel.  Until 2018 Plaintiff's international travel could be approved by the Dean of her

10 college.  Beginning in 2018 exceptions to the travel policy (lodging costs in excess of $250

11 per night or requests for payment that were more than 60 days late) require approval by the

12 President.

13     18.        Although shared governance requires a nuanced analysis and is not the

14 typical paradigm for a section 1983 matter, it is a common concept in educational institutions.

15 A parent wanting her daughter to have more playing time in a soccer match would talk to the

16 coach, not the high school principal.  Although the principal is the final decisionmaker, there

17 are certain areas to which that final decisionmaking authority does not reach (as those areas

18 are insulated from the principal's final decisionmaking authority.)    This is the case with

19 SFSU's shared governance model.

## GENERAL ALLEGATIONS

22     19.  Rabab Abdulhadi is an Arab woman of Palestinian ancestry. When she was

23 twelve years old the Israeli Army invaded and occupied her city, Nablus, and established

24 military rule in violation of well-established international law, custom, and norms. She later

25 came to the United States, earned her BA at Hunter College in 1994 and went on to

26 graduate school at Yale University, earning two Master's degrees and a doctorate in

27 Sociology, the latter being earned in 2000.

28

20.   From 2004-2006 Dr. Abdulhadi was the Director of the Center for Arab American Studies at the University of Michigan (Dearborn).

21.   In 2005, SFSU's Dean of the College of Ethnic Studies, Ken Monteiro, indicated to Plaintiff that SFSU wanted to recruit her for a position as an international scholar as the position was described and presented to her by then Dean of the College of Ethnic Studies, Kenneth Monteiro.  Dean Monteiro indicated that the faculty position would involve Plaintiff leading a program of nearly a dozen senior and junior faculty members.  Plaintiff also wanted to hire three faculty members for the new program she would establish there.  In negotiations with the University she ultimately accepted its offer to fund two full-time tenure track faculty positions.  Dr. Abdulhadi also made it clear that she did not want to be burdened with administrative responsibilities for the new program, insisting on a ten-month academic contract rather than a twelve-month (year-round) administrative one.  SFSU agreed.  It was thus clear to SFSU from the outset that Dr. Abdulhadi expected to function as a senior scholar, exercising intellectual and pedagogical leadership of an international research and teaching effort.

22.   In 2006 Dr. Abdulhadi was recruited to join SFSU as a tenured Associate Professor. SFSU sent her a contractual offer in letter form signed by the then-President Robert Corrigan that included a memorandum of understanding signed by then Dean of the College of Ethnic Studies, Kenneth Monteiro.  The contract offer promised terms that were material to Dr. Abdulhadi's acceptance of the offer, and for which she had specifically negotiated, including, *inter alia*, a guarantee that the University would fully fund two additional full-time faculty positions and would also fund Dr. Abdulhadi's research and teaching-related international and national travel.  As to faculty positions, SFSU explicitly and expressly offered, *inter alia*, two full time faculty positions to support the program Dr. Abdulhadi was creating and a travel budget for international research and teaching.  The following is the pertinent text:

**Additional Positions for Arab/Islamic Studies in Ethnic Studies**

The university will support two additional lines in the areas of Arab/Islamic studies. They will first be opened as Research Associates (R.A) under your supervision and then can be converted to tenure track faculty lines at a later time to be determined by the academic needs as you assess them. When they are converted a normal tenure track search process will be used to fill the positions (see http://wv.rlv.sfsu.edu/~acaffrs/faculty_nanual/3_1_1.htm?t=1). The likely R.A. salary range for these positions would be between $55,000 and $65,000 annually based on the credentials of the applicant and on approval of the Provost. The likely Assistant Professor salary would be between $58,000 and $70,000. The beginning dates for the research associates or faculty will be determined by the Provost's approval after your submission of appropriate job descriptions, supervisory models, accountability standards and search processes for the positions. These appointments could begin as early as spring 2007.

23.   The offer extended by SFSU and accepted by Dr. Abdulhadi called for her "leadership to the development of curriculum and scholarship regarding Arab and Islamic diaspora studies."  This ultimately was named by Dr. Abdulhadi the "Arab and Muslim Ethnicities and Disapora Studies" program (hereinafter "AMED").

24.   Pursuant to the aforementioned terms of employment, beginning in 2007 the University opened two lines for Research Associates who were immediately hired by Dr. Abdulhadi as part of the University's budget.  In 2009, Dr. Abdulhadi obtained approval at all academic and administrative levels to begin the search for two tenure-track assistant professors.  The searches were advertised in academic circles and publications, Dr. Abdulhadi formed and chaired a search committee, interviews were set up for screening interviews to create the long/short list at the annual meetings of the American Studies Association (hereinafter "ASA") and the Middle East Studies Association (hereinafter "MESA"), and a short list of candidates were about to be invited for campus interviews.

Although these positions were included in SFSU's approved budget for 2009, then-President Corrigan canceled the searches. SFSU never reinstated them.

25.   Plaintiff is informed and believes and based thereon alleges that virtually all other faculty searches in programs other than AMED Studies which were canceled at that time were later restored. Plaintiff is further informed and believes that the positions that were promised for Dr. Abdulhadi's program are almost the only ones that were never restored.

26.   In either 2011 or 2012, SFSU suspended the budget lines which would have permitted Dr. Abdulhadi to hire research associates and lecturers.  This left her as the sole faculty member in this AMED "program".

27.   It was not until late August of 2018 that Dr. Abdulhadi learned that Provost Summit was stating that Corrigan, while he was President, had repudiated the existence of the contractually obligated faculty lines, and that Summit had instructed Dean Monteiro to act and speak as though the lines had never existed.

28.   Plaintiff is one of the most outspoken advocates for justice for and in Palestine in the world and certainly the most outspoken advocate for justice for and in Palestine at SFSU. The following is a non-exhaustive list of among her many and numerous accomplishments in this field:

      a.   Plaintiff is a national leader within the Boycott, Divestment, Sanctions (hereinafter "BDS") movement. [1]

      b.   Plaintiff is a founding member of the US Campaign for the Academic and

---

[1] The nonviolent campaign bears the acronym BDS and is a Palestinian-led international movement dedicated to the proposition that Palestinians deserve the same rights as everyone else.  The BDS movement seeks to achieve this by encouraging the boycott of the Israeli government and Israeli and international companies involved in human rights violations; divestment from such companies by churches, universities, and labor pension funds, and governmental sanctions, similar to those the United States and European nations applied to South Africa.  (*See* https://usacbi.org/guidelines-for-applying-the-international-academic-boycott-of-israel/ last visited January 13, 2019.  Request for Judicial Notice of this document was granted by Judge Orrick in *Mandel, et. al. v. Board of Trustees* 3:17-cv-03511 Dkt. No. 167, pp. 2-3, fn. 3.)

Cultural Boycott (hereinafter "USACBI")[2].

   c. Plaintiff is the advisor and mentor of the General Union of Palestinian Students (herineafter "GUPS") at San Francisco State University.

      i. GUPS' overall goal is to organize student activists to achieve justice and freedom for the Palestinian people.

         1. As the result of its advocacy, GUPS has been targeted by anti-Palestinian smear campaigns and its individual members have been put on a McCarthyite website called Canary Mission.[3] Canary Mission smears GUPS with frivolous allegations of anti-Semitism (see paragraph 29 below for context) and baseless claims of ties with terrorism.

   d. Plaintiff was a keynote speaker at the 2006 National Al-Awda Conference

---

[2] USACBI guidelines state "The BDS movement, including PACBI, rejects on principle boycotts of individuals based on their identity (such as citizenship, race, gender, or religion) or opinion" and goes on to state that "[m]*ere affiliation of Israeli scholars to an Israeli academic institution is therefore not grounds for applying the boycott.*

The Guidelines remind activists that: "An Israeli academic is entitled, as a taxpayer to receive funding from his/her government or institution ... so long as this is not condition upon serving Israel's policy interests in any way ... mere affiliation of the academic to an Israeli institution does not subject the conference or activity to boycott." They go on to state that "Debates between Palestinians/Arabs and Israelis are also excluded from the boycott if organized without any cooperation with Israel, its lobby groups, or its complicit institutions."

[3] Canary Mission is a McCarthyite website that seeks to intimidate, harass and defame students, faculty and organizations that advocate for justice for an in Palestine by falsely accusing such entities of anti-Semitism and links to terrorist organizations. The website puts up a profile of such students, faculty members and organizations on their website and provides a defamatory description of those entities. Targets of Canary Mission have been prevented from entering Palestine by the Israeli government, forced to undergo interrogation by their employers and university administrators, received death threats and suffered from racist, homophobic and misogynistic harassment. Canary Mission's self-proclaimed goal is to prevent its targets from securing employment.

advocating for the right of the Palestinian people to return to their homeland.[4]

    i.  Al Awda advocates for the Palestinians' right to return to their homelands as codified in United Nations resolutions and customary international law.

e.  In 2009, GUPS and AMED co-sponsored an event to celebrate the creation of a mural on campus, which honored the late Edward Said, who had been a Professor at Columbia University, had served as President of the Modern Language Association, and had been a visiting Professor at Harvard, Yale, and Johns Hopkins.

f.  In 2009 GUPS and AMED invited Omar Barghouti to speak at this event. Although Barghouti had received international acclaim he as disliked by some influential community members and SFSU donors because he advocated a nonviolent campaign to pressure the Israeli government to change some of its policies.[5]

g.  In November 2009, Plaintiff was integrally involved in organizing an SFSU conference called "BDS: A Quest for Justice, Human Rights, and Peace," which pro-Israel and anti-Palestinian organizations vilified.

---

[4] The right of the Palestinian people to return to their homeland has been codified in international law in a number of ways including but not limited to United Nations General Assembly Resolution 194. International legal scholars have argued that the right of return, as the result of being reaffirmed more than 135 times, has risen to the level of customary international law.

[5] The nonviolent campaign bears the acronym BDS and is a Palestinian-led international movement dedicated to the proposition that Palestinians deserve the same rights as everyone else. The BDS movement seeks to achieve this by encouraging the boycott of the Israeli government and Israeli and international companies involved in human rights violations; divestment from such companies by churches, universities, and labor pension funds, and governmental sanctions, similar to those the United States and European nations applied to South Africa. (*See* https://usacbi.org/guidelines-for-applying-the-international-academic-boycott-of-israel/ last visited January 13, 2009. Request for Judicial Notice of this document was granted by Judge Orrick in *Mandel, et. al. v. Board of Trustees* 3:17-cv-03511 Dkt. No. 167, pp. 2-3, fn. 3.)

h.  In May 2016, Plaintiff advised students who had gone on a hunger strike in support of the College of Ethnic Studies.  The strikers' demands included advocacy for justice for and in Palestine.  As the result of advising the strikers, Plaintiff was the target of a smear campaign by anti-Palestinian organizations.

i.  Plaintiff was a keynote speaker at the 2017 Students for Justice in Palestine (hereinafter "SJP") National Conference.[6]

   i.  SJP is one of the primary student movements advancing justice for and in Palestine on North American campuses and one of the primary forces behind the BDS campaign at universities.

      1.  As the result of its advocacy, SJP has been targeted by anti-Palestinian smear campaigns including but not limited to Canary Mission. Canary Mission smears SJP with frivolous allegations of anti-Semitism (see paragraph 29 below for context).

   ii.  The 2017 SJP National Conference aimed to promote BDS throughout the all regions.

j.  Plaintiff has worked to establish a study abroad program in Palestine (the first of its kind) with Al-Najah University.

   i.  As the result of such advocacy, Plaintiff has been the target of a smear campaign by Campus Watch, an anti-Palestinian organization, among other anti-Palestinian organizations.

k.  As the result of Plaintiff's advocacy, Plaintiff has been targeted by anti-Palestinian smear campaigns including but not limited to Canary Mission. Canary Mission smears Plaintiff with frivolous allegations of anti-Semitism (see paragraph 29 below for context)..

[6] SJP is a national organization dedicated to justice in and for Palestine with over 120 campus chapters in the United States.

SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 3:18-cv-04662-YGR

l.   As the result of Plaintiff's advocacy, Plaintiff has been unsuccessfully sued by an organization called the Lawfare Project in the matter of <u>Mandel v. Board of Trustees, et al.</u> (Case Number 3:17-CV-03511-WHO).  The Lawfare Project is an anti-Palestinian organization with the self-proclaimed goal of inflicting massive punishments on critics of Israel.  On October 29, 2018, United States District Judge William H. Orrick of the Northern District of California dismissed the Lawfare Project's lawsuit with prejudice.  Although the Lawfare Project subsequently appealed to the Ninth Circuit Court of Appeals, the Lawfare Project thereafter abandoned its appeal.

m.   Plaintiff has also served as an advisor to the Muslim Students Association (hereinafter "MSA").

 i.   MSA advocates for justice for and in Palestine.  As the result of such advocacy, MSA has been targeted by anti-Palestinian smear campaigns including but not limited to Canary Mission.  Canary Mission smears MSA with frivolous allegations of anti-Semitism (see paragraph 29 below for context).

29.  False allegations of anti-Semitism is a common tactic that anti-Palestinian organizations routinely, habitually and regularly use to improperly abuse, discredit, punish, silence, censor, bully, intimidate, and/or harass scholars and students who advocate who advocate for justice in/ for Palestine such as Dr. Abdulhadi.  In Summer 2018, an Al-Jazeera documentary on such organizations revealed that such organizations engage in "character assassination" against such activists and academics.  The same documentary revealed that such organizations were directly connected with and received funding and other material support from the Israeli government.  Indeed, Shulamit Aloni, a former Israeli government minister and a signator to the Oslo Accords exclaimed in an interview that frivolous accusations of anti-Semitism are "a trick we always use" -to deflect criticism of Israel and to

justify Israel's mistreatment of the Palestinians.[7]  As the result of the 2008 recession, SFSU became more dependent upon outside donors such as the Koret Foundation[8] for financial support.  Such outside donors included individuals and entities that were anti-Palestinian with political agendas that were diametrically opposed and hostile towards Plaintiff's advocacy for justice for an in Palestine.  Such outside donors also included individuals and entities that had ties with and/or were affiliated with anti-Palestinian organizations with political agendas that were diametrically opposed and hostile towards Plaintiff's advocacy for justice for and in Palestine.  The aforementioned donors leveraged their influence over SFSU to get SFSU's administrators to stifle Plaintiff's political speech.

30.  Such donors, their affiliates and even the Israeli government, are particularly hostile towards BDS and advocates of BDS such as Dr. Abdulhadi.  Yossi Kuperwasser former Director General of Israel's Ministry of Strategic Affairs and Brigadier General in charge of Military Intelligence[9] led the Israeli government's efforts against the BDS movement until 2014.  While Director General of the Israel Ministry of Strategic Affairs, he turned the ministry into Israel's command center for what he referred to as the battle against BDS.  Importantly, this was after the 2008-2009 Gaza war, which had murdered approximately 1,400 Palestinians and, as a response, increased BDS activity to new levels. In September 2009, Israel's international standing was dealt a heavy blow by the United Nation's report on the war, which was prepared by a fact-finding mission directed by the eminent South African jurist, Richard Goldstone.  Goldstone's report found that Israel had

[7] https://www.youtube.com/watch?v=7BEVLD6YHsc (last accessed April 7, 2019)

[8] The Koret Foundation is a Bay Area foundation which describes itself as seeking to improve the quality of life for Bay Area residents "and to supporting the vitality of the worldwide Jewish community".   The Koret Foundation, which promised a two million donation to SFSU also established a "donor directed fund" at the Jewish Community Federation of San Francisco through which it sought to funnel large sums to AMCHA undetected.

[9] Kuperwasser is an Israeli intelligence and security expert who currently works at the Jerusalem Center for Public Affairs, which has ties with other former Israeli government officials.

1  carried out "deliberate attacks on civilians" with "the intention of spreading terror."

2  Subsequently, Israeli politicians commonly referred to BDS as an "existential" or "strategic"

3  threat.  Kupperwasser identifies BDS as a real threat and insists that ignoring BDS will fail.

4  Kupperwasser reveals that "Until 2010, we tried this policy [of ignoring BDS or treating it

5  as a nuisance] and the results were not good."  Meanwhile, prominent anti-BDS advocate,

6  Ron Hassner revealingly declared "Zionists don't kvetch or complain about things.  They

7  either ignore them or take action to ***eliminate*** them."  (emphasis added)  Apparently, anti-

8  BDS entities refuse to consider a middle ground.

9       31.  The concerted pressure on Wong to attack the Plaintiff bear a striking

10  resemblance to the donor pressure exerted on the University of Illinois to fire Professor

11  Steven Salaita, another outspoken critic of Israeli policies.  Although the University of

12  Illinois sought to deny it, Freedom of Information Act litigation revealed nearly three

13  hundred pages of emails to University administrators from donors threatening to withdraw

14  their support and demanding that Professor Salaita be fired.  Indeed, the Center for

15  Constitutional Rights and Palestine Legal have documented a concerted nationwide

16  campaign to censor Palestinian advocacy on campus.  The report, "The Palestine Exception

17  to Free Speech", documents how a network of pro-Israel advocacy organizations combine

18  their efforts to smear advocates with false accusations of anti-Semitism and support for

19  terrorism and to demand that universities erect bureaucratic obstacles and make official

20  denunciations of nonviolent support for a nonviolent boycott.  Again, the campaigns

21  described and the universities' capitulation to pressure tactics are eerily similar to Plaintiff's

22  experience.

23       32.  In 2009, GUPS and AMED co-sponsored an event to celebrate the creation of a

24  mural on campus, which honored the late Edward Said, who had been a Professor at

25  Columbia University, had served as President of the Modern Language Association, and had

26  been a visiting Professor at Harvard, Yale, and Johns Hopkins.

27       33.  In 2009 GUPS and AMED invited Omar Barghouti, a founder of the BDS

28

---

SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 3:18-cv-04662-YGR

movement, to speak at this event.  Although Barghouti had received international acclaim he is disliked by some influential community members and SFSU donors because he advocated a nonviolent campaign to pressure the Israeli government to change some of its policies.[10]

34.   At or about the time of the commemoration event then-SFSU President Corrigan met with representatives Jewish Community Relations Council (hereinafter "JCRC") and the Koret Foundation, which demanded the event be cancelled.  Very shortly thereafter Corrigan issued a statement condemning this nonviolent campaign, which was met with applause by Susan Wolfe, who was the then Director of Grant Making Programs at the Koret Foundation (see below). SFSU then cancelled the faculty search and withdrew the contractually promised faculty lines. Corrigan possessed final decision-making authority in such matters.  Plaintiff is informed and believes and based thereon alleges that these actions were ordered by Corrigan in retaliation for Dr. Abdulhadi's firmness in bringing Barghouti and other speakers to the campus, and in standing up for the rights of Palestinians.

35.   On information and belief, the Koret Foundation has donated millions of dollars to SFSU.  Other donations include but are not limited to the following:

      a.   It has also donated heavily to the David Horowitz Freedom Center, which was responsible for plastering the campus with posters falsely claiming that Dr. Abdulhadi and other professors and students hated Jewish people and

---

[10]  The nonviolent campaign bears the acronym BDS and is a Palestinian-led international movement dedicated to the proposition that Palestinians deserve the same rights as everyone else.  The BDS movement seeks to achieve this by encouraging the boycott of the Israeli government and Israeli and international companies involved in human rights violations; divestment from such companies by churches, universities, and labor pension funds, and governmental sanctions, similar to those the United States and European nations applied to South Africa.  (*See* https://usacbi.org/guidelines-for-applying-the-international-academic-boycott-of-israel/ last visited January 13, 2009.  Request for Judicial Notice of this document was granted by Judge Orrick in *Mandel, et. al. v. Board of Trustees* 3:17-cv-03511 Dkt. No. 167, pp. 2-3, fn. 3.)

supported terrorism (all anti-Palestinian tropes designed to stifle free speech and advocacy).

b. The Koret Foundation has also donated heavily to pro-Zionist organizations, which have opposed campaigns supporting justice for and in Palestine, and have attacked student and faculty alike.  Such organizations include the Zionist Organization of America, Israel on Campus Coalition, the Israel Project, the Brandeis Law Center (which has sought to criminalize BDS activities), Stand With Us (which has falsely accused BDS of anti-Semitism to stifle BDS activities) and Hillel International (which claims to be open to all Jewish students but bans student activities critical of Israel).

    i. Hillel International's San Francisco Chapter was responsible for launching a smear campaign against pro-Palestinian student protestors at SFSU in 2016.  This smear campaign resulted in those pro-Palestinian students at SFSU being subjected to death and rape threats.

c. The Koret Foundation gave $100,000 to SFSU in 2015, and another $135,000 between 1993 and 2003.

d. In 2012, 2013 and 2014, the Koret Foundation made donations of $100,000 per year to the San Francisco branch of the Jewish Federation, which in turn gave $100,000 to the AMCHA Initiative, a pro-Zionist organization dedicated to attacking campus-based activity for Palestinian rights.

e. The Koret Foundation-funded the Jewish Federation, which in addition to giving AMCHA a large portion of its annual budget, also donated heavily to the Horowitz Freedom Center (which has been identified as a hate group by the Southern Poverty Law Center).

f. In 2015, the Koret Foundation donated to Israel on Campus Coalition (hereinafter "ICC"), -an anti-Palestinian organization that operates closely

with Canary Mission.  ICC's executive director, Jacob Baime has boasted that, "Canary Mission is highly, highly effective to the extent that we monitor the Students for Justice in Palestine and their allies."  Baime has been caught on camera discussing Canary Mission as an example of the ICC's secretive strategy of putting "up some anonymous website" that was promoted by targeted Facebook ads to smear Palestine solidarity activists on campus.  Baime also revealed that ICC cooperates with Israel's Strategic Affairs Ministry, Israel's covert agency that fights Palestine solidarity movements around the world, particularly BDS.  What is more, Baime claimed that ICC has a budget of $2 million for "research" for smear campaigns against activists and that the ICC coordinated with Israel's Strategic Affairs Ministry.  Disturbingly, Baime admitted that such campaigns were "psychological warfare."

    g.  In 2015, the Koret Foundation donated to the David Project, which is -one of the many organizations that does anti-BDS work on university campuses. The David Project has a long history of dirty tricks involving slander and fabrication campaigns.  The David Project was a key actor in the slander and fabrication campaign against Columbia University Professor Joseph Massad in an effort to deny him tenure.  Professor Massad is an advocate for justice for and in Palestine.  The David Project's campaign against Professor Massad -falsely labeled him as an anti-Semite in an attempt to have him denied tenure and intimidate him from advocating for justice for and in Palestine.

36.   At the time Corrigan withdrew the two faculty positions SFSU had, at the minimum, a policy or practice of honoring the terms of contracts it had negotiated and signed with faculty members.

37.   When Corrigan unilaterally withdrew the contractually required faculty

positions for AMED it was clearly established that professors at state universities could not be subjected to retaliation for the exercise of their rights of free speech under the First Amendment to the United States Constitution.

38.  When President Wong first arrived on campus in 2012 he initially stated his support for the AMED program. Upon his investiture, Wong accepted an invitation to travel to Israel from the JCRC, which has a pro-Israel and anti-Palestinian bias.

39.  Information on this trip's itinerary, flights and accommodations, meetings, goals and objectives has not been made available to the university community.  This is unsurprising, as JCRC and its supporters have declared that JCRC is an organization that works discreetly and behind the scenes.  Indeed, JCRC boasts that it is the "go-to ***behind the scenes*** resource for consultative services on complex community issues."  (emphasis added) Serena Eisenberg, Executive Director of Stanford University Hillel noted that "JCRC has been enormously helpful to me as the Hillel Director at Stanford.  ***Behind the scenes***, whenever sensitive Israel issues arise, the JCRC has been immediately available to advise me, providing invaluable advocacy coaching."  (emphasis added)

40.  On information and belief, President Wong's JCRC sponsored trip to Israel closely resembled the standard JCRC tours to Israel for United States civic leaders.  Such trips feature VIP handling at the Ben Gurion airport and meetings with individuals with anti-Palestinian viewpoints including those who advocate for ethnic cleansing of Palestinians. The aims and results of the trip were (a) to whitewash, concealing and distract from Israel's human rights violations thereby delegitimizing BDS advocates like Dr. Abdulhadi; and (b) to provide President Wong with the ideological justification(s) for doing the bidding of the herein mentioned anti-BDS donors (which included retaliating against Dr. Abdulhadi for her political speech advocating for justice for and in Palestine).  Another Koret Foundation funded organization, the American Jewish Committee (hereinafter "AJC"), an associate of JCRC, has indicated that BDS "poses a particularly sinister threat" on the "American campus."  AJC then boasts that "By showing Israel first-hand, in all its complexity and

vibrancy, [AJC Project Interchange] seminars serve as an antidote to BDS attempts.  After a series of votes by a few academic institutions to boycott Israel, hundreds of leading ***university presidents*** spoke out forcefully against such efforts, and among the most vocal were [AJC Project Interchange] alumni."[11] (emphasis added).

41.  Upon President Wong's return from Israel he began to express notable hostility toward Professor Abdulhadi, AMED studies, and Palestinian students, accepting AMCHA's erroneous conflation of criticism of Israel with anti-Semitism. In the fall of 2013 , the Koret Foundation-funded AMCHA Initiative began loudly (and falsely) accusing Dr. Abdulhadi of anti-Semitism.[12]

42.   Shortly after the AMCHA slanders, high-ranking campus administrators themselves directed anti-Palestinian slurs at Dr. Abdulhadi.  Although President Wong was present, neither he nor any of the other administrators objected or even challenged these remarks.  Having remarks such as these condoned by the university President and other high-ranking officials effectively ratified their making.

43.   Far from censuring the anti-Palestinian remarks, President Wong enthusiastically acted on them, ordering repeated investigations into Plaintiff's international research and lecturing trips, which were supported pursuant to Plaintiff's contract with SFSU. SFSU also revoked authorization for Plaintiff's 2014 research trip to Palestine even though it had already been approved.   The excuse that SFSU provided for canceling this trip was that the US State Department had issued a travel warning.  However, the trip was

---

[11] AJC defines "AJC Project Interchange" as "bringing influential leaders to [Israel]".  AJC boasts that 90% of AJC Project Interchange participants "took positive Israel-related actions upon their return."

[12]  The AMCHA Initiative is a pro-Israel group which released a blacklist of more than 200 Middle East Studies professors in the United States it declared to be "anti-Israel" (including Plaintiff).  It has also filed multiple complaints with the U.S. Department of Education Office for Civil Rights alleging that speech critical of Israel creates a hostile environment for Jewish students in violation of Title VI of the 1964 Civil Rights Act.  None of these complaints have ever been upheld.  AMCHA has also tried to pressure UC and CSU campuses into cancelling courses and lectures with which it disagreed.

1    ordered canceled before the travel warning was issued.

2        44.  This was followed by a campaign of harassing inquisition into Plaintiff's

3    scholastically-related travel which continues to this day.  The ongoing harassment is the

4    result of and evidence of continuing violations of Plaintiff's civil rights.

5        45.  Defendants have continued their campaign to obstruct and impede Dr.

6    Abdulhadi's research and teaching-related travel by imposing conditions and requirements

7    not typically imposed on other faculty members, by delaying reimbursement for approved

8    trips, and by setting impossible deadlines, insisting that Dr. Abdulhadi respond to demands

9    on Christmas Day, on a Saturday night, during school breaks, etc.

10       46.  Plaintiff is informed and believes and based thereon alleges that the objective of

11   this campaign of discriminatory and unending harassment is to establish a work

12   environment that is so hostile and inimical to Dr. Abdulhadi's research and academic

13   pursuits that she either resigns her position or at least spends most of her time locked in

14   administrative battles, thus reducing her energy, time, and effectiveness for her scholarship,

15   to advocate for teaching, publishing and protecting her students, and engaging in service as

16   a public intellectual.  Plaintiff is also informed and believes and based thereon alleges that

17   the defendants engage in this campaign of discriminatory harassment which continually

18   violates her rights in order to appease donors and influential political figures who

19   themselves harbor biases against students and faculty who are Arabs and/or Muslims or who

20   are members of organizations primarily composed of Arabs and/or Muslims.  This is

21   evidenced by the following:

22           a)  As recently as June 9, 2016, President Wong and Vice President Hong

23               admitted to GUPS, whose membership is overwhelmingly Arab and Muslim

24               they were being targeted by University officials.  Wong and Hong admitted

25               that GUPS members were selectively prosecuted for acts undertaken by many

26

27

28

students who were neither Arab or Muslim or members of GUPS.[13]  Many of these students are enrolled in courses in AMED studies, the program run by Dr. Abdulhadi.

    b)  Although President Wong has explicitly and repeatedly denounced as "anti-Semitism" acts or speech he has viewed, or claimed to view in this fashion, he does not similarly criticize anti-Arab or anti-Palestinian racism or Islamophobia by name, instead offering broad generalizations about "racism" and "discrimination".

47.   One of the key conduits for continuing pressure on Wong has been officers, staff, and associates of JCRC, which gave Wong this trip in the first place.

    a.  JCRC wields significant influence over SFSU.  As just one example, Dana Corvin, a major donor to JCRC, is also a board officer of the San Francisco based Jewish Community Federation and a board member of the San Francisco State University Foundation.  In 2016, shortly after a demonstration against an Israeli official on SFSU's campus, Corvin emailed President Wong about a political rally organized by the Stanford chapter of Hillel.  Corvin later complained to SFSU officials that SFSU was not being harsh enough with the students who demonstrated against the aforementioned Israeli official.  Corvin's complaint, though general, was taken so seriously that it was almost immediately relayed to President Wong and to SFSU's Chief Financial Officer.

---

[13]  GUPS is the General Union of Palestinian Students, GUPS is a student-run organization that has been a part of the SFSU community for over four decades.  It is dedicated to political and cultural awareness of Palestinian and Arab culture within the San Francisco Bay Area community.  GUPS also increases awareness of the Palestinian struggle for liberation and justice.

b.  As another example, Jason Porth, executive director of University

Corporation, San Francisco State (UCorp).  UCorp oversees much of the

commercial activity on the campus and millions of dollars of grants a year.

Jason Porth's spouse, Abby Porth, is the Associate Executive Director of San

Francisco JCRC.   Jason Porth used his executive position to amplify

pressure tactics calculated to push SFSU to harshly punish student

demonstrators.  aimed at students Both Jason Porth and Abby Porth worked

to stop the San Francisco Board of Supervisors from condemning Israel's

blockade of Gaza.

48.   For at least the past several years prior to the filing of this suit, despite her

senior status and her title as director and senior scholar in AMED Studies, Dr. Abdulhadi, a

Palestinian Muslim woman, was repeatedly excluded from University task forces and

working groups that were set up to address anti-Semitism and Islamophobia.

49.  In the Spring of 2015 Provost Rosser blocked a university grant Plaintiff was

seeking to write a book with Simona Sharoni, an Israeli feminist colleague.  Plaintiff

reported to SFSU that the University of Washington Press had agreed it would publish the

book.  Plaintiff was later informed by SFSU's Office of Research and Sponsored Programs,

that Provost Rosser's "office" denied the funding, despite excellent reviews from external

reviewers whom the University hired to review the proposal.

50.  In the Spring of 2016, Provost Rosser directed Dean Monteiro to investigate the

contractual agreement that the University would fund Plaintiff's travel, giving Monteiro the

impression that Rosser wanted him to cancel it.

51.  Since at least October 14, 2016, in addition to direct forms of national origin

discrimination, SFSU has tolerated the acts of third parties that have contributed to the

creation and maintenance of a hostile and threatening environment for Dr. Abdulhadi.  The

acts tolerated have included outside organizations putting up posters that made vile and

unfounded accusations against her, her colleagues, and her students.  Although the posters

1   violated SFSU regulations, the university took no steps to remove them or to prevent the

2   reoccurrence of this.  Similar posters have been placed on campus several times.

3       52.  In the Fall of 2017, Provost Summit delayed Plaintiff's delayed travel

4   authorization to Palestine insisting that forms be changed to read "in consultation with

5   President's office" regarding the Memorandum of Understanding between SFSU and an-

6   Najah National University in Palestine.  This new requirement was imposed after a right-

7   winged "think tank" launched a petition smearing Plaintiff as a terrorist apologist and

8   demanding cancellation of the Memorandum of Understanding.

9       53.  In February of 2018, when Plaintiff requested an operating budget for AMED

10  that would support administrative assistants and faculty, Provost Summit refused, stating

11  that support for the AMED program should come out of what Plaintiff had previously

12  negotiated for herself in her contract.

13      54.  On March 23, 2018, Summit sent an email to Dr. Abdulhadi demanding that

14  she remove a post on a privately owned Facebook page wherein Dr. Abdulhadi criticized

15  President Wong's position on anti-Palestinian views on campus.  In that email, Summit

16  threatened disciplinary action against Dr. Abdulhadi if Dr. Abdulhadi did not obey and

17  remove the aforementioned Facebook post.

18      55.  On February 13, 2019, Plaintiff led a protest against SFSU's decision to

19  recognize Israel Independence Day as a religious holiday and SFSU's refusal to recognize

20  Ramadan as a religious holiday.  Barely one week later, SFSU's administration fired

21  Plaintiff's student assistant, who had been hired by the disabilities office.  Within the next

22  two weeks thereafter, SFSU's administration denied Plaintiff's travel authorization to

23  South Africa.

24      56.  The treatment to which Dr. Abdulhadi and her students have been subjected by

25  SFSU contrasts greatly with the kid-glove treatment afforded non-Muslim, non-Arab, and

26  non-Palestinian students. For example, in the fall of 2018 an avowed Nazi whose social

27  media posts have called for the murder of Muslims, Jews and immigrants, registered as a

28

SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 3:18-cv-04662-YGR

1   student in Dr. Abdulhadi's Palestine class.  Despite these  threats of bigoted violence, on

2   information and belief,  Defendants have not removed the Nazi from campus or in any way

3   address the danger he poses to students, faculty, and administration, or at least provided Dr.

4   Abdulhadi and her students reasonable security and protection for this class.  This stands in

5   sharp contrast to the 2014 treatment meted out to a Palestinian student, who was ordered

6   out of school and suspended for a year for social media posts.

7          57.   Another stark contrast is the University's double standard in choosing which

8   complaints to formally investigate.  When the Executive Director of San Francisco Hillel,

9   an off-campus organization, complained over coffee to Vice President Hong about Hillel's

10  purported exclusion from a student-organized event in 2017 the University immediately

11  launched a massive and time-consuming investigation.  By contrast, in the face of Hillel's

12  public silence about a violence-advocating Nazi student on campus, the complaints of Dr.

13  Abdulahadi and student groups, such as Jews Against Zionism, GUPS, the Muslim

14  Students' Association, the Muslim Women's Students Association, Movimiento Estudiantil

15  Chicano de Aztlan, Students for Quality Education (hereinafter "MECHA"), Ethnic Studies

16  Students' Organization, and other groups representing students of color, went unheeded.

17         58.   In addition to the foregoing, Dr. Abdulhadi has been subjected to a continuous

18  stream of discriminatory harassing conduct including, *inter alia*, abrupt and arbitrary

19  cancellation of classes she had planned and selected qualified community scholars to teach;

20  University republication, on the official SFSU website, of false and smearing allegations

21  delaying replacement of her work laptop computer for several months after hers was stolen

22  during an academic trip; preventing Dr. Abdulhadi from accepting prestigious visiting

23  fellowships at five international and national universities; refusing to publicize academic

24  fellowships she was awarded; moving her office without her permission (which was halted

25  only after the faculty union intervened); insisting that she obtain insurance for a teach-in

26  that was held in the college conference room where insurance had never been required or

27  suggested for non-Arab, non-Muslim groups; doing nothing to protect her students who

28

have been stalked on-line and received death threats and threats of sexual violence, and at least one whose employer was contacted in an effort to get the student fired; and arbitrarily reducing the amount of travel support by 13% in further violation of the contractual agreement SFSU made with Dr. Abdulhadi.[14]

59.  **Associational Retaliation** Throughout her time at San Francisco State University Dr. Abdulhadi has closely associated with students who advocate for justice for and in Palestine who were Palestinians and others of Arab ancestry, as well as with Muslim students.  She has also advocated for them when they felt themselves subjected to discriminatory treatment.

60.  For example, Dr. Abdulhadi worked with and advocated for Palestinian, Arab, and Muslim students:

a.  When they were attacked by the Administration for wanting to include a nonviolent cartoon character on a mural to be displayed at the student center on campus;

b.   When they were subjected to hate speech on campus perpetrated by outsiders;

c.  When they were threatened with disciplinary action in retaliation for political protests; and most recently

d.  When the University did not even investigate it after students discovered a naked man inside of the Muslim Women Students' Association's prayer room.

---

[14] Adjusted for inflation since the contract's inception, this is a 29% reduction in support for Dr. Abdulhadi's academic-related travel expenses.

SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 3:18-cv-04662-YGR

1

**Unlawful Retaliation in Violation of 42 U.S.C. §1983**

2

61.    When Plaintiff was invited as an SFSU faculty member in addition to her

3

teaching and scholarship, to serve as faculty adviser to GUPS.

4

62.    In 2009, GUPS and AMED co-sponsored an event to celebrate the creation of a

5

mural on campus which honored the late Edward Said, who had been a Professor at

6

Columbia University, had served as President of the Modern Language Association, and had

7

been a visiting Professor at Harvard, Yale, and Johns Hopkins.

8

63.    In 2009 GUPS and AMED invited Omar Barghouti to speak at this event.

9

Although Barghouti had received international acclaim he is disliked by some influential

10

community members and SFSU donors because he advocated a nonviolent campaign to

11

pressure the Israeli government to change some of its policies.[15]

12

64.    At or about the time of the commemoration event then-SFSU President

13

Corrigan met with representatives Jewish Community Relations Council (hereinafter

14

"JCRC") and the Koret Foundation, which demanded the event be cancelled.  Very shortly

15

thereafter Corrigan issued a statement condemning this nonviolent campaign, which was

16

met with applause by Susan Wolfe, who was the then Director of Grant Making Programs

17

at the Koret Foundation (see below). SFSU then cancelled the faculty search and withdrew

18

the contractually promised faculty lines. Corrigan possessed final decision-making

19

authority in such matters.  Plaintiff is informed and believes and based thereon alleges that

20

these actions were ordered by Corrigan in retaliation for Dr. Abdulhadi's firmness in

21

22

---

23

[15]  The nonviolent campaign bears the acronym BDS and is a Palestinian-led international movement dedicated to the proposition that Palestinians deserve the same rights as everyone else.  The BDS movement seeks to achieve this by encouraging the boycott of the Israeli government and Israeli and international companies involved in human rights violations; divestment from such companies by churches, universities, and labor pension funds, and governmental sanctions, similar to those the United States and European nations applied to South Africa.  (*See* https://usacbi.org/guidelines-for-applying-the-international-academic-boycott-of-israel/ last visited January 13, 2009.  Request for Judicial Notice of this document was granted by Judge Orrick in *Mandel, et. al. v. Board of Trustees* 3:17-cv-03511 Dkt. No. 167, pp. 2-3, fn. 3.)

24

25

26

27

28

bringing Barghouti and other speakers to the campus, and in standing up for the rights of Palestinians.

65.   At the time Corrigan withdrew the two faculty positions SFSU had, at the minimum, a policy or practice of honoring the terms of contracts it had negotiated and signed with faculty members.

66.   When Corrigan unilaterally withdrew the contractually required faculty positions for AMED it was clearly established that professors at state universities could not be subjected to retaliation for the exercise of their rights of free speech under the First Amendment to the United States Constitution.

67.   On November 7, 2013, the student group Dr. Abdulhadi advised, GUPS, held a rally and event on-campus to commemorate the anniversary of the Edward Said Memorial Mural.  On November 19, 2013, President Wong, under pressure from outside organizations, issued a statement claiming that chalked slogans and posters and the image on a sweatshirt celebrated violence and promoted anti-Semitism, even though none of the slogans, posters, or images mentioned Jews or used images associated with Jewishness.

68.   In January 2014, Dr. Abdulhadi led a research trip to Palestine that included other academics, including another SFSU Professor.  Beginning in March 2014, outside pressure groups complained about the trip.  In May of 2014 President Wong ordered three separate (and redundant) audits into Dr. Abdulhadi's travels including a five-year audit going back to 2009 even though SFSU had reviewed and approved each of these trips in advance, and even though Dr. Abdulhadi, who had been proclaimed by SFSU as an international scholar under the terms of her contract, was entitled to take University-funded international research trips.

69.   Thus began a pattern of interference and harassment, which continues to the present.  The pattern of acts was undertaken at the direction of President Wong, who held final decision-making authority at SFSU, and was so consistently executed as to constitute a  governmental "custom"  as defined by *Los Angeles County v. Humphries,* 562 U.S. 29,

36 (2010).  In violation of its own travel policies SFSU has canceled a trip it had already approved, has singled out Dr. Abdulhadi for repeated scrutiny of how she spends her authorized budget for research-related travel, has demanded justifications of her trips not asked of other faculty, and has repeated "lost" travel-related documents, delaying reimbursement and forcing Dr. Abdulhadi through the time consuming exercise of repeatedly finding and resubmitting the same paperwork.  This has had the effect of obstructing Dr. Abdulhadi from her academic and scholarly obligations, which are already unconscionably burdensome in light of SFSU's repeated refusal to provide administrative support for this officially sanctioned program despite promises to do so.  It has also forced her to personally absorb expenses of the type that SFSU had previously approved, that were simply taking too much of her time to dispute, and to pay out of pocket for a part-time administrative assistant, a position which SFSU should have made available to AMED.

70.  SFSU has denied or greatly delayed repayment for, *inter alia*, the following legitimate and contractually authorized expenses:

    a.  In 2013 SFSU refused to pay for Dr. Abdulhadi's travel to present a paper at the bi-annual conference of the Center for American Studies and Research at the American University of Beirut.  SFSU and CSU delayed authorizing the trip for so long that Dr. Abdulhadi was ultimately unable to confirm to the conference organizers that she would be able to participate and was removed from the schedule.  This resulted in reputational harm to Dr. Abdulhadi, among other damages.

    b.  In 2015 SFSU delayed authorizing payment for Dr. Abdulhadi's travel to the annual meeting of the American Studies Association, until the day the conference began, so she could not attend.  The American Studies Association is the oldest scholarly organization dedicated to the study of U.S. culture and history.  This resulted in reputational harm to Dr. Abdulhadi, among other damages.

c.  SFSU claimed that in February of 2017 Dr. Abdulhadi had "canceled" two trips she had taken to the American Studies Association's and the National Women's Studies Association's annual meetings – even though the meetings had occurred months before.  Although SFSU ultimately relented, it took over a year -of bureaucratic wrangling to wrest the contractually authorized payments from SFSU.

d.  In October of 2017 Professor Abdulhadi was refused reimbursement for part of her expenses a trip to present a paper at the acclaimed Afro Middle East Center in Johannesburg where she met privately with (then) Deputy President Cyril Ramaphosa, weeks before he became President of South Africa.

e.  SFSU also denied contractually authorized travel authorization for Dr. Abdulhadi to present a 2017 lecture on the 100th Anniversary of the Balfour Declaration at the University of London's School of Oriental and African Studies (SOAS).  SOAS is widely acknowledged as the world's leading institution for the study of Asia, Africa and the Middle East.

f.  SFSU also denied payment to Dr. Abdulhadi for part of her expenses to travel to address the French National Assembly on the 100th Anniversary of the Balfour Declaration.  Importantly, Defendants are aware that these tactics impose a substantial financial hardship upon Dr. Abdulhadi.

71.  Dr. Abdulhadi is informed and believes and based thereon alleges that after 2014 and before 2016, Wong and/or Provost Rosser ordered Dean Kenneth Monteiro and possibly other officials to interfere with her travel and to initiate pointless and time-consuming audits.  Dr. Abdulhadi is informed and believes and based thereon alleges that Provost Rosser expanded the scope of the audits that President Wong had ordered against Dr. Abdulhadi, leading to the spiteful requirement that Dr. Abdulhadi account for and document every single food item purchased and consumed even though she had a per diem

allowance.

72.  These instructions were issued and carried out in violation of SFSU travel policies.  This was done and is still being done at a time when it was clearly established that professors at state universities could not be punished for the exercise of their rights of free speech and/or academic freedom.

73.  Dr. Abdulhadi is further informed and believes and based thereon alleges that the same directions and the same approach has led to SFSU's denial of routine reimbursement for supplies necessary for her research and teaching, including, *inter alia*, storage charges for substantial amounts of electronic data, the cost of shipping extensive research files held at SFSU to New York where she was continuing her research and writing for publication, etc.

74.  Plaintiff suffers from a disability or disabilities, at least one of which significantly limits major life and work activities, of which Defendants are aware. Defendants are further aware that such disabilities compound and exacerbate the effects of Defendants' bureaucratic harassment of Plaintiff in retaliation of her political speech.

### Further Retaliation by Excluding Dr. Abdulhadi From Key Task Forces and Working Groups, and by Seeking to Deprive Her of Authority as Director of AMED Studies

75.  In May of 2017 SFSU convened a Presidential Task Force on "Campus Climate", headed by Dr. Wong.  Although numerous faculty, students, community representatives and administrators were invited to participate, Dr. Abdulhadi was conspicuously **_not_** invited, nor was her input sought.

76.  In the summer of 2017, Dr. Hong established an "Ad Hoc Working Group to develop an "Equity and Social Justice Educational Outreach Plan".  Although a great many faculty members were invited, again, Dr. Abdulhadi was not invited, nor was her input sought.

77.   Similarly, in 2018, the Department Chair has repeatedly sought to sidestep Dr. Abdulhadi and deal directly with her teaching associate and doctoral student about what courses he can teach and how to arrange them.  The Department Chair has continued with this approach despite repeatedly being asked to go through Dr. Abdulhadi on these matters.

78.   Beginning with President Corrigan and continuing with President Wong, SFSU enacted policies and consistent customs to interfere with and obstruct Plaintiff's professional productivity, to deny her support regardless of the fact that it had been contractually agreed to or was otherwise required by law, and to harass her in ways large and small so as to reduce her effectiveness, all in retaliation for her exercise of her rights of freedom of speech and academic freedom.

**Cause of Action for Deprivation of Civil Rights Under Color of State Law**

**Against the Board of Trustees of California State University, Leslie Wong,**

**Sue V. Rosser, Jennifer Summit, and Does 1-10, Inclusive**

79.  Plaintiff repeats and repleads each allegation in Paragraphs 1-78 inclusive, as though fully set forth herein.

80.  This cause of action is asserted against defendants Wong, Rosser and Summit and Does 1-10 in their individual capacities insofar as compensatory and punitive damages are sought.

81.  This cause of action is asserted against defendants Wong, Rosser, and Summit and Does 1-10 in their official capacities only insofar as prospective and injunctive relief are sought.

82.  At all times material hereto Plaintiff was an employee of California State University.

83.  Plaintiff exercised her right to free speech under the First Amendment of the U.S. Constitution by speaking out on a matter of public concern, including but not limited to racism, Islamophobia, sexism, and the rights of the Palestinian people, inter alia.

84.  Plaintiff has been subjected to harassment, interference with her professional

and scholastic activities, denial of opportunities for professional advancement, withdrawal of promised support for additional tenure-track professors and administrative support, and denial of reasonable accommodations.

85.  These adverse actions against Plaintiff were a direct response to and were intended to harass and discriminate against Plaintiff for her exercise of her free speech rights on matters of public concern. The Board of Trustee's adverse retaliatory actions Plaintiff violated her constitutional rights under the First Amendment to the U.S. Constitution, as enforced through 42 U.S.C. Section 1983.  These adverse actions were directed, supervised and/or executed by Defendants Wong, Rosser, and Summit.

86.     The acts by Defendants of which Plaintiff complains in this cause of action were taken by Defendants under color of state law.

87.  Defendants were at all times material hereto policy makers and operating under policy or practice of California State University.

88.  As a direct and legal result of the aforementioned violations, Plaintiff has been harmed in an amount to be proven at trial.

89.  The acts of defendants Wong, Rosser, and Summit were done with malice, fraud, oppression, and in reckless disregard of Plaintiff's clearly established constitutional rights.  Further, these acts were despicable in character and warrant the imposition of punitive damages in an amount sufficient to punish the defendants and to deter future similar misconduct.

//

//

//

//

//

//

//

---

SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for damages against Defendants as follows:

**ACTION FOR DEPRIVATION OF CIVIL RIGHTS UNDER COLOR OF STATE LAW**

**Against California State University and Against Leslie Wong, Sue V. Rosser, and Jennifer Summit Only in Their Official Capacities**

1.  Such injunctive relief as the Court may specify to prevent Plaintiff from being retaliated against for the exercise of her rights under the First Amendment of the United States Constitution.

2.  Such other and further relief as the court may find justified.

**Against Leslie Wong, Sue V. Rosser, and Jennifer Summit Only in Their Individual Capacities**

1.  General damages for embarrassment, humiliation, stress, anxiety, emotional distress, pain and suffering, inconvenience, mental anguish, loss of enjoyment, loss of dignity and damage to personal and professional reputation in an amount to be proven at trial;

2.  Damages for loss of income in an amount to be proven at trial;

3.  Damages for future loss of income in an amount to be proven at trial;

4.  Damages for incidental expenses for services, equipment, and travel in an amount to be proven at trial;

5.  As to Defendants Wong, Rosser, and Summit: Punitive or exemplary damages in an amount sufficient to punish each defendant and to deter future similar misconduct

6.  Reasonable attorney's fees and costs of litigation;

7.  Such other and further relief as the court may find justified.

1

DATED:  April 11, 2019                    RESPECTFULLY SUBMITTED

2

**LAW OFFICE OF MARK ALLEN KLEIMAN**

3

4

By:  __/s/ Mark Allen Kleiman, Esq._____

5

6

Mark Allen Kleiman, Esq.

7

**LAW OFFICES OF BEN GHARAGOZLI**
Ben Gharagozli, Esq.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Case No. 3:18-cv-04662-YGR

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff demands a jury trial on all issues so triable.

3

4

DATED:  April 11, 2019                          RESPECTFULLY SUBMITTED

5

**LAW OFFICE OF MARK ALLEN KLEIMAN**

6

7

8

By:   _/s/ Mark Allen Kleiman, Esq._

9

Mark Allen Kleiman, Esq.

10

**LAW OFFICES OF BEN GHARAGOZLI**
Ben Gharagozli, Esq.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28