Mark A. Kleiman (SBN 115919)
Law Office of Mark Allen Kleiman
2907 Stanford Ave. Venice, CA 90292
Telephone: (310) 306-8094
Facsimile: (310) 306-8491
Email: mkleiman@quitam.org

Ben Gharagozli (SBN 272302)
Law Offices of Ben Gharagozli
2907 Stanford Avenue
Marina del Rey, California 90292
Telephone: (661) 607-4665
Facsimile: (855) 628-5517
Email: ben.gharagozli@gmail.com


Attorney for Plaintiff, RABAB ABDULHADI

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| RABAB ABDULHADI,<br><br>       Plaintiff,<br>       v.<br><br>BOARD OF TRUSTEES of the CALIFORNIA STATE UNIVERSITY; LESLIE WONG;  SUE V. ROSSER; and JENNIFER SUMMIT<br><br>       Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 4:18-cv-04662-YGR<br><br>**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT [ECF 45]**<br><br>**Date: July 9, 2019**<br>**Time: 2:00 p.m.**<br>**Location: Courtroom 1 (4th Floor)**<br>**Judge: Yvonne Gonzalez Rogers** |

PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT [ECF 45]
Case No. __4:18-cv-04662

1

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES…………………………………………………………………iii

I.      INTRODUCTION…………………………………………………………...1

II.     ARGUMENT…………………………………………………………………...1

A) The Question of Intent Is One of Fact that Is Not Appropriate to Resolve
   on a 12(b)(6) Motion………………………………………………………..1

B) Even Permissible Acts That Comprise Retaliatory Action Are
   Unconstitutional……………………………………………………………2

    1.      Constitutionally Protected Activity……………………………………3

    2.      Chill a Person of Ordinary Firmness……………………………………4

    3.      Substantial or Motivating Factor in the Defendants' Conduct…………………6

        (a) Temporal Proximity……………………………………………… 7

            i)      The SAC Pleads Sufficient Temporal Proximity to
                    Support Retaliation………………………………………8

        (b) Defendants' Opposition to Plaintiff's Speech………………………11

        (c) Defendants' Excuses Have Been False and Pretextual………………14

        (d) Because These Acts Have Been Taken by Officials With Final
            Decision-Making Authority Over Plaintiff's Working Environment,
            They Comprise Government Policy…………………………………...15

C)  Harm to Plaintiff…………………………………………………………..18

D)  Defendants' "No Other Rational Basis Test" Does Not Exist………………………… 20

E)  Defendants' Argument Regarding The Facebook Post Ignores Defendants'
    Own Policies and Prior Arguments in the Northern District……………………………20

F)  Since Plaintiff Has Properly Alleged Retaliatory Motive it Is Unnecessary to
    Establish WHY Decision-Makers Have Such Motives…………………………………23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

G) Although Information on Defendant Wong's Israel Trip Is In the
Possession of Defendants, Plaintiff Has Met Her Pleading Obligations.....................24

III.     REQUEST FOR LEAVE TO AMEND..............................................................25

IV.     CONCLUSION...................................................................................25

---

**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT [ECF 45]**

Case No. __4:18-cv-04662

## <u>TABLE OF AUTHORITIES</u>

1

2

3                                                                                      <u>Page</u>

4

<u>Allen v. Iranon</u>, 283 F.3d 1070 (9th Cir. 2002) ...........................................................7

5

<u>Ariz. Students' Ass'n v. Ariz. Bd of Regents</u>, 824 F.3d 858 .................................... 6-7

6

<u>Baughman v. Walt Disney World Co.</u>, 685 F.3d 1131 (9th Cir. 2012) ....................21

7

<u>Braxton-Secret v. A.H. Robins Co.</u>, 769 F.2d 528 (9th Cir. 1985) ...........................2

8

<u>Coszalter v. City of Salem</u>, 320 F.3d 968 (9th Cir. 2003) .........................................7

9

<u>Demers v. Austin</u>, 746 F.3d 402 (9th Cir. 2014) ....................................................13

10

<u>Denney v. DEA</u>, 508 F. Supp. 2d 815, 829 (E.D. 2007) ...........................................1

11

12

<u>Downs v. Los Angeles Unified Sch. Dist</u>, 228 F.3d 1003 (9th Cir. 2000) ................22

13

<u>Emergency Coalition to Defend Educ. Travel v. United States</u>
      Dep't of the Treasury 545 F.3d 4, 16 (D.C. Cir. 2008) ...............................17

14

15

<u>Eng v. Cooley</u>, 552 F.3d 1062 (9th Cir. 2009) ........................................................20

16

<u>Fears v. Morgan (In re Ohio Execution Protocol)</u>, 860 F.3d 881 (6th Cir. 2017) .................22

17

<u>Fogel v. Collins</u>, 531 F.3d 824 (9th Cir. 2008) .......................................................16

18

<u>Fonda v. Gray</u>, 707 F.2d 435 (9th Cir. 1983) ...........................................................2

19

20

<u>Gernetzke v. Kenosha Unified Sch. Dist. No. 1</u>, 274 F.3d, 464 (7th Cir. 2001) ..........................15

21

22

<u>Illinois ex rel. Gordon v. Campbell</u>, 329 U.S. 362 (1946) .......................................22

23

<u>Keyser v. Sacramento City Unified Sch. Dist.</u>, 265 F.3ed 741 (9th Cir. 2001) .........................7

24

<u>Magana v. Commonwealth of N. Mariana Islands</u>,
      107 F.3d 1436 (9th Cir. 1997) ........................................................................2

25

26

<u>Mendocino Envtl. Ctr. v. Mendocino County</u>, 192 F.3d 1283 (9th Cir. 1999) ...........................2,3

27

<u>Menotti v. City of Seattle</u>, 409 F.3d 1113 (9th Cir. 2005) ......................................16

28

---

New Hampshire v. Maine, 532 U.S. 742 (2001) ...........................................................22

O'Brien v. Welty, 818 F.3d 920 (9th Cir. 2016) ..........................................................3

Oviatt v. Pearce, 954 F.2d 1470 (9th Cir. 1992)........................................................16

Park v. Thompson, 851 F.3d 910..............................................................................25

Pembaur v. City of Cincinnati, 475 U.S. 469 (1986) ..................................................15

Price v. Akaka, 928 F.2d 824 (9th Cir. 1991)............................................................15

Rissetto v. Plumbers and Steamfitters Local 343, 94 F.3d 597 (9th Cir. 1996)...........22

Ulrich v. City & County of San Francisco, 308 F.3d 968 (9th Cir. 2002) ...................16

United States v. Perry, 431 F.2d 1020 (9th Cir. 1970) ................................................2

Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,
     739 F.2d 1434 (9th Cir. 1984) ............................................................................2

Yniguez v. Arizona, 939 F.2d 727 (9th Cir. 1991)......................................................21

---

**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT [ECF 45]**

Case No. __4:18-cv-04662

## I.    INTRODUCTION

Plaintiff has more than met the standards to establish the plausibility that she has suffered retaliation from government officials who do not like what she has to say. Because Defendants sometimes mischaracterize her allegations and sometimes flatly ignore some of the most crucial ones, this opposition will necessarily devote time to an exacting and accurate review of what is actually alleged, rather than what Defendants may *wish* we alleged.  When the *actual* allegations are measured against the correct Ninth Circuit standards rather than a selectively quoted case from another jurisdiction, it should be apparent that the allegations have been properly made and that this case is now at issue.

Questions crucial to this case (such as retaliatory intent and the scope and nature of the authority of decision-makers in a complex institution) simply cannot be resolved without diligent and searching discovery, and we respectfully ask this Court to focus on what we have actually alleged, and not what the Defendants would prefer to find was lacking.

## II.    ARGUMENT

### A)  The Question of Intent Is One of Fact that Is Not Appropriate to Resolve on a 12(b)(6) Motion

"Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in light of the timing and the surrounding circumstances."  Coszalter v. City of Salem, 320 F.3d 968, 978 (9th Cir. 2003).  Defendants provide no case law supporting their claim that the issue of intent in this case can be decided on a 12(b)(6) motion.

In denying a motion to dismiss and motion for summary judgment in a First Amendment retaliation claim, Judge Karlton of the Eastern District ruled that where "the circumstances at least ***permit*** the inference that plaintiff was under investigation for his speech."  Denney v. DEA, 508 F. Supp. 2d 815, 829 (E.D. 2007) (emphasis added).  Judge Karlton noted that "[q]uestions involving a person's state of mind…are generally factual issues inappropriate for

---

PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT [ECF 45]

Case No. __4:18-cv-04662

1

resolution by summary judgment." Id. [citing Braxton-Secret v. A.H. Robins Co., 769 F.2d 528, 531 (9th Cir. 1985); see also Vucinich v. Paine, Webber, Jackson & Curtis, Inc., 739 F.2d 1434, 1436 (9th Cir. 1984) ("Summary judgment is generally inappropriate when mental state is an issue, unless no reasonable inference supports the adverse party's claim.")]. An issue that is inappropriate to resolve via summary judgment is certainly inappropriate for a 12(b)(6) motion.

At the last hearing, the Court explained to Defendants that:

"I try these cases all the time. Rarely, if ever, do I have a defendant come in here and do we have a nice document that the jury can see that says *hey, we've got a policy that allows us to harass the plaintiff*. It doesn't happen."

(Dkt. 41, p.,6:4-7).

This same standard applies to issues of retaliatory intent. "Direct evidence of improper motive or an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available. Instead, it will almost always be necessary to infer such agreements from circumstantial evidence or the existence of joint action." Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d 1283, 1302 (9th Cir. 1999) (referencing Magana v. Commonwealth of N. Mariana Islands, 107 F.3d 1436, 1447, (9th Cir. 1997). The Mendocino court also relied on the Braxton decision holding that questions about an individual's state of mind are generally issues of fact inappropriate for resolution by summary judgment. Mendocino, 192 F.3d at 1302.

Plaintiff recognizes that such cases can at times be resolved by way of a motion for summary judgment. Specifically, "where the palpable facts are substantially undisputed, such issues can become questions of law which may be properly decided by summary judgment." Braxton, 769 F.2d at 531 [referencing Fonda v. Gray, 707 F.2d 435, 438 (9th Cir. 1983)]. However, Braxton carefully cautioned that "summary judgment should not be granted where contradictory inferences may be drawn from such facts even if undisputed." Id. [relying on United States v. Perry, 431 F.2d 1020, 1022 (9th Cir. 1970)].

**B) Even Permissible Acts That Comprise Retaliatory Action Are Unconstitutional**

In support of their contention that Plaintiff has not alleged the requisite retaliatory intent. (Dkt. 45, p. 11:8), Defendants insist that Plaintiff has alleged "merely permissible behavior on

---

**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT [ECF 45]**

Case No. __4:18-cv-04662

the part of the university." (Id. at 11:14).  This argument ignores the well-established principle that "Otherwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment."[1]  O'Brien v. Welty, 818 F.3d 920, 932 (9th Cir. 2016). .  Neil O'Brien was a student and outspoken critic of California State University Fresno ("Fresno State").  He confronted and videotaped two professors in their offices to question them about a poem they had published in the student newspaper.  Fresno State disciplined the plaintiff for harassment, intimidation and posing a threat to others.  The district court dismissed the plaintiff's First Amendment lawsuit. Id. at 924.

In reversing, the Ninth Circuit reasoned that although the plaintiff "could lawfully be subject to discipline for his actions, that does not end our inquiry.  Otherwise lawful government action may nonetheless be unlawful if motivated by retaliation for having engaged in activity protected under the First Amendment."  Id. at 932.

The O'Brien court noted that there are three elements to a First Amendment retaliation claim: a plaintiff must show that "(1) he was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity[2] and (3) the protected activity was a substantial or motivating factor in the defendant's conduct."  Id. and Mendocino Envt'l Cntr. v. Mendocino Cnty., 192 F.3d 1283, 1300 (9th Cir. 1999)].  At the motion to dismiss stage, a court determines whether a complaint meets the aforementioned criteria by the plausibility standard.  Id. at 933.

### 1) Constitutionally Protected Activity

O'Brien met the first prong because he had engaged in constitutionally protected activity in the months before the videotape confrontation.  Indeed, there were allegations that months

---

[1] If a CSU president were the subject of a criminal investigation, threatening to fire the investigator could still be obstruction of justice even if firing was within that president's authority.

[2] The O'Brien court explained that this test is "generic and objective" and observed that whether the plaintiff themselves was or would have been chilled is not relevant.  O'Brien, 818 F.3d at 933.

---

**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT [ECF 45]**

Case No. __4:18-cv-04662

3

before the plaintiff "posted on a website opposing the student govern-ment president and the school administration" and "made several public records requests to Fresno State." Id. And in the case at bar, Defendants do not and cannot dispute that Plaintiff has engaged in constitution-ally protected activity in her advocacy, research and teaching about justice for and in Palestine.

### 2) Chill a Person of Ordinary Firmness

Plaintiff has satisfied this prong in the present case by alleging the following:

1) The bureaucratic nightmare Plaintiff is forced to endure at the hands of Defendants, (See SAC ¶¶ 31, 43, 44, 45, 46, 49, 51, 52, 53, 54, 55, 56, 57, 58, 68, 69, 70, 71, 73, 74, 78);

2) Cancellation of the two additional faculty lines SFSU had promised Plaintiff, (SAC ¶ 24).

3) Defendants' suspended the budget lines that would have permitted Plaintiff to hire research associates and lecturers, (SAC ¶ 26);

4) Defendant Wong tolerated and condoned \high-ranking campus administrators directing political attacks against Plaintiff on the heels of similar attacks by a pro-Israel group, (SAC ¶¶ 29, 41-42);[3]

5) Defendant Rosser blocking a university grant that Plaintiff sought to write a book despite the proposal's excellent reviews, (SAC ¶ 49);

6) Selectively prosecuting GUPS (a political student group that Plaintiff advises), (SAC ¶¶ 28(c)(i), 46(a));

7) Defendants tolerating outside groups' inciting violence against Plaintiff with vile posters on campus in violation of SFSU's own regulations, (SAC ¶ 51);

8) Defendant Summit refusing Plaintiff's requested operating budget for AMED despite being contractually obligated to allocate funds, (SAC ¶ 53);

---

[3] Should the Court deem this allegation too vague, Plaintiff respectfully requests leave to amend to specifically plead that she was falsely accused of anti-semitism and being a "Holocaust denier" by Defendant Rosser, in the presence of Defendant Wong.

---

**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT [ECF 45]**

Case No. __4:18-cv-04662

4

9) Defendant Summit threatening Plaintiff with disciplinary proceedings unless Plaintiff removed a post on a privately owned Facebook page which criticized Wong's position on Zionism, (SAC ¶ 54; Dkt 45-2; 45-3, 45-4);

10) Defendants refusing to protect Plaintiff and her students when they complained about a self-proclaimed Nazi in Plaintiff's class who had threatened violence)[4], (SAC ¶ 56);

11) Defendants firing Plaintiff's student assistant (SAC ¶ 55);

12) Defendants abruptly and arbitrarily cancelling Plaintiff's classes, (SAC ¶ 58);

13) Defendants republishing on SFSU 's official website, false and smearing allegations against Plaintiff, (SAC ¶ 58);

14) Delayed replacement of Plaintiff's work laptop computer for several months after Plaintiff's laptop was stolen during an academic trip, (SAC ¶ 58);

15)  Preventing Plaintiff from accepting prestigious visiting fellowships, (SAC ¶ 58);

16) Refusing to publicize academic fellowships Plaintiff had been awarded, (SAC ¶ 58);

17) Insisting that Plaintiff obtain insurance for a teach in that was held in the college conference room where insurance had not been required or even suggested for groups with different political outlooks, (SAC ¶ 58);

18) Doing nothing to protect Plaintiff's students who had been stalked online and received death threats and threats of sexual violence, (SAC ¶ 58);

19) Interfering with Plaintiff's academic travel by taking steps including but not limited to:

    a.  Defendants demanding that Plaintiff account for every single food item purchased and consumed despite having a per diem allowance, (SAC ¶ 71);

    b.   Defendants denying Plaintiff's travel authorization to South Africa, (SAC ¶ 55);

    c.  Defendant Summit delaying Plaintiff's travel authorization to Palestine insisting on a new and bizarre bureaucratic requirement, (SAC ¶ 52);

---

[4] This refusal to take action must be compared with SFSU's swift suspension of a Palestinian student for social media posts and Defendants immediately launching a massive and time consuming investigation in response to an outside organization's informal complaint about its exclusion from a student organized event.  (SAC ¶ 57)

---

d.   Wong ordering repeated investigations into Plaintiff's academic travels, (SAC ¶ 43);

e.   Defendants revoking authorization for Plaintiff's 2014 research trip to Palestine despite it having already been approved, (SAC ¶ 43);

f.   Defendant Wong ordering three separate and redundant audits into Plaintiff's travels including a five-year audit going back to 2009 despite the fact that SFSU had reviewed and approved each of those trips in advance, (SAC ¶ 68);

g.   Singling out Plaintiff for repeated scrutiny on how she spends her authorized travel budget for research travel (in a manner that is not imposed on other faculty), (SAC ¶ 69);

h.   Unjust delay and denial of reimbursement of travel expenses, setting impossible bureaucratic deadlines, (SAC ¶¶ 45, 69);

i.   Defendants Wong and Rosser ordering Dean Monteiro to interfere with Plaintiff's travel and initiate pointless, time-crushing audits, (SAC ¶ 71); Defendants violating SFSU's own travel policies to disrupt Plaintiff's academic travel, (SAC ¶¶ 71-72);

Even more chilling are the striking similarities between the crusade Defendants have undertaken against Plaintiff and the content and structure of attacks on other faculty members who are targeted by pro-Israel advocacy organizations seeking to silence advocates such as Plaintiff (SAC ¶ 31).  Finally, the fact that this campaign appears entirely consistent with the Israeli government's program of "character assassination", and that at least one anti-BDS advocate bragged about how they "eliminate" things rather than complain about them proves that persons of ordinary firmness would be intimidated by these actions.  (SAC ¶ 29).

### 3) <u>Substantial or Motivating Factor in the Defendants' Conduct</u>.

"A person's First Amendment free speech right is at its highest when that person engages in 'core political speech,'." <u>Ariz. Students' Assn.</u>, 824 F.3d at 867 (reversing a district court's 12(b)(6) dismissal of a First Amendment retaliation lawsuit).  It is no surprise then that a plaintiff can establish motive in First Amendment retaliation cases by either direct evidence or mere circumstantial evidence.  <u>Id.</u> at 870. During the "pleading stage, a plaintiff adequately

---

**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT [ECF 45]**

Case No.  __4:18-cv-04662

asserts First Amendment retaliation if the complaint alleges ***plausible*** circumstances connecting the defendant's retaliatory intent to the suppressive conduct." Id. (emphasis added).

Since they often complained about it or attacked her for it, defendants can hardly deny they knew of Plaintiff's protected speech. Once knowledge is plausibly plead, three different kinds of allegations will support the conclusion that retaliatory intent was a substantial or motivating factor behind an adverse action: (1) evidence of "proximity in time between the protected action and the allegedly retaliatory employment decision"; (2) evidence, which the "employer expressed opposition to…speech"; (3) evidence indicating that the "employer's proffered explanations for the adverse employment action were false and pretextual." Keyser v. Sacramento City Unified Sch. Dist., 265 F.3ed 741, 751-752 (9th Cir. 2001); see also Ariz. Students' Ass'n v. Ariz. Bd of Regents, 824 F.3d 858. In the present case, the SAC facts showing temporal proximity, opposition to Plaintiff's speech, and pretextual excuses.

### (a) Temporal Proximity

During the prior oral argument the Court observed that four months "in my view is not all that long of a period of time." (Dkt. 7:7). Yet, Defendants now insist the Court accept their argument that allegations that Defendant Wong ordered three separate and redundant audits into Plaintiff's travels (including those that had already been reviewed and approved) only two months after outside pressure groups complained about Plaintiff's travel to Palestine is insufficient to show a nexus (Dkt. 45, p. 11:17-23; 13:1-3). Defendants fail to explain why the Court's prior observation about timing is wrong, so they simply ignore it in their recent motion to dismiss. Defendants also marshall not one shred of legal authority for their claim that "temporal proximity cannot by itself establish retaliatory motive." (Dkt. 45, p. 13:8).

"[T]hree to eight months is easily within a time range that can support an inference of retaliation." Coszalter v. City of Salem, 320 F.3d 968, 977 (9th Cir. 2003). Even eleven months can support an inference of retaliation. Id.[5] However, even if a plaintiff does not

---

[5] See also Allen v. Iranon, 283 F.3d 1070, 1078 (9th Cir. 2002) (an eleven-month gap from protected speech to an adverse action can support an inference of retaliation).

1    demonstrate that she falls within such a guideline, "[t]here is no set time beyond which acts

2    cannot support an inference of retaliation, and there is no set time within which acts necessarily

3    support an inference of retaliation." Id. at 978.

### i) The SAC Pleads Sufficient Temporal Proximity to Support Retaliation.

5    "Revenge is a dish best served cold."   Les Liaisons Dangereuses

6         Plaintiff has long been a prominent and outspoken advocate for justice for and in

7    Palestine and this was well known to SFSU when they recruited her.  (SAC ¶¶ 19, 20, 28, 59-

8    60). In fact, just months before she was offered the position as AMED Director she was a

9    keynote speaker at the on-campus  2006 Al-Awda Convention advocating the Palestinian

10   people's right to return to their homeland. (SAC ¶28(d).)[6]  After the 2008 Israeli invasion of

11   Gaza which garnered worldwide revulsion there was a concomitant increase in advocacy for a

12   nonviolent boycott campaign directed against the Israeli government. (SAC ¶30).  As pressure

13   mounted the Israeli government stepped in to provide increasing direction and logistical support

14   to pro-Israel groups throughout Europe and the United States.  (Id.)  Pro-Israel organizations in

15   the U.S. were even connected to the Israeli Government itself, which has expressly identified

16   Plaintiff's advocacy for justice for and in Palestine (BDS in particular) as an "existential" or

17   "strategic" threat.  The increased pressure coincided with the effects of the 2008 recession.

18   Funding cuts made SFSU increasingly dependent upon outside donors for financial support.

19   (SAC ¶29). The SAC alleges that anti-BDS organizations have engaged in "character assassina-

20   tions" against individuals like the Plaintiff, with one anti-BDS advocate going so far as to boast

21   that Zionists (people who support Israel), rather than complaining about problems, take action to

22   "eliminate them."  (SAC ¶¶ 29-30).  The 2008 recession made SFSU ever more dependent on

23   outside donors for financial support.  Pro-Israel organizations, among others, moved in to fill

---

[6] The SAC did not specify that the Convention was held on SFSU's campus.  Out of an
abundance of caution, should the Court deem it necessary Plaintiff asks for leave to provide this
detail.

---

1    this void and along with it, brought their anti-BDS agenda.  This agenda included convincing

2    Defendants to persecute Plaintiff for her BDS advocacy.  (Id)

3         Consistent with reports that such anti-Palestinian organizations have launched concerted

4    campaigns to pressure university administrators to censor Palestinian advocacy on (SAC ¶ 31),

5    in 2009, then SFSU President, Robert Corrigan canceled the searches for the two other faculty

6    lines that the University had promised to Plaintiff as part of its recruitment package.  (SAC ¶¶

7    24-25).  This severely increased her workload.  (See e.g. SAC ¶ 69)  Shortly before these

8    cancellations, Plaintiff had been involved in promoting an event to honor the creation of a mural

9    that commemorated Palestinian rights.  Outside pressure groups (JCRC and Koret Foundation-

10   explained below) opposed the event.  (SAC ¶¶ 32-34).

11        In either 2011 or 2012, SFSU suspended the budget lines that would have enabled

12   Plaintiff to hire research associates and lecturers, leaving her the sole faculty member of the

13   AMED Studies program (and violating SFSU's contractual with Plaintiff).  (SAC ¶ 26).[7]

14        In 2012, Defendant Wong replaced Corrigan as President of SFSU.  Shortly after his

15   arrival, Wong accepted an invitation to take a trip to Israel that was sponsored by the JCRC.

16   Such trips, which the JCRC regularly sponsors for American civic leaders like Wong, include

17   meetings with individuals who advocate for ethnic cleansing of Palestinians.  The aims and

18   results of the trip were to delegitimize BDS advocates like Plaintiff, provide Wong with the

19   justification to comply with the expectations of SFSU's anti-BDS donors (including retaliation

20   against Plaintiff for her political speech). (SAC ¶¶ 38-40, fn.11)

21        Defendant Wong went from supporting Plaintiff to expressing hostility towards her after

22   his JCRC sponsored trip to Israel.  (SAC ¶ 41).  In Defendant Wong's presence, high-ranking

23   campus administrators repeated the Koret-Foundation backed AMCHA Initiative's false

24

25

26

27   [7]  However, it was not until August 2018, that Plaintiff learned that Provost Summit had

28   instructed Dean Monteiro to speak as though the lines had never existed.  (SAC ¶ 27).

---

**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT [ECF 45]**

Case No. __4:18-cv-04662

accusations of anti-Semitism[8] against Plaintiff..  Rather than objecting to or challenging such comments, Defendant Wong condoned and ratified them.  (SAC ¶¶ 41-42).

Defendant Wong then ordered repeated investigations into Plaintiff's international research and lecturing travels (despite the fact that such travel was supported by Plaintiff's contract with SFSU).  Defendants revoked authorization for Plaintiff's 2014 research trip to Palestine even though it had already been approved.  (SAC ¶¶ 43-44)

In January 2014, Plaintiff led a research trip to Palestine that included other academics (including another SFSU Professor).  In March 2014, outside pressure groups complained about the trip. A mere two months later, Defendant Wong ordered three separate and redundant audits into Plaintiff's travels including a five-year audit going back to 2009 despite the fact that SFSU had reviewed and approved each of those trips in advance.  What is more, Plaintiff had the right to take those academically-related trips pursuant to her contract with SFSU.  (SAC ¶ 68).  In addition to cancelling a trip SFSU had already approved, Defendants singled out Plaintiff for repeated scrutiny on how she spends her authorized travel budget for research travel. Defendants have also demanded that Plaintiff provide explanations for her travel that they do not ask other faculty to do.  Not so mysteriously, Defendants have repeatedly claimed to lose travel-related documents, which delays reimbursement to Plaintiff and forces Plaintiff to repeatedly go through time consuming exercises of finding and submitting the same paperwork many times over.  (SAC ¶ 69).

To further aggravate matters, despite contractual obligations, Defendants have either denied or significantly delayed reimbursement to Plaintiff for many travel expenses for academic and research related trips.  (SAC ¶ 70).  Defendants have also denied Plaintiff reimbursement for supplies necessary for research and teaching.  (SAC ¶ 73).

---

[8] False allegations of anti-Semitism are a common tactic used to intimidate scholars and advocates for justice for and in Palestine such as Plaintiff.  At least one former Israeli government minister explained that such frivolous accusations are "a trick we always use" to deflect criticism of Israel and justify Israel's violations of Palestinian rights.  (SAC ¶ 29).

---

**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT [ECF 45]**

Case No. __4:18-cv-04662

To make matters worse, Defendants have imposed conditions and requirements on Plaintiff's research and teaching related travel that other faculty members do not endure.  This includes delaying reimbursement for approved trips, setting impossible bureaucratic deadlines and insisting that Plaintiff respond to demands on holidays and weekends.  (SAC ¶ 45).

Between 2014 and 2016, Defendants Wong and Rosser ordered then Dean Monteiro and possibly other SFSU officials to interfere with Plaintiff's travel and initiate pointless, time-crushing audits. It appears that Defendant Rosser expanded the scope of such audits that Defendant Wong had ordered against Plaintiff to include a spiteful requirement for Plaintiff to account for every single food item purchased and consumed despite having a per diem allowance.  All of these instructions were issued and carried out in violation of SFSU's own travel policies.  (SAC ¶ 71).

In Spring 2016, Defendant Rosser directed then Dean Monteiro to investigate SFSU's contractual agreement with Plaintiff that requires the University to fund Plaintiff's travel.  Monteiro got the impression that Defendant Rosser sought its cancellation.  (SAC ¶ 50).

On February 13, 2019, Plaintiff led a protest against SFSU's decision to treat Israel Independence Day as a religious holiday.  (This day carries no religious significance in any organized religion -- even in Israel) The protest also decried SFSU's refusal to recognize Ramadan (which is categorically recognized as an Islamic religious holiday).  Barely one week later Defendants fired Plaintiff's student assistant.  Two weeks after that Defendants' denied Plaintiff's travel authorization for another academic/research Palestine-related trip  (SAC ¶ 55).

**(b) <u>Defendants' Opposition to Plaintiff's Speech</u>**

In 2009, as the result of pressure from JCRC and the Koret Foundation[9], then SFSU President Corrigan condemned BDS near the time of a commemoration event that sought to honor the late Edward Said and to which Omar Barghouti, a BDS founder, had been invited to

---

[9] The Koret Foundation is an outside SFSU donor, which, in addition to donating millions to SFSU, has donated to a number of vocal anti-Palestinian organizations that have not only smeared Plaintiff with false allegations of anti-Semitism and terrorist support, but whose campaigns have resulted in death and rape threats against pro-Palestinian students at SFSU

---

speak. The intent of this condemnation is apparent as it occurred not only after JCRC's and the Koret Foundation's pressure, the condemnation was applauded by Susan Wolfe, Director of Grant Making Programs at the Koret Foundation (SAC ¶¶ 29, 32-34, fns. 8 and 10).

November 2013, GUPS held a rally to commemorate the anniversary of the Palestinian Cultural Mural honoring the late professor Edward Said.  Only twelve (12) days[10] later, under pressure from outside organizations, Wong condemned the event's speech, denouncing it as one that celebrated violence and promoted anti-Semitism although the event did neither. (SAC ¶ 67).

In Spring 2015, Defendant Rosser blocked a university grant that Plaintiff had sought to write a book, despite the agreement by the University of Washington Press to publish it. According to reports Plaintiff received from SFSU, Rosser's office denied the funding despite excellent reviews from external reviewers whom SFSU itself had hired.  (SAC ¶ 49).

In June 2016, Defendant Wong admitted that SFSU was selectively prosecuting GUPS, a student group that Plaintiff advises and advocates for Palestinian rights.   (SAC ¶ 46(a)).

Since at least October 14, 2016, Defendants have tolerated and emboldened outside groups' creation of a hostile and threatening environment for Plaintiff.  This has included such outside organizations putting up posters that vilely defame Plaintiff and incite violence against her.  Although the posters violated SFSU regulations, Defendants did not remove them or prevent such events from recurring.  (SAC ¶ 51).

In February 2018, Defendant Summit refused Plaintiff's requested operating budget for AMED despite SFSU's contractual obligation to pay for this.  (SAC ¶ 53).   This constituted opposition to Plaintiff's speech as it made it harder for Plaintiff to run the AMED studies program, which includes advocacy, research and teaching about justice for and in Palestine.

Defendants treat Plaintiff and her students quite differently than others who do not advocate for justice for and in Palestine As just one example, in the Fall of 2018, Defendants did nothing when a Swastika-tattooed Nazi who had made violent threats turned up in Plaintiff's

---

[10] Such a short time span also triggers the temporal proximity guideline.

PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT [ECF 45]
Case No. __4:18-cv-04662

12

1   class.  Although Plaintiff and various student groups sought protective action, Defendants took

2   no steps to remove the Nazi from the class or to protect Plaintiff and her students from harm.

3   This is revealing especially when compared with (a) 2014 SFSU's suspension and removal from

4   campus of a Palestinian student for social media posts; (b) Defendants' immediately launching a

5   massive and time-consuming investigation in response to Hillel's[11] informal complaint about its

6   exclusion from a student organized event in 2017.  (SAC ¶¶ 56-57).

7   Defendants have, among other things, abruptly and arbitrarily cancelled Plaintiff's

8   courses, republished, on its official website, false and smearing allegations against Plaintiff ,

9   delayed replacement of Plaintiff's work laptop computer for several months after Plaintiff's

10   laptop was stolen during an academic trip, prevented Plaintiff from accepting prestigious

11   visiting fellowships, refusing to publicize academic fellowships Plaintiff had been awarded,

12   insisted that the college conference room where Plaintiff was organizing a teach-in on Palestine

13   be insured although insurance had not been required or even suggested for other faculty, did

14   nothing to protect Plaintiff's students who had been stalked online and receiving death threats

15   and threats of sexual violence. (SAC ¶ 58).[12]

16   The objective of this campaign of bureaucratic harassment is to create a hostile work

17   environment that disrupts Plaintiff's scholarly pursuits and advocacy.  Defendants regularly

18   distract Plaintiff with bureaucratic nonsense to undermine her research and advocacy for and in

19   Palestine.  This is consistent with the anti-BDS agenda of some of SFSU's major donors

20   (which, again SFSU is vulnerable to because of budget cutbacks.)  The bureaucratic harassment

21   is also strikingly similar to that repeatedly visited upon activists on other campuses. (See, "The

22

23   [11] Importantly, Hillel is yet another Koret Foundation-funded organization.  (SAC ¶ 35(b)).
24   Hillel is also an off campus organization.  (SAC ¶ 57).

25   [12] These are all forms of Defendants' opposition to Plaintiff's speech precisely because it is
26   Plaintiff's job to research, teach, talk and write about Palestine in transnational perspective. But
     see Demers v. Austin, 746 F.3d 402 (9th Cir. 2014) (holding that since "teaching and academic
27   writing are at the core of the official duties of teachers and professors…." the general rule that
     public employees' statements per their official duties are not protected by the First Amendment
28   are inapplicable when it comes to statements made by academics like Plaintiff).

---

**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT [ECF 45]**

Case No. __4:18-cv-04662

Palestine Exception to Free Speech", pp. 24-26,[13] which documents how pro-Israel advocacy organizations coordinate efforts to not only smear advocates like Plaintiff, but also "demand that universities erect bureaucratic obstacles.") (SAC ¶¶ 31, 46).

Defendants' bureaucratic harassment obstructs Plaintiff's academic and scholarly work, which is the very foundation of her political speech.  which is already unconscionably burdensome given Defendants' repeated refusal to provide any administrative support to the program Plaintiff is charged with running.  Furthermore, Plaintiff has had to absorb travel and other program related expenses out of her own pocket and to use her own personal funds to hire part-time administrative and research assistants in the face of SFSU's refusal to provide any support. Defendants have done all of this in retaliation of Plaintiff's exercise of her rights of freedom of speech and academic freedom. (SAC ¶¶ 69, 78).

### (c) Defendants' Excuses Have Been False and Pretextual

In 2014 Defendants cancelled Plaintiffs' research in Palestine even though they had already approved it. Defendants sought to excuse the cancelation by invoking a US State Dept. travel warning -- but, the trip was canceled ***before*** the travel warning was issued.  (SAC ¶ 43)

In Fall 2017, Defendant Summit delayed Plaintiff's travel authorization to Palestine bizarrely insisting on a new bureaucratic requirement, insisting that the travel authorizations be rewritten to include the phrase "in consultation with the President's office".  This odd requirement was imposed after a right-wing organization smeared Plaintiff as a terrorist apologist and demanded that Plaintiff's study abroad program with a Palestinian University be cancelled.  (SAC ¶ 52).

---

[13] Published by the Center for Constitutional Rights and available at https://ccrjustice.org/the-palestine-exception, last visited May 26, 2019.

PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT [ECF 45]
Case No. __4:18-cv-04662

14

1
2
3

(d) **Because These Acts Have Been Taken by Officials With Final Decision-Making Authority Over Plaintiff's Working Environment. They Comprise Government Policy.**

4   Defendants seek an unprecedented ruling that would immunize all CSU officials from

5   §1983 official capacity suits.  They argue that to be sued in an official capacity the violator <u>must</u>

6   be the person with final authority (rather than the final decision-maker).   They claim that since

7   Wong reports to a higher authority (the Chancellor of the statewide university system) Wong

8   can never act in his official capacity.  First, this would mean that <u>nothing</u> Wong or his designees

9   did to over 3,700 faculty and staff[14] would ever be remediable under §1983 because only the

10  Chancellor will have final authority.  Second, and equally perniciously, the Chancellor would

11  also be free of liability because he may act only "consistent with Trustee policy" (Dkt. 45-5,

12  p.2) and must also "regularly report to the Board of Trustees concerning the performance of his

13  or her office."  <u>Id.</u>, at p.3.  Accepting Defendants' argument would close the courthouse doors to

14  everyone seeking redress from civil rights violations at California State University.

15  Defendants try to obscure this unlikely result with resort to a state court case and a

16  Seventh Circuit case that actually warns against the "potentially misleading" language

17  surrounding the definition of "final policymaking authority".  <u>Gernetzke v. Kenosha Unified</u>

18  <u>Sch. Dist. No. 1</u>, 274 F.3d, 464, 468 (7th Cir. 2001).  What matters is whether the actor, be it

19  Wong, Rosser, or Summit, "was at the apex of authority for **the action in question.**" <u>Id.</u>

20  Indeed, official capacity "is best understood as a reference to the capacity in which the state

21  officer is sued, not the capacity in which the officer inflicts the alleged injury."  <u>Price v. Akaka</u>,

22  928 F.2d 824, 828 (9th Cir. 1991).

23          A "decision to adopt [a] particular course of action. . . by the government's

24          authorized decisionmakers . . . surely represents an act of official government

25          'policy.' " <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 481, 89 L. Ed. 2d 452,

26

27

28  ────────────────────
[14]  SFSU Campus Profile, 2013 headcount, <u>https://hr.sfsu.edu/content/san-francisco-state-university-campus-profile</u>, last visited May 26, 2019.

────────────────────
**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT [ECF 45]**
Case No. __4:18-cv-04662

15

106 S. Ct. 1292 (1986). In other words, a policy is "a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483-84(plurality opinion).

Oviatt v. Pearce, 954 F.2d 1470, 1477 (9th Cir. 1992) This has been the law in this Circuit for more than twenty-five years and remains so today. A public entity thus remains liable if a policymaking official delegates his or her discretionary authority to a subordinate, and the subordinate uses that discretion.  Fogel v. Collins, 531 F.3d 824, 834 (9th Cir. 2008),

In the vein of Fogel, Dr. Abdulhadi can establish liability "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.  Ulrich v. City & County of San Francisco, 308 F.3d 968, 984-985 (9th Cir. 2002) (reversing and remanding for further discovery Judge Thelton Henderson's grant of summary adjudication for individual defendants sued for §1983 violations.)  Ulrich and Menotti v. City of Seattle, 409 F.3d 1113, 1147 (9th Cir. 2005) direct the analysis to the question of whether a defendant is "responsible for establishing final policy with respect to the subject matter in question."  Id.

In this instance the "subject matter in question" is the treatment of a specific professor, Plaintiff Abdulhadi, who alleges she has been singled out for persecution because constitution-ally protected speech.  Where the plaintiff has sued SFSU's "Chief Executive Officer" and Provost/Academic Vice President, and where governance is "shared", as a matter of policy, the question of who bears responsibility for any specific "final policy" requires a factual inquiry.

There is nothing exceptional about this.  In both Menotti and Ulrich the question of *who* wielded *what* authority was context-dependent and fact-specific.  In Menotti journalists, protestors, and others challenged the constitutionality of an emergency proclamation issued by the Mayor in the face of militant political protests (Order No. 3).  Menotti at 1124, 409 F.3d. Although the Mayor, as the signator of Order No. 3 was formally the "final authority", deposit-ion testimony established that the Mayor had left enforcement in the hands of his Chief of

---

Police (Stamper) who had in turn delegated responsibility for enforcement to Assistant Chief Joiner.  Id., at 1129-1130, fns. 27 and 28.  None of this was clear until discovery was taken.[15]

Finally, a review of the capacity in which any of the defendants act must also be understood in light of the unique characteristics of a university– shared governance, where authority over some matters, especially faculty governance, is shared with the professors.  [See Emergency Coalition to Defend Educ. Travel v. United States Dep't of the Treasury 545 F.3d 4, 16 (D.C. Cir. 2008) (Silberman, J., concurring), reviewing a series of Supreme Court cases recognizing this facet of academic life.]   Shared governance is taken seriously at SFSU.  A March, 2019 job posting for an Associate Vice President of Faculty Affairs states candidates "must demonstrate"  "a record of meaningful participation in a range of service roles that reflect a commitment to campus shared governance" and "experience working in a strong collective bargaining and shared governance environment"  (Exh. B to RJN, Dkt. 47.  Similarly, SFSU's Academic Senate's policies (Exhs. C and D to Plaintiff's RJN) actively involve the faculty in search committees for the Assistant Vice President for Faculty Affairs and the Provost, as well as the Deans of the colleges and evaluation of faculty and administrators.)  In a "shared governance" environment, the hierarchic emphasis on "final authorities" bears little relationship to how decisions are actually made.  Indeed, Defendants do not question the factual basis or legal significance of "shared governance".  What is more, there is no basis in either fact or in law to suggest that every institution has only one final decision-maker for all issues.

_____

[15]   Although hardly as tumultuous as Seattle's WTO protests the situation here is similarly murky.  Defendants have proffered Dkt. 45-5, "Standing Orders of the Board of Trustees".  However, the legend on the bottom left of each page of that Exhibit shows that it has only been in force for the last fourteen months.  Defendants are silent about what delegation took place in the eleven years from 2007 when Plaintiff joined the faculty until this new policy was created. Nor has plaintiff been able to unearth it, despite strenuous efforts.

_____

**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT [ECF 45]**

Case No.  __4:18-cv-04662

1

## C) <u>Harm to Plaintiff</u>

2      While President of SFSU, Corrigan cancelled the two additional faculty lines that SFSU
3   had promised Plaintiff when they recruited her.  (SAC ¶ 24).  His further cutbacks left Plaintiff
4   unable to hire \research associates and lecturers.  (SAC ¶ 26).

5      **Defendant Wong**    After returning from the JCRC-sponsored trip to Israel, Wong
6   tolerated and condoned high-ranking campus administrators echoing political attacks against
7   Plaintiff that followed on the heels of similar attacks by a pro-Israel group.  (SAC ¶¶ 29, 41-42).
8   Wong ordered repeated investigations into Plaintiff's academic travels (SAC ¶ 43).

9      On information and belief, Wong ordered officials to interfere with Plaintiff's travel by
10  initiating pointless and time-consuming audits.  (SAC ¶ 71).  Wong ordered three separate and
11  redundant audits into Plaintiff's travels including a five-year audit going back to 2009 despite
12  the fact that SFSU had reviewed and approved each of those trips in advance, (SAC ¶ 68);

13     **Defendant Rosser**   Rosser blocked a university grant Plaintiff sought to write a book
14  despite the proposal's excellent reviews and the commitment of a major university press to
15  publish it.  (SAC ¶ 49).  On information and belief, Rosser ordered officials to interfere with
16  Plaintiff's travel by initiating pointless and time-consuming audits.  (SAC ¶ 71) and expanded
17  the scope of the harassing audits that Defendant Wong had ordered against Plaintiff, leading to
18  the "spiteful requirement that [Plaintiff] account for and document every single food item
19  purchased and consumed even though she had a per diem allowance."  (SAC ¶ 71).

20     **Defendant Summit** Summit refused Plaintiff's requested operating budget for AMED.
21  (SAC ¶ 53).  Summit also threatened Plaintiff with disciplinary proceedings if Plaintiff did not
22  remove a post on a non-university, privately owned Facebook page which criticized Defendant
23  Wong's position on Zionism.  (SAC ¶ 54; Dkt 45-2; 45-4).  Defendant Summit delayed
24  Plaintiff's travel authorization to Palestine insisting on a new and bizarre bureaucratic
25  requirement no one else was subjected to. (SAC ¶ 52).

26     **Shared Governance**  Plaintiff understands from discussions with SFSU's own civil
27  rights investigators that most, if not all, of these decisions originated at the Provost or

28

---

1    Presidential level, but she cannot, consistent with her Rule 11 obligations, identify which of

2    these two officials is responsible at this time.

3           Per Defendant Wong, the University had been selectively prosecuting GUPS (a political

4    student group that Plaintiff advises).  (SAC ¶¶ 28(c)(i), 46(a)).  Defendants tolerate outside

5    groups' defaming Plaintiff with vile posters on campus in violation of SFSU's own regulations.

6    (SAC ¶ 51).  Defendants refusing to protect Plaintiff and her students when they complained

7    about a self-proclaimed Nazi in Plaintiff's class who had threatened violence)[16], (SAC ¶ 56).

8    Defendants fired Plaintiff's student assistant (SAC ¶ 55).

9           Defendants have also abruptly and arbitrarily cancelled Plaintiff's classes, republished

10   on SFSU 's official website, false and smearing allegations against Plaintiff, delayed

11   replacement of Plaintiff's work laptop computer for several months after Plaintiff's laptop was

12   stolen during an academic trip, prevented Plaintiff from accepting prestigious visiting

13   fellowships, refused to publicize academic fellowships Plaintiff had been awarded, insisted that

14   Plaintiff obtain insurance for a teach in that was held in the college conference room where

15   insurance had not been required or even suggested for groups with different political outlooks,

16   done nothing to protect Plaintiff's students who had been stalked online and received death

17   threats and threats of sexual violence, (SAC ¶ 58).  Defendants have also denied Plaintiff's

18   travel authorization to South Africa.  (SAC ¶ 55).

19          Defendants revoked authorization for Plaintiff's 2014 research travel to Palestine despite

20   it having already been approved.  (SAC ¶ 43).  SFSU singled Plaintiff out for repeated scrutiny

21   on how Plaintiff spends her authorized travel budget for research travel (in a manner that is not

22   imposed on other faculty).  (SAC ¶ 69).

23

24

25   _____

26   [16] This refusal to take action must be compared with SFSU's swift suspension of a Palestinian
     student for social media posts and Defendants immediately launching a massive and time
27   consuming investigation in response to an outside organization's informal complaint about its
28   exclusion from a student organized event.  (SAC ¶ 57)

_____

**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT [ECF 45]**

Case No. __4:18-cv-04662

1
2
3

Defendants also unjustly delayed and denied reimbursement of travel expenses, setting impossible bureaucratic deadlines. (SAC ¶¶ 45, 69).  All of Defendants' collective actions to interfere with Plaintiff's academic travel violates SFSU's own travel policies.  (SAC ¶¶ 71-72).

4

**D) Defendants' "No Other Rational Basis Test" Does Not Exist.**

5
6
7
8
9
10
11
12
13
14

Defendants complain that the SAC fails to allege Defendants' misconduct had no other rational or legitimate basis.  (Dkt. 45, pp. 11:26; 13:18).  This argument lacks merit for three reasons: first, Defendants have not and cannot provide legal authority that Plaintiff must plead such allegations. Second, Defendants are importing into a 12(b)(6) motion the burden-shifting analysis conducted at the summary judgement stage. After a plaintiff in a First Amendment retaliation case meets the first three prongs (see section IIB, p. 3, *infra*. "the burden shifts to the government to show that under the balancing test…the state's legitimate administrative interests outweigh the employee's First Amendment rights."  Eng v. Cooley, 552 F.3d 1062, 1071 (9th Cir. 2009).  Resolution at the pleading stage is impossible given the factual inquiry that such a demonstration would necessarily require.  See Id. at 1071-1072.

15
16
17
18
19
20

Third, although there is no such requirement, Plaintiff has alleged numerous actions which make such an inference plausible.  (e.g. being the only academic whose travel authorizat- ion must bear the legend "in consultation with the President", having to account for every single food item purchased while on a *per diem* reimbursement basis,,, etc.)  Indeed, the SAC's alleg- ations showing that Defendants' excuses for punishing Plaintiff have been false gives rise to the inference that there Defendants' actions lack a rational basis.[17]

21
22

**E) Defendants' Argument Regarding The Facebook Post Ignores Defendants' Own Policies and Prior Arguments in the Northern District.**

23
24
25

Ironically, after repeatedly misstating what is actually in the SAC, Defendants would have the Court believe that Plaintiff's paragraph 54 regarding a Facebook post is misleading. (Dkt. 45, p. 18:10-14).   Specifically, Defendants claim that Plaintiff omitted that "her post was

26
27
28

[17] If this Court deems such an allegation is necessary, Plaintiff respectfully requests leave to amend to conform to such a requirement.

---

**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT [ECF 45]**

Case No. __4:18-cv-04662

1  re-posted to San Francisco State University's Arab and Islamic Ethnicities and Diaspora Studies

2  ("AMED") department Facebook page and to the Facebook page of the University-affiliated

3  General Union of Palestinian ("GUPS") student group."  (Dkt. 45, p. 18:14-17).  Upon this

4  misguided premise, Defendants insist that the Facebook post implicated San Francisco State

5  University's own free speech interest and thereby allowed Defendants to censor Plaintiff's

6  speech in this regard. (Dkt. 45, pp. 18:18-19:6).

7          It is surprising to see Defendants advance a claim that is contradicted by the represent-

8  ations they made to Judge Orrick that SFSU did not have the ability to remove the post itself.

9  (Ex. G, to RJN, Dkt. 131 7:22-23 in <u>Mandel, et. al. v. Board of Trustees of California State</u>

10  <u>University</u>; Case No. 3:17-cv-03511.)  As Defendants know perfectly well, the reason they

11  could not remove the post from this Facebook page is that it is not an official SFSU-owned

12  page. SFSU has clear rules for student organization pages, which AMED  scrupulously obeyed:

13  "Student Organizations may indicate that their respective organization resides at San Francisco

14  State University, i.e. Culinary Club **at** SF State." (Exh. E to RJN, Dkt. 47, (emphasis added).

15  The AMED Facebook pages as Defendants' own request for judicial notice acknowledges,

16  include the heading "AMED Studies **_at_** SFSU".  (Dkt. 45-2, pp. 2-4) (emphasis added).  Since

17  the Facebook page includes the important clarification of "at SFSU", it is consistent with

18  SFSU's own policies in this regard and therefore does not speak for SFSU itself.

19          Defendants cannot have it both ways.  Plaintiff's right to post her views on the AMED

20  Studies **at** SFSU Facebook page, cannot be outside of Defendants' power to remove in the

21  matter of <u>Mandel v. Board of Trustees</u> (Case No. 3:17-cv-03511-WHO) and then suddenly

22  within Defendants' power to demand be removed in the case before this Court.

23          Given Defendants' representation in <u>Mandel,</u> their argument *du jour* should be barred by

24  the doctrine of judicial estoppel.   <u>Baughman v. Walt Disney World Co.</u>, 685 F.3d 1131, 1133

25  (9th Cir. 2012) (judicial estoppel may apply to prevent party from making legal assertion that

26  contradicted its earlier legal assertion, and in such case it is immaterial whether party's assertions

27  were made under oath); <u>Yniguez v. Arizona</u>, 939 F.2d 727, 738 (9th Cir. 1991) (doctrine also

28

---

**PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT [ECF 45]**

Case No. __4:18-cv-04662

1 | applies to inconsistent legal assertions); <u>Rissetto v. Plumbers and Steamfitters Local 343</u>, 94 F.3d

2 | 597, 600 (9th Cir. 1996) ("Judicial estoppel, sometimes also known as the doctrine of preclusion

3 | of inconsistent positions, precludes a party from gaining an advantage by taking one position, and

4 | then seeking a second advantage by taking an incompatible position").[18]

5 |       Second, Defendants' argument about the GUPS Facebook page is a red herring simply

6 | because, as Defendants' own request for judicial notice indicates, Defendant Summit's March

7 | 23, 2018 correspondence to Plaintiff only made reference to the AMED Facebook page and not

8 | the GUPS Facebook page.  (Dkt. 42-4, p. 2).

9 |       Finally, the sharing of posts from one page to another is perhaps Facebook's most

10 | fundamental feature.  That a post on Plaintiff's personal Facebook page was reposted on other

11 | Facebook pages does not afford Defendants the power to censor Plaintiff's personal Facebook

12 | page.  There is no basis in law or fact that Defendants had any right to control Plaintiff's

13 | ***personal*** Facebook page.

14 |       Apparently realizing this, Defendants try to argue that Plaintiff's conduct implied that

15 | she was speaking on behalf of SFSU.  However, Plaintiff has never said this, and Defendants are

16 | bereft of legal authority to support of their hope that mere "***implication*** that [a Facebook post]

17 | reflected the views of the university" gives Defendants the power to censor a ***privately owned***

18 | Facebook post.  The one case they invoke, is <u>Downs v. Los Angeles Unified Sch. Dist</u>, 228 F.3d

19 | 1003 (9th Cir. 2000).  <u>Downs</u> is inapplicable because it involved a finding that the medium of

20 | speech, bulletin boards, "were a manifestation of the school board's policy" and were therefore

21 | state speech.  <u>Id</u>. at 1012.  Defendants cite to no authority that mere implication is sufficient to

22 | trigger the rule in <u>Downs</u>.

23 |

24 | [18] The state-litigant exception to the judicial estoppel doctrine does not apply here.  That

25 | exception's purpose is to "avoid compromising a state's governmental interest in enforcing its

own laws, and to allow states to make legitimate changes in public policy."  See <u>New

26 | Hampshire v. Maine</u>, 532 U.S. 742, 755 (2001); <u>Illinois ex rel. Gordon v. Campbell</u>, 329 U.S.

362, 369 (1946); <u>Fears v. Morgan (In re Ohio Execution Protocol)</u>, 860 F.3d 881, 891-892 (6th

27 | Cir. 2017).  However, a state litigant may not assert this exception when doing so would not

28 | further the aforementioned two interests.  <u>New Hampshire</u>, 532 U.S. at 755.

**F)   Since Plaintiff Has Properly Alleged Retaliatory Motive it Is Unnecessary to Establish WHY Decision-Makers Have Such Motives**

Defendants insist, "there are no alleged facts sufficient to attribute the outside groups' actions or motivations to President Wong."  (Dkt. 145, p. 12:8-10).  This argument, even were it true, misses the point.  What matters is that the decision-makers have the requisite state of mind.  It does not matter *why* they have it.  Whether they acquired their bias through fair means or foul is of no consequence.  The purest of motives for misusing power to deprive plaintiff of her rights does not make inexcusable conduct somehow excusable.

Plaintiff has alleged – and will prove – the role of these outside groups because it is the truth.  But even were these groups absent from the SAC, nothing would change.  Plaintiff would still have adequately pled a First Amendment retaliation claim as she has pled all three forms of evidence of retaliation (see IIB, *infra*.).

What is more, Defendants are simply incorrect in their claim that the SAC lacks a connection between Defendant Wong and outside groups' actions and motivations.  Plaintiff has been a prominent and outspoken advocate for justice for and in Palestine (including but not limited to BDS advocacy) before and after SFSU recruited her (see e.g. SAC ¶ 28).  However, it was not until after 2008-2009 that Plaintiff began to suffer from Defendants' bureaucratic campaign against her.  2008 was the year when the Israeli Government's human rights violations in Gaza were exposed, which increased BDS activity to new levels.  This caused the Israeli Government to target BDS much more aggressively (SAC ¶ 30).  Second, 2008 also witnessed the Great Recession, which made SFSU more dependent upon outside donors for financial support.  (SAC ¶ 29).  Such outside donors included organizations that are particularly hostile towards BDS and engage in "character assassination" against activists and academics like Plaintiff, which includes false allegations of anti-Semitism[19], demanding that universities "erect bureaucratic obstacles and make official denunciations."  (SAC ¶¶ 29-31).

---

[19] It is ironic that Defendants' attorneys, in their motion to dismiss, subtly use the same tactic of false allegations of anti-Semitism.  (Dkt. 45, p. 16:6-8).

---

That SFSU's persecution of Plaintiff began in 2009 when then-SFSU President Corrigan canceled the searches for the two faculty lines promised to Plaintiff and vocally condemned a BDS event on campus after outside pressure groups complained) is not a coincidence.   (SAC ¶¶ 24-25, 32-34).

Further, JCRC, one of these outside organizations, wields significant influence over SFSU.  JCRC sponsored Wong's trip to Israel.  It also has a major donor (Dana Corvin) who sits on the board of the San Francisco State University Foundation.  SFSU's handling of Corvin's complaint of student protest against an Israeli official reveals the extent of such influence. (SAC ¶ 47(a)).  Another example of JCRC's influence over SFSU is Jason Porth, who is the executive direct of UCorp, which oversees much of SFSU's commercial activity as well as millions of dollars of grants a year.  Mr. Porth's spouse, Abby Porth, is the Associate Executive Direct of San Francisco JCRC.  Mr. Porth has used his executive position to pressure SFSU to punish student demonstrators.  Mr. and Mrs. Porth have both worked to stop the San Francisco Board of Supervisors from condemning Israel's blockade of Gaza.  (SAC ¶ 47(b)).

What is more, the Koret Foundation, a major SFSU donor, (see e.g. SAC ¶¶ 29, 35 fn. 8), has also donated to Israel on Campus Coalition, which operates closely with Canary Mission (SAC ¶ 35(f)).  Canary Mission, a McCarthyite website that puts up profiles of advocates for justice for Palestine with false accusations of terrorist support and anti-Semitism has directly targeted Plaintiff with smear campaigns (SAC ¶ 28(k), fn. 3).   The Koret Foundation has also donated to other organizations that have directly targeted Plaintiff.  (SAC ¶ 35).

**G) <u>Although Information on Defendant Wong's Israel Trip Is In the Possession of Defendants, Plaintiff Has Met Her Pleading Obligations</u>.**

The applicable plausibility standard allows a plaintiff to plead facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of

PLAINTIFF, RABAB ABDULHADI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT [ECF 45]
Case No. __4:18-cv-04662

24

1  culpability plausible.  Park v. Thompson, 851 F.3d 910, 928.  In the present case, information on

2  Defendant Wong's JCRC-sponsored trip to Israel has not been made available.  (SAC ¶ 39).

3  However, Plaintiff has alleged, on information and belief, what Defendant Wong's trip looked

4  like as well as the aims and results of the trip based on information available (including but not

5  limited to JCRC sponsored trips to Israel for civic leaders like Defendant Wong).  (SAC ¶ 40).

6       Defendants' mischaracterizations to the contrary (Dkt. 45, pp. 15:26-16:6), it is reason-

7  able to infer that AJC-sponsored trips to Israel are similar to the JCRC-sponsored trip to Israel

8  that Defendant Wong took part because both AJC and JCRC receive Koret Foundation money,

9  AJC and JCRC are associated with one another, and AJC and JCRC both share anti-BDS

10  political agendas (SAC ¶¶ 33-34, 40).

11       Given JCRC's anti-Palestinian bias and its sponsoring Defendant Wong's trip to Israel,

12  coupled with Defendant Wong's conversion from supportive to hostile towards Plaintiff upon

13  his return from Israel, it is reasonable to infer that Wong wanted to please JCRC and its allies,

14  especially those in a position to help support SFSU.  Wong's interest in silencing Plaintiff is

15  unsurprising.

16  **III.**    **REQUEST FOR LEAVE TO AMEND**

17       In the event that the Court finds that Plaintiff has inadequately pled any of her claims,

18  Plaintiff respectfully requests leave to amend to address any such issues.  Any and all of

19  Defendants' arguments, if found to have merit, would easily become moot if Plaintiff were to

20  have leave to amend to address them.

21  **V.**    **CONCLUSION**

22       Plaintiffs' allegations and the inferences to be drawn from them make it plausible that

23  her civil rights have been violated.  The arguments Defendants raise turn on factual questions

24  best resolved after discovery.  This motion should be denied.

25

26

27

28

---

DATED:  May 28, 2019                    LAW OFFICE OF MARK ALLEN KLEIMAN
                                        MARK A. KLEIMAN (SBN 115919)



                             By:    /s/ Mark A. Kleiman
                                    MARK  A. KLEIMAN

                             LAW OFFICE OF BEN GHARAGOZLI
                                 BEN GHARAGOZLI (SBN 272302)


                             By:    /s/ Ben Gharagozli
                                    BEN GHARAGOZLI

                             Attorneys for Plaintiff RABAB ABDULHADI