# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RABAB ABDULHADI,** | CASE NO. 18-cv-04662-YGR |
| Plaintiff**,** | |
| vs. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |
| **LESLIE WONG, ET AL.,** | Re: Dkt. No. 45 |
| Defendants**.** | |

Plaintiff Rabab Abdulhadi brings this action against defendants Leslie Wong; Sue V. Rosser; Jennifer Summit; and Does 1-10 for retaliation against plaintiff for her exercise of her right to freedom of speech and academic freedom at San Francisco State University ("SFSU") in violation of 42 U.S.C. § 1983 ("Section 1983"). (*See* Dkt. No. 42 ("SAC") ¶ 1.)

Now before the Court is defendants' motion to dismiss plaintiff's second amended complaint ("SAC") for failure to state a claim under Rule 12(b)(6).[1] (Dkt. No. 45 ("MTD").) Having carefully considered the pleadings and the papers submitted, and for the reasons set forth more fully below, the Court hereby **GRANTS IN PART** and **DENIES IN PART** defendants' motion to dismiss.[2]

---

[1] The Court previously granted defendants' motion to dismiss plaintiff's first amended complaint in a ruling issued from the bench on March 12, 2019 and confirmed on March 14, 2019. (*See* Dkt. Nos. 38, 39.)

[2] In connection with their motion to dismiss, defendants request that the Court take judicial notice of four documents. (Dkt. No. 46 ("MTD RJN").) Specifically, defendants request that the Court take judicial notice of copies of the re-posting of Facebook post mentioned in Paragraph 54 of the SAC (*id.*, Exs. A, B), the letter regarding that Facebook post similarly mentioned (*id.*, Ex. C), and a copy of the publicly available Standing Orders issued by the Board of Trustees of the California State University (*id.*, Ex. D). The Court agrees, and plaintiff does not contest, that plaintiff's SAC incorporates the letter by reference and that the Standing Orders constitute the public records of a state agency. Accordingly, the Court **GRANTS IN PART** defendants' request as it applies to the email and the Standing Orders, namely Exhibits C and D to defendants' request for judicial notice. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir.

## I.   BACKGROUND

Plaintiff's thirty-four page SAC alleges as follows:

Plaintiff Rabab Abdulhadi is an associate professor at SFSU.  (SAC ¶ 2.)  She is an Arab woman of Palestinian ancestry.  (*Id.* ¶ 19.)  Defendant Leslie Wong, Ph.D., became the President of SFSU in October of 2012 and is the chief executive officer of the university.  (*Id.* ¶ 3.)  Defendant Sue V. Rosser, Ph.D., was Provost and Vice President for Academic Affairs at SFSU from August 2009 until October 2016.  (*Id.* ¶ 4.)  Defendant Jennifer Summit, Ph.D., served as Interim Provost at SFSU from October 2016 until March 2018, when she was appointed Provost.  (*Id.* ¶ 5.)  As Provost, Rosser and Summit were (and are) the senior academic administrator and the second highest ranking officer at the university.  (*Id.* ¶¶ 4, 5.)

---

2003) (noting that a court may consider certain materials, including "documents incorporated by reference in the complaint, . . . without converting the motion to dismiss into a motion for summary judgment"); *see Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001) (noting "a court may take judicial notice of matters of public record" and documents whose "authenticity . . . is not contested" and upon which a plaintiff's complaint relies) (internal quotation marks omitted) (alterations in original).  However, the Court finds that the SAC does *not* reference the re-posting of Facebook post.  Accordingly, the Court **DENIES IN PART** defendants' request as it applies to the remaining documents, namely, Exhibits A and B to defendants' request for judicial notice.

In connection with her opposition to defendants' motion to dismiss, plaintiff requests that the Court take judicial notice of eight documents.  (Dkt. No. 47 ("Opp. RJN").)  Specifically, plaintiff requests that the Court take judicial notice of five documents available on SFSU's website, including SFSU's Academic Affairs Organizational Chart, SFSU's job posting for associate vice president for faculty affairs, SFSU's Academic Senate Polices on "Search Committees for [SFSU] Administrators" and "Department Chairs Equivalent Unit Directors," and SFSU's Student Activities & Events, Constitution Guideline (*id.*, Exs. A-D, F), SFSU's LEAD Student Organization Handbook (*id.*, Ex. E); a motion to dismiss filed by defendants in *Mandel, et al v. Board of Trustees of California State University*, Case No. 3:17-cv-03511 (*id.*, Ex. G); and Facebook's Trademark Report Procedure (*id.*, Ex. H).  The Court agrees, and defendants do not contest, that the SFSU policies and handbook are matters of public record.  Accordingly, the Court **GRANTS IN PART** plaintiff's request as it applies to the SFSU policies and handbook excerpt, namely Exhibits A and C through F to plaintiff's request for judicial notice.  *See Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001) (noting "a court may take judicial notice of matters of public record" and documents whose "authenticity . . . is not contested" and upon which a plaintiff's complaint relies) (internal quotation marks omitted) (alterations in original).  However, the Court finds a filing in another civil action is not appropriate for judicial notice and that an SFSU job posting and Facebook's Trademark Report Procedure are not matters of public record.  Accordingly, the Court **DENIES IN PART** plaintiff's request as it applies to the remaining documents, namely, Exhibits B, G, and H to plaintiff's request for judicial notice.

In 2006, plaintiff was recruited to join SFSU as a tenured associate professor. (*Id.* ¶ 22.) The contract offer promised terms that were material to plaintiff's acceptance of the offer, including a guarantee that the University would fully fund two additional full-time faculty positions and would also fund plaintiff's research and teaching-related international and national travel. (*Id.*) The offer extended by SFSU and accepted by plaintiff also called for her "leadership to development of curriculum and scholarship regarding Arab and Islamic diaspora studies." (*Id.* ¶ 23.) This program was ultimately named the "Arab and Muslim Ethnicities and Diaspora Studies" program (hereinafter, "AMED"). (*Id.*) In 2007, plaintiff started the AMED program, and in 2008, she obtained approval to begin the search for two tenure-track assistant professors. (*Id.* ¶ 24.) In either 2011 or 2012, SFSU suspended the budget lines that would have permitted plaintiff to hire research associates and lecturers. (*Id.* ¶ 26.) In August 2018, plaintiff learned that the previous university president had repudiated the faculty lines provided for in plaintiff's contract and defendant Summit had instructed a dean "to act and speak as though the lines had never existed." (*Id.* ¶ 27.)

Plaintiff is "one of the most outspoken advocates for justice for and in Palestine in the world and certainly the most outspoken advocate for justice for and in Palestine at SFSU." (*Id.* ¶ 28.) Her accomplishments include, but are not limited to, being (i) a national leader within the Boycott, Divestment, Sanctions ("BDS") movement; (ii) a founding member of the US Campaign for the Academic and Cultural Boycott ("USACBI"); (iii) an advisor and mentor of the General Union of Palestinian Students ("GUPS") at SFSU; (iv) a keynote speaker at the 2006 National Al-Awda Conference and (v) a keynote speaker at the 2017 Students for Justice in Palestine ("SJP") National Conference. (*Id.*) Plaintiff also, through her work with BDS, GUPS, and AMED, organized a number of events and conferences. (*Id.*) As a result of her advocacy, plaintiff has been targeted by a number of smear campaigns, by a number of organizations, including but not limited to Campus Watch (an anti-Palestinian organization), Canary Mission (same), and the Lawfare Project (same). (*Id.*) In particular, these efforts have used false allegations of anti-Semitism to engage in character assassination of plaintiff. (*Id.* ¶ 29.)

Following the 2008 recession, SFSU became more financially dependent on outside donors, including organizations and individuals with anti-Palestinian beliefs and political agendas

that "were diametrically opposed and hostile towards [p]laintiff's advocacy for justice for an[d] in Palestine. (*Id.*) Such donors, their affiliates and the Israeli government are particularly hostile towards BDS and BDS's advocates, such as plaintiff, and leveraged their influence over SFSU to encourage SFSU's administrators to stifle plaintiff's political speech. (*Id.* ¶¶ 29, 30.)

For example, in 2009 GUPS and AMED co-sponsored an event to celebrate the creation of a mural on campus honoring a law Columbia University professor who had served as the President of the Modern Language Association and at which GUPS and AMED invited to speak the founder of a nonviolent campaign which pressured the Israeli government to change some of its policies, known as the BDS movement. (*Id.* ¶¶ 32, 33, 62, 63.) At or about the time of this event, the then-president of SFSU met with representatives of the Jewish Community Relations Council ("JCRC") and the Koret Foundations, who demanded that the event be cancelled. (*Id.* ¶¶ 34, 64.) He then issued a statement condemning BDS that was applauded by the then Director of Grant Making Programs at the Koret Foundation. (*Id.*) The Koret Foundation has donated millions of dollars to SFSU. (*Id.* ¶ 35.) The then-SFSU president subsequently withdrew the two AMED faculty positions. (*Id.* ¶¶ 36, 37.) At this time, it was clearly established that professors at state universities could not be subjected to retaliation for the exercise of their rights of free speech under the First Amendment. (*Id.* ¶ 37.)

When President Wong first arrived on campus in 2012, he stated his support for the AMED program. (*Id.* ¶ 38.) Upon his investiture, Wong accepted an invitation to travel to Israel from JCRC, "which has a pro-Israel and anti-Palestinian bias." (*Id.*) Information on this trip's itinerary, flights and accommodations, meetings, goals, and objectives has not been made available to the university community. (*Id.* ¶ 39.) This is "unsurprising" because JCRC and its supporters have described the organization as one that "works discreetly and behind the scenes." (*Id.*) On information and belief, Wong's JCRC sponsored trip to Israel closely resembled the standard JCRC tours to Israel for United States civic leaders, which includes VIP handling at the Ben Gurion airport, meetings with individuals harboring anti-Palestinian views including those who advocate for ethnic cleansing of Palestinians. (*Id.* ¶ 40.) "The aims and results of the trip were (a) to whitewash, concealing and distract [sic] from Israel's human rights violations thereby delegitimizing BDS advocates like [plaintiff]; and (b) to provide President Wong with the

ideological justification(s) for doing the bidding of the herein mentioned anti-BDS donors (which included retaliating against [plaintiff] for her political speech advocating for justice for and in Palestine)." (*Id.*)

Upon Wong's return from Israel, "he began to express notable hostility toward" plaintiff, AMED studies, and Palestinian students. (*Id.* ¶ 41) In the fall of 2013, "the Koret Foundation-funded AMCHA Initiative[3] began accusing plaintiff of anti-Semitism." (*Id.*) Shortly thereafter, Wong was present and did nothing when high-ranking campus administrators directed anti-Palestinian slurs at plaintiff. (*Id.* ¶ 42.) "Far from censuring the anti-Palestinian remarks, President Wong enthusiastically acted on them, ordering repeated investigations into [p]laintiff's international research and lecturing trips, which were supported pursuant to [p]laintiff's contract with SFSU." (*Id.* ¶ 43.) SFSU also revoked authorization for plaintiff's 2014 research trip to Palestine even though it had already been approved. (*Id.*) SFSU said that the cancellation was due to a travel warning issued by the U.S. State Department, however, the trip was cancelled prior to the issuance of the warning. (*Id.*)

"This was followed by a campaign of harassing inquisition into plaintiff's scholastically-related travel which continues to this day." (*Id.* ¶ 44.) "Defendants have continued their campaign to obstruct and impede [plaintiff's] research and teaching-related travel by imposing conditions and requirements not typically imposed on other faculty members, by delaying reimbursement for approved trips, and by setting impossible deadlines, insisting that [plaintiff] respond to demands on Christmas Day, on a Saturday night, during school breaks, etc." (*Id.* ¶ 45.) The objective of "this campaign of discriminatory and unending harassment is to establish a work environment that is so hostile and inimical to [plaintiff's] research and academic pursuits that she either resigns her position or at least spends most of her time locked in administrative battles[.]" (*Id.*) On June 9, 2016, Wong admitted to GUPS that their membership was being targeted by University officials in that GUPS members were selectively prosecuted for acts undertaken by many students who were neither Arab or Muslim or members of GUPS. (*Id.*)

---

[3] The Court notes that although plaintiff describes the AMCHA Initiative as a pro-Israel group which released a blacklist of more than 200 Middle East Studies professors in the United States who it declared to be "anti-Israel," including plaintiff, plaintiff does not provide the meaning of the AMCHA acronym. (*See* Compl. ¶ 41 n. 12.)

In the spring of 2015, Rosser blocked a university grant plaintiff was seeking to write a book with Simona Sharoni, an Israeli feminist colleague. (*Id.* ¶ 49.) Plaintiff reported to SFSU that the University of Washington Press had agreed it would publish the book. (*Id.*) Plaintiff was later informed by SFSU's Office of Research and Sponsored Programs that Rosser's "office" denied the funding despite excellent reviews from the external team who the University had hired to evaluate the proposal. (*Id.*) In spring of 2016, Rosser directed an SFSU dean "to investigate the contractual agreement that the University would fund [p]laintiff's travel, giving [the dean] the impression that Rosser wanted him to cancel it." (*Id.* ¶ 50.)

Since October of 2016, SFSU has also tolerated the acts of third parties that have contributed to the creation and maintenance of a hostile and threatening environment for plaintiff, including allowing outside organizations to put up posters that made vile and unfounded accusations against plaintiff, her colleagues, and her students. (*Id.* ¶ 51.) Although these posters violated SFSU regulations, the university took no steps to remove them or prevent their reoccurrence. (*Id.*)

In the fall of 2017, Summit delayed plaintiff's travel authorization to Palestine insisting that forms be changed to read "in consultations with President's office" regarding the Memorandum of Understanding between SFSU and an-Najah National University in Palestine. (*Id.* ¶ 52.) This requirement was first imposed after a "right-winged 'think tank'" launched a petition smearing plaintiff as a terrorist apologist and demanded cancellation of the Memorandum of Understanding. (*Id.*) In February 2018, Summit refused plaintiff's request for an operating budget for AMED that would support administrative assistants and faculty, stating that support of the AMED program should come out of what plaintiff had previously negotiated in her contract. (*Id.* ¶ 53.) On March 23, 2018, Summit emailed plaintiff demanding that she remove a post on a privately-owned Facebook page on which plaintiff criticized Wong's position on anti-Palestinian views on campus. (*Id.* ¶ 54.) Therein, Summit threatened disciplinary action against plaintiff if she "did not obey and remove" the post. (*Id.*)

On February 13, 2019, plaintiff led a protest against SFSU's decision to recognize Israel Independence Day as a religious holiday while refusing to recognize Ramadan as a religious holiday. (*Id.* ¶ 55.) "Barely one week later," SFSU's administration fired [p]laintiff's student

assistant, who had been hired by "the disabilities office." (*Id.*) Within the next two weeks, SFSU's administration denied plaintiff's travel authorization to South Africa. (*Id.*)

SFSU treats plaintiff and her students very differently than non-Muslim, non-Arab, and non-Palestinian students. (*Id.* ¶ 56.) For example, SFSU has allowed "an avowed Nazi whose social media posts have called for the murder of Muslims, Jews and immigrants" to remain on campus, but suspended a Palestinian student for a year based on social media posts. (*Id.*) SFSU has also failed to investigate complaints by plaintiff and student groups,[4] while "immediately launch[ing] a massive and time-consuming investigation" into complaints by the Executive Director of San Francisco Hillel to Hong regarding Hillel's purported exclusion from a student-organization event in 2017. (*Id.* ¶ 57.)

Plaintiff has also been subjected to a "continuous stream of discriminatory harassing conduct including," abrupt and arbitrary cancellation of classes for which plaintiff had planned and selected qualified community scholars to teach; replication by the University, on the official SFSU website, of false and smearing allegations; delayed replacement of plaintiff's work laptop computer for several months after it was stolen during an academic trip; prohibition of plaintiff's acceptance of "prestigious visiting fellowships at five international and national universities;" refusal to publicize academic fellowships awarded to plaintiff; relocation of plaintiff's office without her permission; insistence that plaintiff obtain insurance for a teach-in that was held in the college conference room, when SFSU had never required or suggested insurance for non-Arab, non-Muslim groups; failure to protect plaintiff's students who were subject to online stalking, received death threats and threats of sexual violence, and, in at least one instance, a student's employer "was contacted in an effort to get the student fired;" and arbitrary reduction of the amount of travel support by 13% in violation of plaintiff's contractual agreement with SFSU. (*Id.* ¶ 58.)

Throughout plaintiff's time at SFSU, she has closely associated with students of Palestinian and Arab ancestry, as well as Muslim students, who advocate for justice for and in

---

[4] Including Jews Against Zionism, GUPS, the Muslim Students' Association, the Muslim Women's Students Association, Movimiento Estudiantil Chicano de Aztlan ("MECHA"), Students for Quality Education, Ethnic Studies and Students' Organization, and other groups representing students of color.

Palestine.  (*Id.* ¶ 59.)  Plaintiff has also advocated for these students when they felt subject to discriminatory treatment.  (*Id.*)  For example, plaintiff worked with and advocated for Palestinian, Arab, and Muslim students when: (i) "they were attacked by the Administration" for wanting to include a nonviolent cartoon character on a mural set for display at the student center on campus; (ii) "they were subjected to hate speech on campus perpetrated by outsiders;" (iii) "they were threatened with disciplinary action in retaliation for political protests;" and (iv) the University failed to investigate after students discovered a naked man inside the Muslim Women Students' Association's prayer room.  (*Id.* ¶ 60.)

When SFSU invited plaintiff to join its faculty, it invited her to serve as a faculty adviser to GUPS, in addition to her teaching and scholarship.  (*Id.* ¶ 61.)  In 2009, GUPS and AMED co-sponsored an event to celebrate the creation of a mural on campus to honor the late Edward Said, a former professor at Columbia University, president of the Modern Language Association, and visiting professor at Harvard, Yale, and Johns Hopkins.  (*Id.* ¶ 62.)  In 2009, GUPS and AMED invited Omar Barghouti to speak at this event.  (*Id.* ¶ 63.)  Barghouti has received international acclaim, but "is disliked by some influential community members and SFSU donors" due to his advocacy for the BDS movement.  (*Id.*)

At or about the time of the commemoration event, then SFSU President Corrigan met with representatives from JCRC and the Koret foundation, both of which demanded that the event be cancelled.  (*Id.* ¶ 64.)  Corrigan then issued a statement condemning the BDS movement, which then Director of Grant Making Programs at the Koret Foundation, Susan Wolfe, applauded.  (*Id.*)  SFSU then "cancelled" the faculty search and withdrew the promised faculty lines provided for by plaintiff's contract with SFSU.  (*Id.*)  Corrigan possessed final decision-making authority in such matters.  (*Id.*)  Plaintiff believes that these actions were ordered by Corrigan in retaliation for plaintiff's "firmness in bringing Barghouti and other speakers to the campus, and in standing up for the rights of Palestinians."  (*Id.*)

On November 7, 2013, GUPS held a rally and event on-campus to commemorate the anniversary of the Edward Said Memorial Mural.  (*Id.* ¶ 67.)  On November 19, 2013, President Wong, "under pressure from outside organizations, issued a statement claiming that chalked slogans and posters and the images on a sweatshirt celebrated violence and promoted anti-

Semitism, even though none of the slogans, posters, or images mentioned Jews or used images associated with Jewishness." (*Id.*)

In January 2014, plaintiff led a research trip to Palestine that included other academics, including another SFSU professor. (*Id.* ¶ 68.) Beginning in March 2014, "outside pressure groups complained about the trip." (*Id.*) In May of the same year, "Wong ordered three separate (and redundant) audits into [plaintiff's] travels including a five-year audit going back to 2009 even though SFSU had reviewed and approved each of these trips in advance, and even though [plaintiff], who had been proclaimed by SFSU as an international scholar under the terms of her contract, was entitled to take University-funding international research trips." (*Id.*)

Thereafter began a pattern of interference and harassment which continues to the present. (*Id.* ¶ 69.) This pattern of acts was undertaken at the direction of Wong, who held final decision-making authority at SFSU, and was so consistently executed as to constitute a governmental "custom." (*Id.*) Specifically, SFSU has cancelled a trip that it had already approved, singled out plaintiff for repeated scrutiny of how she spends her authorized budget for research-related travel, demanded justifications of plaintiff's trips not asked of other faculty, repeatedly "lost" travel-related documents, delaying reimbursement and forcing plaintiff through the time-consuming exercise of repeatedly finding and resubmitting the same paperwork. (*Id.*) This conduct has had the effect of "obstructing [plaintiff] from her academic and scholarly obligations, which were already unconscionably burdensome in light of SFSU's repeated refusal to provide administrative support for this officially sanctioned program despite promises to do so." (*Id.*)

SFSU's conduct has also forced plaintiff to "personally absorbe expenses of the type that SFSU had previously approved, that were simply taking too much of her time to dispute, and to pay out of pocket for a part-time administrative assistant, a position which SFSU should have made available to AMED." (*Id.*) Specifically, SFSU denied or greatly delayed repayment for a number of legitimate and contractually authorized expenses, including a number of travel expenses, SFSU's denial of which resulted in plaintiff having to either pay the expenses out-of-pocket or cancel her travel plans resulting in reputational harm. (*Id.* ¶ 70.)

Between 2014 and 2016, Wong and/or Rosser ordered Dean Kenneth Monteiro and possibly other SFSU officials in interfere with plaintiff's travel and to initiate pointless and time-

consuming audits. (*Id.* ¶ 71.) Rosser then expanded the scope of those audits ordered by Wong, "leading to the spiteful requirement that [plaintiff] account for and document every single food item purchased and consumed even though she had a per diem allowance." (*Id.*) These instructions were issued and carried out in violation of SFSU travel policies and at a time "when it was clearly established that professors at state universities could not be punished for the exercise of their rights of free speech and/or academic freedom." (*Id.* ¶ 72.) These instructions also resulted in SFSU's denial of "routine reimbursement for supplied necessary for [plaintiff's] research and teaching, including . . . storage charges for substantial amounts of electronic data [and] the cost of shipping extensive research files held at SFSU to New York where [plaintiff] was continuing her research and writing for publication[.]" (*Id.* ¶ 73.) Finally, "[p]laintiff suffers from a disability or disabilities, at least one of which significantly limits major life and work activities, of which [d]efendants are aware." (*Id.* ¶ 74.) Defendants are "aware that such disabilities compound and exacerbate the effects of [their] bureaucratic harassment of [p]laintiff in retaliation of her political speech." (*Id.*)

SFSU also excluded plaintiff from various key tasks forces and working groups and sought to deprive her of her authority as director of AMED studies. In May 2017, SFSU convened a Presidential Task Force on "Campus Climate," lead by Wong. (*Id.* ¶ 75.) Although numerous faculty members, students, community representatives, and administrators were invited to participate, plaintiff "was conspicuously ***not*** invited, nor was her input sought." (*Id.* (emphasis in original).) Similarly, in the summer of 2017, Wong established an "Ad Hoc Working Group" to develop an "Equity and Social Justice Educational Outreach Plan."[5] (*Id.* ¶ 76.) Again, although "a great many faculty members were invited," plaintiff was excluded and her input was not sought. (*Id.*)

In 2018, "the Department Chair" repeatedly sought to "sidestep" plaintiff and deal directly with her teaching associate and doctoral student about which courses he could teach and how to

---

[5] The Court notes that plaintiff's complaint states that "Dr. Hong" engaged in this conduct. As a "Dr. Hong" does not appear elsewhere in the complaint, the Court assumes that this statement reflects a typographical error and plaintiff intended to represent that defendant Wong so engaged.

arrange them.[6]  (*Id.* ¶ 77.)  The Department Chair has continued this approach despite repeatedly being asked to go through plaintiff on these matters.  (*Id.*)  Beginning with President Corrigan and continuing with President Wong, "SFSU enacted policies and consistent customs to interfere with and obstruct [p]laintiff's professional productivity, to deny her support regardless of the fact that it had been contractually agreed to or was otherwise required by law, and to harass her in ways large and small so as to reduce her effectiveness, all in retaliation for her exercise of her rights of freedom of speech and academic freedom."  (*Id.* ¶ 78.)

## II.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted.  Dismissal for failure to state a claim under Rule 12(b)(6) is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).  The complaint must plead "enough facts to state a claim [for] relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  If the facts alleged do not support a reasonable inference of liability, stronger than a mere possibility, the claim must be dismissed.  *Id.* at 678-79; *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (stating that a court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.").  If a court dismisses a complaint, it should give leave to amend unless "the pleading could not possibly be cured by the allegation of other facts."  *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

\\

\\

\\

---

[6]  The Court notes that plaintiff does not indicate the name or official position of the "Department Chair."

### III.  ANALYSIS

The SAC includes allegations of First Amendment retaliation in violation of Section 1983 by defendants Wong, Rosser, and Summit in both their official and individual capacities.  (SAC ¶¶ 80, 81.)  The Court addresses each, in turn.

### A.  Allegations of First Amendment Retaliation Against Defendants in their Official Capacities

"An official-capacity suit 'represent[s] only another way of pleading an action against an entity of which an officer is an agent.'"  *Hartmann v. California Dept. of Corrections and Rehabilitation*, 707 F.3d 1114, 1127 (9th Cir. 2013) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  "Suits against state officials in their official capacity therefore should be treated as suits against the State."  *Id.* (quoting *Hafer*, 502 U.S. at 25.  Such an action requires a plaintiff to allege that a law or policy amounts to a constitutional violation.  *See Los Angeles County, Cal. v. Humphries*, 562 U.S. 29, 39 (2010); *see also Arizona Students' Association v. Arizona Board of Regents*, 824 F.3d 858, 863 (9th Cir. 2016) (holding that a complaint states a plausible claim for First Amendment retaliation where complaint includes allegations that defendant "modified . . . policies to retaliate" against the plaintiff for its "exercise of its First Amendment free speech rights").

A plaintiff may sue local entities directly under Section 1983 only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that [entity's] officers."  *Monell v. Dept of Soc. Servs. of N.Y.*, 436 U.S. 658, 690 (1978).  Such municipal liability may be established "(1) by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or (2) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate."  *Ulrich v. City and Cty. of San Francisco*, 308 F.3d 968, 984-85 (9th Cir. 2002) (internal citation omitted).

Here, plaintiff does not point to a specific policy by defendants but instead argues that "[t]he pattern of acts was undertaken at the direction of President Wong, who held final decision-making authority at SFSU, and was so consistently executed as to constitute a governmental

'custom' as defined by *Los Angeles County v. Humphries*[.]" (SAC ¶ 69.) Specifically, plaintiff alleges that "[b]egining with President Corrigan and continuing with President Wong, SFSU enacted policies and consistent customs to interfere with and obstruct [p]laintiff's professional productivity, to deny her support regardless of the fact that it had been contractually agreed to or was otherwise required by law, and to harass her in ways large and small so as to reduce her effectiveness, all in retaliation for her exercise of her rights of freedom of speech and academic freedom."[7] (*Id.* ¶ 78.)

To determine whether an individual possessed final policymaking authority, a plaintiff must show more than discretion to make decisions. "[T]he fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Ulrich*, 308 F.3d at 985.

Defendants assert that "while President Wong may be the 'Chief Executive Officer' at SFSU, he is not the Chief Executive officer of [California State University ("CSU")] and he reports to a higher authority within the CSU system. (MTD at 4 (citing MTD RJN, Ex. D).) The document upon which defendants rely, CSU's Board of Trustees Standing Orders, state that "[t]he Presidents of the California State University campuses are the chief executive officers for their campuses and have authority and responsibility, with appropriate consultation, to take whatever actions are necessary, consistent with Trustee and Chancellor's policy . . . ." (MTD RJN, Ex. D at 4.) This statement, coupled with plaintiff's allegations that Wong, as President of SFSU, had final decision-making authority with respect to the alleged conduct comprising the pattern of harassment and interference with her professional activities suffices to show that the conduct

---

[7] As a preliminary matter, the Court finds that plaintiff has not alleged that defendants Summit and Rosser possessed final policymaking authority such that municipal liability can be found by pursuing actions against them in their official capacities. *See Ulrich*, 308 F.3d at 984-85. Plaintiff's allegations that SFSU promoted their decision-making practice as "shared governance" in various job descriptions and statements by university representatives does not suffice to allege that Summit or Rosser had final decision-making authority by virtue of the alleged shared governance structure. (SAC ¶ 14.) Moreover, plaintiff's opposition provides no authority for her assertion that shared governance anoints university administrators with final policymaking authority. (*See* Dkt. No. 49 ("Opp.") at 17.) Accordingly, the Court **GRANTS** defendants' motion with respect to plaintiff's claims against defendants Summit and Rosser in their official capacities.

stemmed from "a deliberate choice to follow a course of action . . . made from among various alternatives by the official . . . responsible for establishing final policy *with respect to the subject matter in question*." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (emphasis supplied).

For the reasons stated below, the Court finds that plaintiff has alleged sufficient direct and circumstantial evidence, including temporal proximity between the protected activity and the alleged retaliatory conduct, to demonstrate that the customs addressed above were motivated by retaliatory intent. *See Ariz. Students*, 824 F.3d at 867-70. Accordingly, the Court **DENIES** this portion of defendants' motion to dismiss with respect to plaintiff's claims against Wong in his official capacity.

## B. Allegations of First Amendment Retaliation Against Defendants in their Individual Capacities

Unlike official capacity suits, personal, or individual, capacity suits "seek to impose individual liability on a government officer for actions taken under color of state law." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). "While the plaintiff in a personal-capacity suit need not establish a connection to governmental policy or custom," *id.*, a Section 1983 claim does not support vicarious liability. *See OSU Student All. v. Ray*, 699 F.3d 1053, 1069 (9th Cir. 2012). "[E]ach government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* (citing *Iqbal*, 556 U.S. at 677). An individual defendant's "senior position does not by itself make him liable for" unconstitutional conduct "perpetrated by subordinates; rather, he must have engaged in culpable action or inaction himself." *Id.* (citing *Iqbal*, 556 U.S. at 676.) Therefore, "[t]o state a valid [Section] 1983 claim, 'a plaintiff must plead that each government-official defendant, through the official's own individual actions, had violated the Constitution.'" *Id.* (quoting *Iqbal*, 556 U.S. at 676). "A plaintiff may bring a section 1983 claim alleging that public officials, acting in their official capacity, took action with the intent to retaliate against, obstruct, or chill the plaintiff's First Amendment rights." *Ariz. Students'*, 824 F.3d at 867 (9th Cir. 2016) (citing *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986)).

"To bring a claim for First Amendment retaliation, the plaintiff must allege that (1) [he or she] engaged in constitutionally protected activity; (2) the defendant's actions would 'chill a

person of ordinary firmness' from continuing to engage in the protected activity; and (3) the protected activity was a substantial motivating factor in the defendant's conduct—i.e., that there was a nexus between the defendant's actions and an intent to chill speech." *Ariz. Students*, 824 F.3d at 867. "Further, to prevail on such a claim, a plaintiff need only show that the defendant 'intended to interfere' with the plaintiff's First Amendment rights and that [she] suffered some injury as a result; the plaintiff is not required to demonstrate that [her] speech was actually suppressed or inhibited." *Id.*

Defendants concede that "there is no doubt" that plaintiff "engages in constitutionally protected First Amendment activity as a Palestinian rights activist." (MTD at 8.) Moreover, defendants appear to further concede that the actions alleged would chill the speech of a person of ordinary firmness.[8] (*See id.* at 8-13 (arguing only that plaintiff's complaint fails against defendants in their individual capacity because she fails to allege a nexus between the defendants' alleged conduct and plaintiff's speech).) Thus, the only issue presented by defendants' motion is whether the necessary nexus between the defendant's actions and the intent to chill speech exists.

A "First Amendment retaliation claim seeks to vindicate a public employee's exercise of free speech rights when she has suffered an adverse employment action *in response to* having spoken out publicly." *Wasson v. Sonoma Cty. Junior Coll.*, 203 F.3d 659, 663 (9th Cir. 2000) (emphasis supplied). In First Amendment retaliation cases, a plaintiff "may establish motive using direct or circumstantial evidence" by relying "on evidence of temporal proximity between the protected activity and alleged retaliatory conduct." *Ariz. Students*, 824 F.3d at 870 (citing *Ulrich*, 308 F.3d at 979). "Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." *Bell v. Clackamas Cty.*, 341 F.3d 858, 865–66 (9th Cir. 2003); *See also Villiarimo v. Aloha Island Air,*

---

[8] Out of an abundance of caution, the Court evaluates the second prong of the *Arizona Students* test. To determine whether defendants' alleged retaliatory conduct would chill plaintiff's free speech, the Court applies an objective test. *Ariz. Students*, 824 F.3d at 868. "Whether the [plaintiff] was, or would have been chilled, is not the test." *O'Brien v. Welty*, 818 F.3d 920, 933 (9th Cir. 2016). Instead, the Court must evaluate "whether the retaliatory acts would lead ordinary [persons] in the plaintiff's position to refrain from protected speech." *Ariz. Students*, 824 F.3d at 868 (internal quotations and modifications omitted). The Court finds that it "is entirely plausible that a jury could find [defendants'] actions[, as alleged by plaintiff] reasonably likely to deter an ordinary person from engaging in protected speech and conduct." *O'Brien*, 818 F.3d at 933.

United States District Court
Northern District of California

*Inc.,* 281 F.3d 1054, 1065 (9th Cir.2002) ("[C]ausation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.")  At the pleading stage, a plaintiff adequately asserts First Amendment retaliation if the complaint alleges plausible circumstances connecting the defendant's retaliatory intent to the suppressive conduct.  *Id.* (citing *O'Brien* 818 F.3d 920, 933-35).

### 1. Defendant Leslie Wong

With respect to President Wong, plaintiff alleges that although Wong initially stated his support for the AMED program, following his JCRC-sponsored trip to Israel, he "began to express notable hostility toward" plaintiff, AMED studies, and Palestinian students.  (SAC ¶ 41.)  Plaintiff further alleges the "aims and results" of the JCRC trip were to "whitewash" Israel's human rights violations thereby delegitimizing BDS advocates like plaintiff and to provide Wong with the ideological justifications of "doing the bidding" of anti-BDS donors, which included retaliating against plaintiff for her political speech.  (*Id.* ¶ 40.)  By way of example of Wong's alleged hostility, plaintiff asserts that shortly after the JCRC trip, Wong was present and did nothing when high-ranking campus administrators directed anti-Palestinian slurs at plaintiff and began a campaign of investigations into plaintiff's research travel.  (*Id.* ¶¶ 42, 43.)

"Far from censuring the anti-Palestinian remarks, President Wong enthusiastically acted on them, ordering repeated investigations into [p]laintiff's international research and lecturing trips, which were supported pursuant to [p]laintiff's contract with SFSU."  (*Id.* ¶ 43.)  Specifically, plaintiff alleges that the SFSU, at the direction of Wong, cancelled a trip that it had already approved, singled out plaintiff for repeated scrutiny of how she spends he authorized budget for research-related travel, demanded justifications of plaintiff's trips not asked of other faculty, repeatedly "lost" travel-related documents resulting in delay of reimbursement and forcing plaintiff through the time-consuming exercise of repeatedly finding and resubmitting the same paperwork.  (*Id.* ¶ 69.)  Plaintiff alleges that between 2014 and 2016, Wong ordered these audits via Dean Kenneth Monteiro and that Rosser expanded the scope of those audits ordered by Wong, "leading to the spiteful requirement that [plaintiff] account for and document every single food item purchased and consumed even though she had a per diem allowance."  (*Id.* ¶ 71.)  Finally, plaintiff alleges that she was excluded from two tasks forces/working groups established and led

by Wong, while numerous other faculty members were invited and included.  (*Id.* ¶¶ 75, 76.)

Defendants contend that these allegations amount to nothing more than speculation that SFSU is dependent upon outside donors who advocate for anti-Palestinian political agendas and leverage their influence over SFSU to pressure SFSU administrators to stifle plaintiff's political speech and therefore fail to allege a nexus between defendants' conduct and a retaliatory intent. (MTD at 9 (citing SAC ¶ 29).)  However, in addition to the temporal connection between her January 2014 research trip to Palestine, about which "outside pressure groups" began complaining in March 2014, and Wong's May 2014 instruction to audit plaintiff's travel (*id.* ¶ 68), plaintiff has provided substantial detail as to circumstances surrounding this and other instances of alleged retaliation.  *Coszalter v. City of Salem*, 320 F.3d 968, 977-78 (9th Cir. 2003) (finding that "[t]ime periods of three and eight months between protected speech and alleged adverse employment actions were not too long to support an inference of retaliation in First Amendment retaliation suit brought by city employees" and rejecting "any bright-line rule about the timing of retaliation" because "[w]hether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances").

Plaintiff has alleged a pattern of SFSU's reliance on anti-Palestinian outside donors for financial stability resulting in these donors have been able to pressure SFSU administrators, to stifle plaintiff's pro-Palestinian speech through a number of adverse employment actions that predates Wong's presidency, including the 2009 cancellation of the search for the two additional faculty members promised as part of her recruitment shortly after opposition from the same outside donors regarding an event designed to commemorate Palestinian rights. (SAC ¶¶ 24-25, 32-34.)  She has alleged that Wong's conduct in chilling her speech, including ratification of accusations of anti-Semitism against plaintiff by high-level university officials and ordering repeated investigations into plaintiff's international research and lecturing travels, occurred in conjunction with other SFSU actions, including cancellation of a trip already approved, intense scrutiny into how plaintiff spent her authorized travel budget, and denial or significant delay of reimbursement for travel expenses and supplies, that served the same function.  (*Id.* ¶¶ 41-44, 68-70, 73.)  Moreover, plaintiff has alleged that other faculty were not subject to these actions and that the excuses given for some of this conduct, for example the explanation that SFSU cancelled a

pre-approved research trip to Palestine due to a U.S. State Department travel warning, were pretextual, as that warning was issued *after* the trip was cancelled. (*Id.* ¶¶ 44, 45.) These allegations support the reasonable inference that Wong was "motivated by retaliation for [plaintiff] having engaged in a protected activity under the First Amendment."[9] *O'Brien*, 818 F.3d at 932. Accordingly, the Court **DENIES** this portion of defendants' motion as it relates to plaintiff's claims against Wong in his individual capacity.

### 2. Defendant Jennifer Summit

With respect to then-Interim Provost Summit, plaintiff alleges that in the fall of 2017, she delayed plaintiff's travel authorization to Palestine by insisting that forms be changed to read "in consultations with President's office" regarding the Memorandum of Understanding between SFSU and an-Najah National University in Palestine. (SAC ¶ 52.) Plaintiff contends that this requirement was first imposed after a "right-winged 'think tank'" launched a petition smearing plaintiff as a terrorist apologist and demanding cancellation of the Memorandum of Understanding. (*Id.*)

Plaintiff also contends that in February 2018, Summit refused plaintiff's request for an operating budget for AMED that would support administrative assistants and faculty, stating that support of the AMED program should come out of what plaintiff had previously negotiated in her contract. (*Id.* ¶ 53.)

Finally, plaintiff contends that on March 23, 2018, Summit, who had then been appointed Provost, emailed plaintiff demanding that she remove a post on a privately-owned Facebook page on which plaintiff criticized Wong's position on anti-Palestinian views on campus. (*Id.* ¶ 54.) Plaintiff asserts that in that email, Summit threatened disciplinary action against plaintiff if she "did not obey and remove" the post. (*Id.*)

---

[9] The Court is unpersuaded by defendants' argument that plaintiff must allege "that there was no other legitimate basis for the actions." (MTD at 7, 13.) Defendants fail to provide any legal authority for the assertion that plaintiff must so plead and appear to import the burden-shifting analysis conducted at the summary judgment stage into their Rule 12(b)(6) motion. *See id.*; *Eng v. Cooley*, 552 F.2d 1062, 1071 (9th Cir. 2009) (articulating the *Pickering* balancing test for First Amendment retaliation claims at summary judgment as "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public") (internal citations omitted).

As with Wong, plaintiff has alleged temporal proximity, between the delay of her travel authorization and the demand by a "right-wing think tank" for cancellation of the related Memorandum of Understanding, as well as circumstantial evidence that supports a claim of a nexus between the chilling conduct and a retaliatory intent. (*See* SAC ¶ 52.) Specifically, plaintiff alleges that the demand by the think tank included allegations that plaintiff was a "terrorist apologist." (*Id.*) Plaintiff's other allegations of retaliatory conduct immediately prior to the fall 2017 delay of authorization also provide circumstantial support for the allegation of a nexus between the conduct and retaliatory intent. (*See id.* ¶¶ 75, 76 (alleging that in May and summer of 2017 plaintiff was excluded from task forces and working groups designed to address social justice and the political climate on campus).) Accordingly, the Court **DENIES** this portion of defendants' motion to dismiss with respect to plaintiff's claims against Summit in her individual capacity.

The Court is not persuaded that plaintiff's other allegations support her claim, namely with regards to Summit instructing that support of the AMED program should come out of what plaintiff had previously negotiated in her contract. This allegation does not include any connection, temporal or otherwise, that would allow an inference on its face of a nexus between Summit's response and a retaliatory intent. (*See* SAC ¶ 53.)

Further, with respect to plaintiff's allegation that Summit demanded that plaintiff remove a post on a privately-owned Facebook page on which plaintiff criticized Wong's position on anti-Palestinian views on campus (*id.* ¶ 54), defendants contend that because the post was "re-posted" to Facebook pages belonging to SFSU's AMED department and the University-affiliated GUPS student group, the post implicated SFSU's own free speech therefore does not constitute protected speech. (MTD at 12-13.) Plaintiff responds that both of these Facebook pages are privately owned per SFSU's own rules for student organization pages, that they may indicate "that their respective organization resides *at* [SFSU]." (Opp. at 21 (citing Opp. RJN, Ex. E).) However, plaintiff fails to provide any authority to suggest that the insertion of a preposition provides sufficient distance from the university so as negate any First Amendment interest SFSU might otherwise have in the content published on the Facebook pages. [10] (*See id.* at 20-22.) Moreover,

---

[10] Plaintiff also relies on statements made by the Board of Trustees of CSU in *Mandel, et*

19

according to plaintiff's complaint, AMED Studies – Arab and Muslin Ethnicities and Diaspora Studies Program – is not a student organization or club, but a university department. (*See* SAC ¶ 23.) Therefore, the "at SFSU" rule does not apply to the AMED page. (*See* Opp. RJN, Ex. E ("Student Organizations may indicate that their respective organization resides at San Francisco State University, i.e. Culinary Club at SF State. The name should . . . clearly differentiate the club *as a student organization and not a University department or program*.") (emphasis supplied). Thus, the Court finds that the AMED Facebook page is analogous to bulletin boards maintained on a school's campus, posts on those pages implicate SFSU's own First Amendment rights.[11] *See Downs v. Lost Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1009, 1012 (9th Cir. 2000) (finding that the content of bulletin boards at a school, unlike student-written articles in a school-sponsored newspaper or an outside organization's advertisement in school-sponsored student newspapers, yearbooks, and athletic programs, constitutes "speech that will likely bear the imprimatur of the school).

Finally, plaintiff does not sufficiently allege that Summit instructed her to remove the post from her *personal* Facebook page. Rather, the letter Summit sent to plaintiff, which plaintiff incorporates by reference in her complaint, instructs plaintiff to "remove a message that is currently posted on the *AMED Facebook* page[.]" (MTD RJN, Ex. C (emphasis supplied).) Also, although plaintiff's opposition asserts that there is no basis for defendants' right "to control [p]laintiff's ***personal*** Facebook page," she appears to contend that such control has come in the form of Summit limiting her ability to use "Facebook's most fundamental feature" by circumscribing her ability to have posts from her personal page re-posted elsewhere. (Opp. at 22 (emphasis in original).) Without more, these allegations do not support plaintiff's claims against Summit in her individual capacity.

_____

*al v. Board of Trustees of California State University*, Case No. 3:17-cv-03511, that SFSU "did not have the ability to remove the post itself." (*Id.*) The Court is unpersuaded, and plaintiff fails to provide any authority for the assertion that, the mechanical inability to control a webpage, alone, is enough to establish that the institution whose name the page bears does not have a First Amendment interest in the content produced thereon.

[11] Because, as noted below, the letter sent by Summit to plaintiff instructing her to remove the post related to the AMED Facebook page only (*see* MTD RJN, Ex. C), the Court need not reach the issue of whether the GUPS Facebook page similarly implicates the University's First Amendment rights.

### 3. Defendant Sue V. Rosser

With respect to then-Provost and Vice President for Academic Affairs Rosser, plaintiff alleges that in the spring of 2015, Rosser blocked a university grant plaintiff was seeking to write a book with Simona Sharoni, an Israeli feminist colleague. (SAC ¶ 49.) Plaintiff further alleges that she and Sharoni had secured a publisher for the book and that she later learned from SFSU's Office of Research and Sponsored Programs that Rosser's "office" denied the funding despite excellent reviews who the University had hired to review the proposal. (*Id.*) Additionally, plaintiff contends that in the spring of 2016, Rosser directed an SFSU dean "to investigate the contractual agreement that the University would fund [p]laintiff's travel, giving [the dean] the impression that Rosser wanted him to cancel it."[12] (*Id.* ¶ 50.) These allegations, without more, fail to connect Rosser's alleged actions to any retaliatory intent. Accordingly, the Court **GRANTS** this portion of defendants' motion with respect to plaintiffs' claims against Rosser in her individual capacity.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** defendants' motion, as indicated below.

1. The Court **DENIES** defendants' motion to dismiss as it relates to plaintiff's claims against defendant Wong, both in his official and individual capacities;

2. The Court **GRANTS** defendants' motion to dismiss as it relates to defendant Summit in her official capacity;

3. The Court **DENIES** defendants' motion to dismiss as it relates to defendant Summit in her individual capacity; and

4. The Court **GRANTS** defendants' motion to dismiss as it relates to plaintiff's claims against defendant Rosser, both in her official and individual capacities.

\\

\\

---

[12] The Court notes that it is not entire clear from plaintiff's statement whether "it" refers to the contract or proposed travel.

Accordingly, defendants Wong and Summit shall file their answer to the SAC no later than twenty-one (21) days from the date of this Order.

This Order terminates Docket Number 45.

**IT IS SO ORDERED.**

Dated: August 16, 2019

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**