UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RABAB ABDULHADI,**<br>Plaintiff,<br>vs.<br>**LESLIE WONG, ET AL.,**<br>Defendants. | CASE NO. 18-cv-04662-YGR<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT & MOTION TO SEAL**<br>Re: Dkt. Nos. 130, 142, & 143 |

Plaintiff Rabab Abdulhadi, Ph.D., is an Associate Professor of Arab and Muslim Ethnicities and Diasporas ("AMED")/Race and Resistance Studies in the College of Ethnic Studies at San Francisco State University ("SFSU"). She brings this action under 42 U.S.C. § 1983, alleging that she suffered adverse action by defendant, Leslie Wong, the President of SFSU, and defendant Jennifer Summit, the current Provost, in retaliation for protected speech in violation of her First Amendment rights. Before the Court are defendants' motion for summary judgment and motion to seal.

Having carefully considered the papers and exhibits submitted in connection with each motion, the pleadings in this action, and upon further consideration after oral argument which occurred on March 1, 2022, the Court **ORDERS** that each motion is **GRANTED** for the reasons explained more fully below.

**I.   BACKGROUND**

The Court extensively summarized the allegations contained in plaintiff's second amended complaint ("SAC") at Docket Number 42 when the Court granted in part and denied in part defendants' motion to dismiss the SAC. (*See* Dkt. No. 52.) The Court assumes the parties' familiarity with the previous order and the factual allegations described therein. Relevant to the pending motion for summary judgment, the previous order dismissed all claims other than the First Amendment retaliation claims against defendant Wong in his official and individual

capacities and defendant Summit in her individual capacity for facts related to Summit's alleged delay of plaintiff's travel authorization to Palestine in 2017.

On a motion for summary judgment, the Court moves past the allegations contained in plaintiff's SAC.[1]  While the allegations in the SAC span more than fifteen years, and plaintiff argues that the Court should consider this case in the context of plaintiff's career, the motion for summary judgment focuses on eight alleged retaliatory actions.  These eight alleged retaliatory actions are described here.

### A. TOLERATING ACTS OF THIRD PARTIES

First, plaintiff alleges that "[s]ince at least October 14, 2016 . . . SFSU has tolerated the acts of third parties that have contributed to the creation and maintenance of a hostile and threatening environment for Dr. Abdulhadi."  (SAC ¶ 51.)  At one point, plaintiff alleges that the third parties "put[] up posters that made vile and unfounded accusations against her, her

---

[1] Several fundamental principles frame the Court's construction of this background section.  A party who asserts that a fact is genuinely disputed must support the assertion with evidence and argument.  *See* Fed. R. Civ. P. 56(c)(1).  Conclusory assertions that a fact is in dispute without support are not credited.  *See Seaman v. Pyramid Technologies, Inc.*, No. SACV 10-00070 DOC (RNBx), 2011 WL 5508971, *5 (C.D. Cal. Nov. 7, 2011) ("The party opposing a summary judgment motion cannot simply rely on seemingly baseless assertions and expect the Court to search for facts that may or may not support those conclusory arguments."); *see also Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988) ("The district judge is not required to comb the record to find some reason to deny a motion for summary judgment").  Furthermore, the Court does not need to consider evidence that is not "brought to [the Court's] attention in the opposition to summary judgment."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Additionally, "[a]rguments and statements of counsel are not evidence and do not create issues of material fact" on a motion for summary judgment. *Baracamerica Int'l USA Tr. v. Tyfield Imps. Inc.*, 289 F.3d 589, 593 n.4 (9th Cir. 2002) (internal quotations and citation omitted).

The Court notes that the record presented by the plaintiff is objectively thin for an opposition to a motion for summary judgment.  While heavy on hyperbole and rhetoric, plaintiff's opposition includes **four** citations to the record she presents.  Plaintiff's Responsive Statement of Disputed Material Facts and Statement of Additional Disputed Material Facts, In Opposition to Defendants' Motion for Summary Judgment ("SOF") does not always reference the correct pincites of the record and often contradict the responses submitted.  (Dkt. No. 149-2.)  While plaintiff does submit a seventeen-paragraph declaration in support of her opposition, the opposition only cites to one paragraph.  (Dkt. No. 149 at 16.)  Counsel for plaintiff also submits two paragraphs of an attorney declaration (with attached exhibits) for consideration in the opposition papers.  (Dkt. No. 149 at 10, 17-18.)

2

colleagues, and her students" and that "the university took no steps to remove them or to prevent the reoccurrence of this." (*Id*.) Now, on summary judgment, the undisputed record of facts illustrates a different set of circumstances. Plaintiff does not dispute that SFSU investigated the incident, that SFSU contacted the third-party organization claiming responsibility for the creation and dissemination of posters and asked the organization to stop targeting SFSU students and faculty, that SFSU reached out to plaintiff and the affected students to offer assistance and a safety plan, and that based on the investigation there was no basis for criminal charges regarding the posters. (SOF 1A, Nos. 4-7.) It is also undisputed that defendant Wong denounced Islamophobia and the posters that were placed on campus criticizing the plaintiff and that Wong announced the formation of a cross-university and community task force to further address the issue. (SOF 1A, No. 9.)

### B. TASK FORCES AND WORKING GROUPS

Second, plaintiff alleges that during the spring and summer of 2017, she was excluded from "key task forces and working groups." (SAC ¶¶ 75-76.) Specifically, plaintiff alleges that she was not invited to participate in: (1) what has been labeled as a "Presidential Task Force" on "Campus Climate" "headed by [defendant] Wong"; and (2) an "Ad Hoc Working Group" to develop an "Equity and Social Outreach Plan." (*Id*.) Plaintiff contends that she was excluded from these groups in retaliation for having "stood up for students' rights" and "stood up for Palestine" after her students organized a "Know Your Rights" fair in 2017. (Dkt. No. 132-4, Abdulhadi Depo. Tr. at 283:15-284:9.) With respect to the Presidential Task Force, there is no dispute that no faculty member was entitled to participate in the Presidential Task Force and its two associated working groups. (SOF 1B, No. 4.) It is also undisputed that defendant Wong believed plaintiff's expertise and participation would be useful to the working group focused on student identity and campus climate for Muslims and Arabs, and that plaintiff was invited to participate in that working group. (SOF 1B, No. 5-6.) However, while plaintiff was not invited to participate in the Presidential Task Force, the Executive Director of the Council of American-Islamic Relations (and lecturer in the Race and Resistance Studies Department) was invited to participate along with a representative of the General Union of Palestinian Students and the

3

President of the Muslim Student Association. (SOF 1B, No. 9.)[2]

Like the Presidential Task Force, faculty members were not entitled to participate in the Ad Hoc Working Group established in summer 2017. (SOF 1B, Nos. 13-14.) It is undisputed that the Ad Hoc Working Group included a representative from plaintiff's college as well as student representatives from the Muslim Student Associated, General Union of Palestinian Students, and Ethnic Studies Department. (SOF 1B, Nos. 15-16.) It is also undisputed that plaintiff was not invited to participate in the Ad Hoc Working Group because she was previously invited to the working group associated with the Presidential Task Force. (SOF 1B, No. 17.)[3]

### C.  2017 TRAVEL TO PALESTINE

Third, plaintiff alleges that "[i]n the Fall of 2017, [defendant] Summit delayed Plaintiff's [] travel authorization to Palestine" by insisting that plaintiff add the words "in consultation with President's office" to plaintiff's travel form. (SAC ¶ 52.) Plaintiff contends that this was a "new requirement" that was imposed on her "after a right-winged 'think tank' launched a petition smearing Plaintiff as a terrorist apologist and demanding cancellation of the memorandum of Understanding" between SFSU and an-Najah National University in Palestine. (*Id*.) It is undisputed that plaintiff submitted her travel request in January 2018 seeking approval to travel to Palestine in March 2018 with a "Purpose of Travel" to "conduct[] research, a study tour, and Memorandum of Understanding (MOU) with Palestinian Universities." (SOF 1C, Nos. 3-4.) It is also undisputed that Summit reviews international travel request from faculty members to ensure that international travel is consistent with university policies, procedures, risk management requirements, and the budget. (SOF 1C, Nos. 1-2.) There is no dispute that Summit approved plaintiff's travel request even though plaintiff did not agree to add the six words to her travel form. (SOF 1C, Nos. 5, 9.)

---

[2] Plaintiff's SOF is contradictory. Plaintiff does not dispute Fact 9 of Issue 1B where student representatives were invited to participate in the Task Force. However, plaintiff's declaration suggests that students were not invited. Her position is incoherent.

[3] Plaintiff asserts that this fact is disputed, however, the only facts raised in her responsive statement concern the Presidential Task Force. Accordingly, the Court construes this fact as undisputed.

4

### D. 2017 Travel to South Africa, London, and Paris

Fourth, plaintiff alleges that "SFSU has denied or greatly delayed repayment for . . . legitimate and contractually authorized" travel expenses, including reimbursement for the following trips: (1) an October 2017 trip to Johannesburg; (2) a 2017 trip to London; and (3) a 2017 trip to address the French National Assembly in Paris. (SAC ¶¶ 70(d)-(f).) There is no dispute that the university requires that a Request for Authorization of Travel (RAT) form and a Foreign Travel Insurance Program (FTIP) form be submitted to the university's Risk Management Office before travel begins in order to obtain authorization and insurance for international travel. (SOF 1D, No. 1.) The parties dispute whether plaintiff made a complete, timely, and accurate request before her departure date. However, the record is undisputed that plaintiff emailed the Risk Management Office seeking approval for her Paris and London trips on October 11, 2017. (SOF 1D, No. 2.) Plaintiff's travel forms indicated that her trips had begun on October 2, 2017. (SOF 1D, No. 5.) The Risk Management Office informed plaintiff that her requests could not be approved because foreign travel dates could not be processed after the departure date. (SOF 1D, 5-8.) When presented with the issue, defendants Wong and Summit did not retroactively approve plaintiff's travel. (SOF 1D, No. 11-12.) Another faculty member's request was denied at the same time for the same reason. (*Id.*)

### E. Faculty Sidestepping

Fifth, plaintiff alleges that "[i]n 2018, the Department Chair [] repeatedly sought to sidestep [plaintiff] and deal directly with her teaching associate and doctoral student about what courses she can teach and how to arrange them," and that "[t]he Department Chair has continued with this approach despite repeatedly being asked to go through [plaintiff] on these matters." (SAC ¶ 77.) It is undisputed that plaintiff stopped communicating with the Chair of her Department, Doctor Jason Ferreira, in the spring of 2018. (SOF 1E, No. 1.) Doctor Ferrari contacted a graduate student lecturer about course scheduling in fall 2018 about a class that the plaintiff had proposed to "team-teach" with the student in the following spring. (SOF 1E, No. 3.) Based upon the evidence submitted, the Court understands that team teaching was a requested disability accommodation. (Declaration of Rabab Abdulhadi [Abdulhadi Dec.], Dkt. No.149-4,

5

¶ 16; Declaration of Eugene Chelberg, Dkt. No. 136, Ex. A.)

### F. INVESTIGATION OF AVOWED NAZI STUDENT

Sixth, plaintiff alleges that "in the fall of 2018 an avowed Nazi whose social media posts have called for the murder of Muslims, Jews and immigrants, registered as a student in Dr. Abdulhadi's Palestine class," and that the university did "not remove[] the Nazi from campus or in any way address the danger he poses to students, faculty, and administration." (SAC ¶ 56.) Doctor Luoluo Hong was responsible for addressing plaintiff's concerns and the student's social media. Doctor Hong worked with the Dean of Students and campus Chief of Police to investigate the situation. (SOF 1F, No. 2.) This included interviewing the student who indicated that he no longer subscribed to the views in his years old posts and that he took plaintiff's class because he no longer held those views and wanted to learn. (SOF 1F, No. 3.) Plaintiff was informed of efforts to respond to the complaint and the results of the investigation. (SOF 1F, No. 4.)

### G. RELIGIOUS HOLIDAY PROTEST, FUNDING OF STUDENT ASSISTANT, AND 2019 TRIP

Seventh, plaintiff alleges that "[o]n February 13, 2019, Plaintiff led a protest against SFSU's decision to recognize Israel Independence Day as a religious holiday and SFSU's refusal to recognize Ramadan as a religious holiday." (SAC ¶ 55.) Plaintiff contends that "[b]arely a week later," SFSU "fired plaintiff's student assistant," and "[w]ithin the next two weeks thereafter," her travel authorization to South Africa was denied by "SFSU's administration." (*Id*.) There is no dispute that a list of holidays was disseminated and that it did not include Ramadan as a religious holiday. The list was not an official recognition of holidays at SFSU, however, it was disseminated to faculty as a reminder of days students might be absent from class due to holiday observances. (SOF 1G, No. 6.)[4] Defendant Summit's Chief of Staff conveyed that the omission of holidays, including Ramadan, was a mistake and that the list "was never intended to marginalize or support any group." Plaintiff believed the Chief of Staff's explanation. (SOF 1G,

---

[4] Plaintiff asserts that the fact is disputed, however, no evidence was submitted to present a dispute of fact. Therefore, the Court construes it as undisputed. Plaintiff also violated Civil Local Rule 7-3(a) by not including her five objections in her brief. Having considered the objections, they are all unfounded and/or immaterial to the outcome of the motion for summary judgment.

No. 10.) A month prior to the protest, it was conveyed to plaintiff and her student assistant that plaintiff was not authorized to have a student assistant as an accommodation in the spring of 2019 because plaintiff was not teaching. (SOF 1G, No. 11.)[5] The student assistant was reminded of this again on February 28, 2019, because the student had submitted timesheets for payment even though the work had not been authorized. (SOF 1G, No. 13-15.) With respect to plaintiff's travel authorization to South Africa, there is no dispute that a budget review is part of the standard approval process for faculty international travel. (SOF 1G, No. 17.) Plaintiff's travel proposal exceeded her available funds and was denied. (SOF 1G, No. 16.)[6]

### H. REMOVAL OF AMED FACEBOOK POST

Finally, plaintiff alleges that "[o]n March 23, 2018, Summit sent an email to Dr. Abdulhadi demanding that she remove a post on a privately owned Facebook page wherein Dr. Abdulhadi criticized President Wong's position on anti-Palestinian views on campus. In that email, Summit threatened disciplinary action against Dr. Abdulhadi if Dr. Abdulhadi did not obey and remove the aforementioned Facebook post." (SAC ¶ 54.) The Court's prior order granting in part and denying in part the defendants' motion to dismiss the SAC foreclosed plaintiff's reliance on this email. Specifically, the Court rejected the plaintiff's attempt to characterize the Facebook page as private on the grounds that it belonged to SFSU's AMED department. In any event, plaintiff has *not submitted the Facebook post* to the Court on summary judgment, only the email referencing the same. This is insufficient to support her burden as detailed below. It is also not disputed that plaintiff was not asked to remove a similar post made on her private Facebook account.

//

//

---

[5] Plaintiff contends in a conclusory fashion without legal argument or evidentiary support that she was entitled to a disability accommodation for all aspects of her job. Given plaintiff's lack of evidence, the Court construes the lack of authorization as an undisputed fact.

[6] Plaintiff attempts to create a dispute of material fact based on speculation, *i.e.*, that she thought travel authorizations were issued on merit. (SOF 1G, No. 16.) Plaintiff has presented no evidence that her request would have been approved based on its merit as opposed to being denied based upon budgetary concerns. Indeed, she does not dispute that the proposal exceeded available funds.

7

## II. LEGAL STANDARD

The parties do not dispute the general summary judgment standard which is well-known and well-established, including the inferences to be given and the burdens. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288-89 (9th Cir. 1987).

## III. DISCUSSION

The SAC alleges First Amendment retaliation in violation of Section 1983 by defendants Wong and Summit in both their official and individual capacities. Defendants move for partial summary judgment with respect to the period at issue, the substance of plaintiff's claims, and qualified immunity. As discussed below, summary judgment is appropriate as to all of these issues.

### A. LEGAL FRAMEWORK OF CLAIM

While a government employer may regulate the speech of its public employees to a certain degree, it may not abuse its position as employer to stifle "'the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest.'" *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Acknowledging the limits on the government's ability to silence its employees, the Supreme Court has explained that "[t]he problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

To determine whether a plaintiff has established a First Amendment retaliation claim against a government employer on summary judgment, courts conduct a five-step inquiry, namely considering whether: (1) the speech at issue was a matter of public concern; (2) the plaintiff spoke as a private citizen or a public employee; (3) the speech was a substantial or motivating factor in the adverse employment action; (4) the state employer had an adequate justification for treating the employee differently from members of the general public; and (5) the state employer would have taken the adverse employment action even absent the speech. *Eng*, 552 F.3d at 1070 (citing

*Pickering*, 391 U.S. at 568). The parties do not dispute that on summary judgment, the plaintiff bears the burden of establishing the first three elements. If the plaintiff succeeds, the defendants bear the burden of either justifying the alleged adverse action by showing that its "legitimate administrative interests outweigh [plaintiff's] First Amendment rights," or establishing it would have made the same decision regardless of the protected conduct. *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004). Defendants only move for summary judgment on the first three steps of the relevant inquiry. Therefore, if plaintiff meets her burden on the first three elements, summary judgment in favor of the defendants is inappropriate. However, plaintiff's "failure to meet any one of them is fatal to the plaintiff's case." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013). "[B]ecause all five factors are independently necessary, it may be more efficient in some instances to answer a potentially dispositive question further down the *Eng* list first." *Id*. Before addressing the elements, the Court addresses two threshold issues: one, the statute of limitations and two, whether each defendant was acting in an official versus personal capacity.

### 1. The Relevant Period For Consideration

Defendants first argue that summary judgment is appropriate as to any factual allegations before August 2, 2016 on the grounds that plaintiff is barred from asserting a claim for violation of her First Amendment Rights against them because of the statute of limitations. The Court agrees.

It is not disputed that a claim brought under Section 1983 adopts the forum state's statute of limitations for personal injury claims, and in California, that limitations period is two years. *Action Apt. Ass'n, Inc. v. Santa Monica Rent Control Opinion Bd*., 509 F.3d 1020, 1026-27 (9th Cir. 2007); *see* Cal. Code Civ. Proc. § 335.1. Since plaintiff filed suit on August 2, 2018, defendants argue that plaintiff is precluded from relying on any factual allegations before August 2, 2016, even though the allegations in plaintiff's SAC span fifteen years. Plaintiffs' opposition does not address defendants' statute of limitations argument and effectively concedes the point.

The record suggests that plaintiff appears to be relying on the continuing violations doctrine to avoid application of the statute. That doctrine does not apply given the record presented. To invoke the doctrine, "a plaintiff must plead the existence of a systematic policy or

practice of discrimination before and during the statute of limitations." *Ramachandran v. City of Los Altos*, 359 F. Supp. 3d 801, 813 (N.D. Cal. 2019) (quoting *Gutowsky v. Cty. of Placer*, 108 F.3d 256, 259 (9th Cir. 1997)). "Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). No evidence has been submitted to support a systematic policy or practice of discrimination or retaliation. Therefore, summary judgment as to any events that predate August 2, 2016 is appropriate.

Notably, plaintiff's opposition references paragraph 3 of her declaration. (Dkt. No. 149 at 16.) Again, this is the only paragraph from plaintiff's short declaration that is cited in her opposition papers. That declaration provides that "[i]n June 2016, Dr. Hong singled out Palestinian students for prosecution for the student protest against Israeli politician Nir Barakat. Dr. Hong and Dr. Wong admitted this during a meeting with students that Dr. Abdulhadi attended as their advisors." (Abdulhadi Dec. ¶ 3.) This act falls outside of the statute of limitations and, as explained below, provides insufficient information concerning any of plaintiff's speech to support her claims.[7]

Thus, the Court only addresses the specific acts within the limitations period that are described in the background section.

### 2. Official Versus Independent Capacity Claims

The law distinguishes between suits brought against a defendant in an official capacity versus an independent capacity. The Court discussed this in its prior order and assumes the

---

[7] The opposition also references two other instances of speech and conduct that fall outside of the statute of limitations by way of declaration from plaintiff's counsel, not plaintiff. (*See* Declaration of Haytham Faraj [Faraj Dec.], Dkt. No. 149-3; Dkt. No. 149 at 10, 17-18.) Defendants object that counsel's summary of plaintiff's speak is double hearsay and lacks personal knowledge of the underlying events. The Court agrees. "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In any event, both predate August 2, 2016 and are not admissible as presented in the declaration. The first concerns plaintiff's participation in endorsing an event organized by Palestinian students on the second annual anniversary of the Edward Said mural in 2009 on behalf of the AMED studies program. (Faraj Dec. ¶ 2.) The second concerns a general and conclusory statement that plaintiff had been speaking up about Palestine in 2013. (*Id.*)

1    parties' familiarity with this framework.

2    Defendants' motion for summary judgment highlights the importance of the distinction on
3    summary judgment. "[I]n an official-capacity action . . . under § 1983[,] . . . the [government]
4    entity's 'policy or custom' must have played a part in the violation of federal law." *Kentucky v.*
5    *Graham*, 473 U.S. 159, 166 (1985). "Unlike an official capacity claim, where the constitutional
6    injury 'must be attributable to [an] official policy or custom,' an individual capacity claim 'hinges
7    upon [the individual defendant's] participation in the deprivation of constitutional rights.'" *Torres*
8    *v. Goddard*, 793 F.3d 1046, 1057 (9th Cir. 2015) (quoting *Larez v. City of Los Angeles*, 946 F.2d
9    630, 645 (9th Cir. 1991)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) ("[E]ach
10   government official, his or her title notwithstanding, is only liable for his or her own
11   misconduct.").

12   Defendants' motion for summary judgment allocates the actions at issue to the defendants
13   in this case which the Court outlines. Defendant Summit argues that the only act that concerns her
14   is the delay of travel to Palestine in 2017 after she requested that plaintiff include language on her
15   travel form. The Court finds the record also demonstrates that defendant Summit denied
16   plaintiff's trip to South Africa in 2019. (Declaration of Jennifer Summit, Dkt. No. 134, ¶ 10.) No
17   acts are attributed to defendant Summit in an official capacity. With respect to defendant Wong,
18   the only acts that concern his personal participation are decisions in connection with the
19   Presidential Task Force as well as all of plaintiff's travel requests at issue. Since defendant Wong
20   was not a personal participant in the acts related to the Ad Hoc Working Group, communications
21   with plaintiff's teaching assistant, the termination of the student assistant, or the investigation of
22   the Nazi student, defendant Wong argues that official liability attaches only if these underlying
23   acts reflect a "policy or custom" of the University.

24   Notably, plaintiff's opposition fails to address any of the nuance raised by the defendants.
25   Absent from the opposition and factual record presented by the plaintiff is any mention of
26   individual or official-capacity. Also absent is any evidence of a policy or custom, including policy
27   or custom related to the Ad Hoc Working Group, communications with plaintiff's teaching
28   assistant, the termination of the student assistant, or the investigation of the Nazi student. Plaintiff

11

1   must prove official-capacity liability under Section 1983 in one of three ways: (1) by proving that
2   an employee committed the alleged violation pursuant to a "formal governmental policy or a
3   longstanding practice or custom which constitutes the standard operating procedure" of the
4   government entity; (2) by establishing that the individual who committed the violation was an
5   "official with final policy-making authority and that the challenged action itself thus constituted an
6   act of official governmental policy;" or (3) by proving that "an official with final policymaking
7   authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette
8   v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (cleaned up). Plaintiff's failure to submit any
9   argument or evidence makes it impossible to distinguish what her theory of the case is and why
10  liability should attach to each defendant and in this regard, she fails in her burden.
11          In any event, as is discussed below, plaintiff fails to meet her burden as to the substance of
12  a First Amendment retaliation claim.

### 3. Element One: Speech On A Matter Of Public Concern

14          To establish a First Amendment retaliation claim, the plaintiff first must show that the
15  speech at issue involved a matter of public concern. The "public concern inquiry is purely a
16  question of law," *Gibson v. Office of Atty. Gen., State of California*, 561 F.3d 920, 925 (9th Cir.
17  2009) (quoting *Eng*, 552 F.3d at 1070). The scope of the public concern element is defined
18  broadly. *Desrochers v. City of San Bernardino*, 572 F.3d 703, 710 (9th Cir. 2009). In
19  determining whether speech is on a matter of public concern, courts look to "'content, form, and
20  context of a given statement, as revealed by the whole record.'" *Ulrich v. City and County of San
21  Francisco*, 308 F.3d 968, 978 (9th Cir. 2002) (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 &
22  n.7 (1983)); *Foley v. Univ of Houston Sys.*, 355 F.3d 333, 342 (5th Cir. 2003) (holding where a
23  plaintiff claims that the defendants "retaliated against her for making statements protected by the
24  First Amendment, she is required to be specific as to when her statement or statements were made,
25  to whom they were made, whether they were oral or written, and the content of those statements").
26  Foremost of these is the content of the speech. *See Desrochers*, 572 F.3d at 710.
27          Plaintiff's opposition does not focus on any particular speech, rather she broadly argues
28  that she has and continues to be an active and vocal supporter of the Palestinian community that

condemns Zionism. *See, e.g.*, Dkt. No. 149 at 11 ("There can be no legitimate doubt that Plaintiff's public activism for the rights of Palestinians, her support of the BDS Movement, and her condemnation of Israel and Zionism, even in reference to the University's president, constitute matters of public concern deserving of First Amendment protection.").

To support this broad sweeping approach, plaintiff invokes *Jordhal v. Brnovich*, 336 F. Supp. 3d 1016, 1048 (D. Ariz. 2018), *vacated and remanded on other grounds*, 789 F. App'x 589 (9th Cir. 2020). *Jordahl* concerned the likelihood that the plaintiffs would succeed in establishing that BDS boycotts were protected conduct in a pre-enforcement challenge to a law prohibiting contractors from engaging in BDS boycotts. While the district court recognized that "actions taken by Israel in relation to Palestine are matters of much political and public debate," *id*. at 1048, the case did not adopt a *per se* rule that all speech concerning Israel and Palestine are protected speech. Such a *per se* rule is inappropriate. *See Desrochers*, 572 F.3d at 717 ("The question is not whether particular subjects 'could be matters of public concern'; the question is whether '*this* [speech]' meets the test." (quoting *Connick*, 461 U.S. at 148 n.8)).

Instead, as noted above, Courts must look to the "the content, form, and context of a given statement, as revealed by the whole record." *Ulrich*, 308 F.3d at 978 (quoting *Connick*, 461 U.S. at 147-48 & n.7). Curiously, plaintiff has presented essentially no record that allows the Court to discern the content, form, and context of any given statement that she bases her claims upon. She makes bald assertions about her activity at the university without specific support. In opposition, as well as at the hearing, plaintiff primarily focused on her March 2018 statement criticizing SFSU's president for a privately funded trip to Israel on the AMED Facebook page. (Dkt. No. 149 at 10.) However, while plaintiff submits an email directing her to remove the post through her attorney (Faraj Dec., Ex. C),[8] plaintiff has not submitted the Facebook post. Failing to put forth specific instances of speech is "insufficient . . . to support a claim that any such retaliation resulted from those [instances of speech]." *Demers v. Austin*, 746 F. 3d 402, 414 (9th Cir. 2014); *Foley*,

---

[8] Defendants object to the email on the basis that it is unauthenticated and is not a true and correct copy of the email. They claim the email has been altered. A ruling on the objection is not necessary since plaintiff does not submit the underlying post in support of her claim. While the email appears to be excerpt of a chain, it is unclear how it is altered.

355 F.3d at 342. Plaintiff has not met her burden at the first step.

### 4. Element Two: Speech As A Private Citizen Or Public Employee

While failing to identify specific instances of speech at the first step is a sufficient basis to grant summary judgment, plaintiff also fails at the second step. At the second step, plaintiff bears the ultimate burden on whether the speech in question was made in her capacity as a private citizen rather than her job as a public servant. Public employees do not speak as citizens for First Amendment purposes when they "make statements pursuant to their official duties[.]" *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). If the speech was made on account of the speaker's official job duties or as a product of performing the tasks she was paid to perform, it is not protected. *Eng*, 552 F.3d at 1071. Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. *Garcetti*, 547 U.S. at 422.

In the Ninth Circuit, "speech related to scholarship or teaching" warrants special consideration because "teaching and academic writing are at the core of the official duties of teachers and professors." *Demers*, 746 F.3d at 411. Accordingly, speech that relates to teaching and academic writing is evaluated under the traditional *Pickering* test. That is, "[f]irst, the employee must show that his or her speech addressed 'matters of public concern,'" and "[s]econd, the employee's interest 'in commenting upon matters of public concern' must outweigh 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Id*. at 412 (citations omitted).

Thus, there are three possibilities: (1) if plaintiff's statement was not pursuant to her official duties at all, plaintiff was speaking as a private citizen and the *Pickering* test applies; (2) if plaintiff's statement constituted "teaching and academic writing" performed pursuant to her official duties, the *Pickering* test applies; or (3) if plaintiff's statement was pursuant to her official duties but did not constitute "teaching and academic writing," the *Garcetti* test applies and plaintiff's speech was not protected.

To determine if plaintiff was speaking as a private citizen or pursuant to her official duties, the Court must first make a factual determination as to the scope and content of plaintiff's job

14

duties, which is a "practical" inquiry, before determining the constitutional significance as a matter of law. *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 (9th Cir. 2011) (citing *Garcetti*, 547 U.S. at 421, 424). If plaintiff's statement "owes its existence to [her] professional responsibilities," it was pursuant to her official duties. *Garcetti*, 547 U.S. at 421-22.

Here again plaintiff fails to identify the "form and context" of the speech at issue, *Connick*, 461 U.S. at 147, rendering it impossible to discern which speech gave rise to which (if any) acts of retaliation. Plaintiff's opposition contends that defendants cannot allege that any of plaintiff's political speech or activity was made as a public employee, as opposed to a private citizen. This misconstrues her burden. Her failure to identify speech with the requisite specificity makes it impossible for the defendants to determine whether her speech was made in her official duties, if the statements constituted teaching and academic writing, or whether the statements did not concern teaching and academic writing at all. While she argues in opposition, without any reference to the factual record, that her speech was private, her opposition also indicates that "[s]he expressly communicated to SFSU that she would not act in administrative functions but only in scholarly, pedagogical and public engagement/service matters." (Dkt. No. 149 at 5.) The distinction is important to this case, where plaintiff contends that she was retaliated against for speech concerning "the rights of Palestinians" and the "BDS Movement," and her professional biography demonstrates "[h]er scholarship, pedagogy and public activism focus on Palestine, Arab and Muslim communities and their diasporas, race and resistance studies, transnational feminisms, gender and sexuality studies, and social movements and collective action." (Dkt. No. 132-1.)

Plaintiff's extensive reliance on attorney argument in support of her opposition, without more, does not carry her burden on summary judgment.

### 5. Element Three: Adverse Action

The final inquiry here is whether defendants "took adverse action . . . [and that the plaintiff's] speech was a 'substantial or motivating factor' behind the adverse action." *Frietag v. Ayers*, 468 F.3d 528, 543 (9th Cir. 2006) (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003)). An adverse employment action is any act likely to deter an objectively reasonable employee from making the constitutionally protected speech at issue. *See Burlington*

15

*Northern & Santa Fe Railroad v. White*, 548 U.S. 53, 68, (2006); *Coszalter*, 320 F.3d at 976 (stating that the test for adverse action in Title VII and § 1983 cases are functionally equivalent). As a general matter petty slights, minor annoyances, or "snubbing" by supervisors and co-workers are not adverse employment actions. *Burlington*, 548 U.S. at 68. However, despite defendants' suggestion to the contrary, the conduct need not rise to the level of a taking away of a benefit or privilege, and need not be of any particular type or severity, in order to be considered an "action designed to retaliate against and chill political expression." *Coszalter*, 320 F.3d at 976 (quoting *Thomas v. Carpenter*, 881 F.2d 828, 829 (9th Cir. 1989)).

Having failed to submit evidence of specific instances of speech, it is impossible for the Court to discern whether plaintiff's speech was a substantial or motivating factor behind any adverse action. Plaintiff also fails to submit evidence that several of the eight instances even occurred as alleged to create a genuine dispute of material fact. For example, plaintiff claims that the defendants tolerated the acts of third parties that criticized plaintiff. However, the only competent evidence before the Court is that the university investigated the matter and denounced the conduct. The only evidence before the Court with respect to plaintiff's trip to Palestine in 2017 is that the trip was approved. While plaintiff contends that the university took no action with respect to the "avowed Nazi" student, the only evidence before the Court is that the university investigated the matter and determined that he no longer held the views at issue. Finally, with respect to the student assistant that plaintiff alleged was "fired" after plaintiff's religious holidays protest, the only evidence before the Court demonstrated that the student was not authorized to work because plaintiff was no longer teaching, and this was communicated to the plaintiff and student *before* the protest. The Court does not need to credit factual claims that are "blatantly contradicted by the record." *Scott*, 550 U.S. at 380.

Even assuming for purpose of argument that the eight instances of conduct may qualify as adverse employment actions, the Court is left with speculation as to whether these were made in retaliation for protected speech. In an opposition to a motion for summary judgment, "[a] plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did

16

act from an unlawful motive." *Carmen*, 237 F.3d at 1028 (affirming grant of summary judgment where the plaintiff submitted no evidence of retaliatory motive). For instance, plaintiff contends that she was excluded from the Presidential Task Force and Ad Hoc Working Group in retaliation for having "stood up for students' rights" and "stood up for Palestine" after her students organized a "Know Your Rights" fair in 2017. (Abdulhadi Depo. Tr. at 283:15–284:9.) However, she does not present any evidence to support what this fair was, what it include, that it occurred, or her role. As highlighted in the background section, her account of the Presidential Task Force and Ad Hoc Working Group is contradictory and incoherent.

Plaintiff's opposition, notwithstanding the hyperbole, does identify two facts in support of her position that summary judgment is inappropriate. First, the opposition contends that "[i]n June 2016, Dr. Hong singled out Palestinian students for prosecution for the student protest against Israeli politician Nir Barakat. . . . Dr. Hong and Dr. Wong admitted this during a meeting with students that plaintiff attended as their advisors, prompting plaintiff to raise her voice." (Dkt. No. 149 at 16.) Notably, counsel's argument distorts plaintiff's declaration. While the declaration attests to the *student* speech, it does not say that it prompted plaintiff to raise her voice. (Abdulhadi Dec. ¶ 3.) It is also unclear whether she raised her voice to Dr. Hong or defendant Wong, again failing to appreciate what is required of official and individual capacity claims. Plaintiff has not submitted this speech in the record. At most, the Court would have to speculate what her voice may have been despite her well established burden on summary judgment, including whether she spoke in a public or private capacity. Second, plaintiff references her post on the AMED Facebook group, which this Court previously held cannot support her claim. In any event, plaintiff has not submitted the content of this speech. Again, absent evidence, the Court would have to speculate what the content may have been, and this instance of speech, whatever it may be, has not been connected to any of the purported adverse actions. Ultimately, these arguments do not persuade.

Plaintiff's counsel emphasizes a quote from the Ninth Circuit's decision in *Coszalter* that when adverse employment actions are "taken together, it is clear that these acts amounted to a severe and sustained campaign of employer retaliation that was 'reasonably likely to deter'

17

plaintiffs from engaging in speech protected under the First Amendment." 320 F.3d at 976-77. While the Court does not dispute that a severe campaign could deter an individual from engaging in protected speech, here plaintiff's theory is not supported by facts and is distinguishable from *Coszalter*. The plaintiff in *Coszalter* was a public employee that disclosed sewage discharge on several occasions to his employer, media outlets, and the government. *Id*. at 970. After his specific and dated instances of speech, the defendants took adverse actions against the plaintiff such as reassigning him to new duties, investigating him, subjecting him to criminal investigation, suspending or terminating his employment, and demanding that he stop speaking entirely. *Id*. at 970-73. There were 31 concrete acts put into the record supported by evidence. *Id*. Despite the evidence, the district court granted summary judgment against the plaintiff. *Id*. By contrast in this action, plaintiff has not proffered any evidence to show a severe campaign against her. The evidence does not support what her political activism was, when it was, and what the criticism may have been. Several of the acts that she does identify in her complaint are completely contradicted by unrefuted evidence. In this context, *Coszalter* does not suggest a different result.

***

In light of the foregoing, and construing the facts in the light most favorable to plaintiff, the Court determines that plaintiff has not established a First Amendment retaliation claim against defendants. Therefore, the Court **GRANTS** the motion for summary judgment.

### B. QUALIFIED IMMUNITY

Defendants also argue that they are entitled to summary judgment on the individual-capacity claims based on qualified immunity. The Court agrees and **GRANTS** summary judgment as to the individual-capacity claims.

The parties do not dispute the applicable standard for qualified immunity. "A government official is entitled to qualified immunity from a claim for damages unless the plaintiff raises a genuine issue of fact showing (1) 'a violation of a constitutional right,' and (2) that the right was 'clearly established at the time of [the] defendant's alleged misconduct." *Evans v. Skolnik*, 997 F.3d 1060, 1064 (9th Cir. 2021) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). These prongs can be decided in any order. *Pearson*, 555 U.S. 236 ("district courts . . . should be

1  permitted to exercise their sound discretion in deciding which of the two prongs of the qualified
2  immunity analysis should be addressed first in light of the circumstances in the particular case at
3  hand.").

4  As demonstrated above, plaintiff has failed to show a constitutional violation under the
5  well-established summary judgment standard applicable to First Amendment retaliation claims.
6  Therefore, granting qualified immunity is appropriate. *See Eng*, 552 F.3d at 1071 ("If the plaintiff
7  does not sufficiently allege that the state retaliated for the employee's exercise of First
8  Amendment rights, there can be no recovery, and qualified immunity should be granted.").
9  Plaintiff's focus on the last two elements of a First Amendment retaliation claim is a red herring
10 that ignores her failed burden with respect to the first three elements.

11  Since no violation of a constitutional right was shown, the Court does not need to reach the
12  second prong of the qualified immunity analysis. *Dible v. City of Chandler*, 515 F.3d 918, 930
13  (9th Cir. 2008). The Court notes that Ninth Circuit precedent recognizes the exacting constraint
14  placed on a plaintiff to demonstrate that the right was clearly established in the First Amendment
15  context. *Id.* ("But even if we were to find a violation, we would also be constrained to declare that
16  because 'whether a public employee's speech is constitutionally protected turns on a context-
17  intensive, case-by-case balancing analysis, the law regarding such claims will rarely, if ever, be
18  sufficiently 'clearly established' to preclude qualified immunity." (citation omitted)). On the
19  record presented, the plaintiff has not demonstrated how this case satisfies the exacting
20  requirement.

21 **IV.   MOTION TO SEAL**

22  "Historically, courts have recognized a 'general right to inspect and copy public records
23  and documents, including judicial records and documents.'" *Kamakana v. City & County of*
24  *Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435
25  U.S. 589, 597 & n. 7 (1978)). Accordingly, when considering a sealing request, "a 'strong
26  presumption in favor of access' is the starting point." *Id.* (quoting *Foltz v. State Farm Mut. Auto.*
27  *Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)). Parties seeking to seal judicial records relating to
28  dispositive motions bear the burden of overcoming the presumption with "compelling reasons"

19

that outweigh the right of access and the public policies favoring disclosure. *Id*. at 1178-79.

Defendants submit a narrow request to seal: (1) student information protected by the Family Educational Rights Privacy Act (FERPA), 20 U.S.C. § 1232g; and (2) disability accommodation information subject to the privacy protections of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(d)(3)(B), and its implementing regulations, 29 C.F.R. § 1630.14. As to the student emails and names that the defendants wish to seal, the Court finds that the information is irrelevant to the motion for summary judgment and FERPA's privacy protections justify sealing. Information concerning plaintiff's disabilities and requested accommodations are also narrowly tailored and adequately balance the public's interest in knowing how the Court adjudicates the claims before it against the plaintiff's need for privacy. *See Kamakana*, 447 F.3d at 1179 (9th Cir. 2006) (information "traditionally kept secret" is subject to seal); Civ. Local R. 79-5(b). Therefore, the motion to seal is **GRANTED** to the extent material is not otherwise referenced in this Order.

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendants' motions, as indicated below.

1. The Court **GRANTS** summary judgment in favor of defendant Jennifer Summit and against plaintiff on the First Amendment retaliation claim brought against Summit in an individual-capacity;

2. The Court **GRANTS** summary judgment in favor of defendant Leslie Wong and against plaintiff on the First Amendment retaliation claim brought against Wong in both his individual and official-capacity; and

3. The Court **GRANTS** the motion to seal.

This Order terminates Docket Numbers 130, 142, and 143. The Clerk is **DIRECTED** to enter judgment in favor of defendants.

**IT IS SO ORDERED.**

Dated: March 4, 2022

_____
YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE